Receipt number AUSFCC-11114515

## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

STATE OF COLORADO; STATE OF
MARYLAND; STATE OF MINNESOTA;
STATE OF HAWAIʻI; STATE OF
MICHIGAN; and STATE OF RHODE
ISLAND,

*Plaintiffs*,

v.

UNITED STATES, *acting through its
executive agency,* the Department of
Homeland Security, *and its subagency,*
the Federal Emergency Management
Agency,

*Defendant.*

**26-315 C**

Civil Case No. _____

## **COMPLAINT**

1.      Targeted violence and terrorism present real and persistent threats to

public safety throughout our country. Indeed, the President recently issued a

National Security Presidential Memorandum declaring, "The United States requires

a national strategy to investigate and disrupt networks, entities, and organizations

that foment political violence so that law enforcement can intervene in criminal

conspiracies before they result in violent political acts."[1] Yet the Department of Homeland Security ("DHS") wrongfully terminated millions in grants used to prevent against targeted violence and terrorism—not because the risks have abated or because the programs were not worthy—but rather as a means to punish certain disfavored States.

2. The need for a nationwide counterterrorism strategy is not a novel concept. Indeed, since 2020, Congress has appropriated federal funds—awarded via grants to state, local, and tribal governments, as well as to nonprofits and higher education institutions—to enhance national security and public safety across the country and at the state and local level.

3. The Targeted Violence and Terrorism Prevention ("TVTP") grant program is the only source of federal dollars dedicated to funding local, proactive targeted violence and counterterrorism efforts. TVTP funds represent a significant source of financial support for grant recipients in the Plaintiff States, including state agencies, health facilities, state universities, and state and local law enforcement.

4. TVTP grants have a direct impact on public safety. Plaintiffs use these funds to identify threats and prevent targeted attacks by violent extremists, for example, by enhancing threat assessment capabilities. TVTP funds are also used to further the efforts of local violence prevention frameworks and in academic research on how to disrupt and prevent against radicalization.

---

[1] Countering Domestic Terrorism & Organized Political Violence, 90 Fed. Reg. 47225 (Sep. 25, 2025), https://www.whitehouse.gov/presidential-actions/2025/09/countering-domestic-terrorism-and-organized-political-violence/.

5.    This funding is more necessary than ever considering the continuing tide of targeted and political violence, which has been experienced on both sides of the political aisle.

6.    In the past year alone, Minnesota has been the site of multiple, horrific attacks. On June 14, 2025, in an act of targeted political violence, a Minnesota state representative and her spouse were assassinated in their home, and another representative and his spouse were seriously injured. On August 27, 2025, two young children were killed, and 21 others injured, during a mass shooting at a Catholic school in Minneapolis. Likewise, in Colorado, on September 10, 2025, a young person who was radicalized online critically injured multiple students at a high school. That same day, Charlie Kirk was publicly assassinated on a college campus during a speaking engagement. Just over two weeks later, on September 28, 2025, four were killed and nine injured in a mass shooting and arson attack on a Church of Jesus Christ of Latter-day Saints church in Grand Blanc, Michigan. And on December 13, 2025, a mass shooting at Brown University in Providence, Rhode Island, resulted in the deaths of two students and the wounding of nine others.

7.    These events are but a few examples of recent politically motivated and targeted violence in a nation that suffered over 400 mass shootings in 2025 alone.[2]

8.    Despite the recognized importance of TVTP funding in responding to these sorts of threats, on July 21, 2025, Defendant United States, acting through DHS

---

[2] *See 2025 Summary Ledger*, Gun Violence Archive (Feb. 23, 2026), https://www.gun violencearchive.org/past-tolls.

and its subagency, the Federal Emergency Management Agency ("FEMA"), wrongfully terminated Plaintiffs' TVTP grant awards.

9.      On or around July 23, 2025, DHS abruptly notified certain TVTP grant recipients that their Fiscal Year ("FY") 2022, 2023, and 2024 awards would be terminated—mid-funding stream—effective "immediately." According to DHS, the awards "no longer effectuate[] the program goals or agency priorities" of this Administration. In DHS's view, the prior Administration's priorities resulted in the funding of "openly partisan" and "political" organizations, as well as "projects within sanctuary jurisdictions." Other than this general and boilerplate characterization—which appeared verbatim across each termination notice—DHS did not explain why it was terminating these specific TVTP awards.

10.     Defendant's actions constitute a breach of the Grant Agreements. Those Agreements contain terms covering the specific and exclusive grounds for grant termination, such as a grantee's material failure to comply. The Grant Agreements do not allow termination based on changes to "program goals or agency priorities." In other words, Defendant retroactively added a term the parties did not contemplate, negotiate for, or include in the original Grant Agreements. Then, Defendant purported to terminate the grants based on this nonexistent term.

11.     The federal government, no less than a private party, is responsible for upholding the benefit of its bargains. In this case, the United States—without legal or factual justification—breached grants awarded to the Plaintiffs. The Grant Agreements do not allow the United States to unilaterally terminate based on

partisan bias or even on shifts in priorities from one administration to the next. The terminations likewise violate the Defendant's duty of good faith and fair dealing, which lies inherent in each of the Grant Agreements.

12.    For these reasons, Plaintiffs are entitled to recover money damages for the breach of the Grant Agreements caused by Defendant's illegal actions.

## STATEMENT OF JURISDICTION

13.    This Court has jurisdiction to hear claims in excess of $10,000 against the United States founded upon any express or implied contract with the United States. 28 U.S.C. § 1491(a)(1) (the Tucker Act).[3]

## PARTIES

### I.    Plaintiffs

14.    The State of Colorado is a sovereign state in the United States of America. Colorado's TVTP grant recipient is the Colorado Department of Public Safety ("CDPS"), and an entity within CDPS, the Colorado Information Analysis Center ("CIAC"). Colorado and CDPS are represented by Philip J. Weiser, the Attorney General of the State of Colorado. The Attorney General acts as the chief legal representative of the state and is authorized by Colorado Revised Statutes § 24-31-101 to pursue this action.

15.    The State of Maryland is a sovereign state of the United States of America. Maryland's TVTP grant recipient is the Maryland Department of

---

[3] Plaintiffs file this action to obtain money damages for Defendant's breach of the TVTP Grant Agreements and do not waive any rights to challenge any agency action related to the TVTP program in any other forum. *See Nat'l Insts. of Health v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658, 2660–62 (2025) (Barrett, J., concurring).

Emergency Management ("MDEM"), a principal department of the Executive Branch of the State of Maryland. Md. Code Ann., Pub. Safety § 14-103. Maryland and MDEM are represented by Attorney General Anthony G. Brown, who is the chief legal officer of Maryland.

16.    The State of Minnesota is a sovereign state of the United States of America. Minnesota's TVTP grant recipient is the Minnesota Department of Public Safety ("MDPS"). Minnesota and MDPS are represented by Keith Ellison, the Attorney General of the State of Minnesota. The Attorney General's powers and duties include acting in federal court in matters of State concern. Minn. Stat. § 8.01.

17.    The State of Hawai'i is a sovereign state of the United States of America. Hawaii's TVTP grant recipient is the Hawai'i Department of Law Enforcement ("HDLE"), and an entity within HDLE, the Hawai'i Office of Homeland Security ("HOHS"). Hawai'i and HDLE are represented by Anne E. Lopez, the Attorney General of the State of Hawai'i. The Attorney General is Hawaii's chief legal officer and chief law enforcement officer and is authorized by Hawai'i Revised Statutes § 28-1 to pursue this action.

18.    The State of Michigan is a sovereign state of the United States of America. Michigan's TVTP grant recipient is the Michigan State Police ("MSP") Emergency Management & Homeland Security Division ("EMHSD"), which is the State Administrative Agency ("SAA"). Michigan and MSP are represented by Attorney General Dana Nessel, who is the chief law enforcement officer of Michigan.

19.    The State of Rhode Island is a sovereign state in the United States of America. Rhode Island's TVTP grant recipient is the Rhode Island Department of Health ("RIDOH"). Rhode Island and RIDOH are represented by Attorney General Peter F. Neronha. As the State's chief legal officer, the Attorney General is authorized to act on behalf of the State of Rhode Island in this matter.

## II.    Defendant

20.    The United States of America is a sovereign nation that may be named as a defendant under the Tucker Act.

21.    Defendant United States acted by and through the Department of Homeland Security, a cabinet-level Executive Agency, 5 U.S.C. §§ 101, 105, and DHS's administrator, Christopher C. Pratt, Senior Official Performing the Duties of Under Secretary.

22.    Defendant United States also acted by and through the Federal Emergency Management Agency, a federal agency housed within the Department of Homeland Security. 6 U.S.C. § 313.

## FACTUAL BACKGROUND

## I.    Background on the TVTP Grant Program.

23.    The TVTP program is, at its core, a public safety initiative, one that provides federal funding to a wide variety of grantees at the state and local level to strengthen the nation's proactive response to targeted violence and terrorism.

24.    Its origins can be traced back to 2020, when Congress first appropriated $10 million in federal funding that "shall be transferred to [FEMA] for targeted

violence and terrorism prevention grants." Consolidated Appropriations Act, 2020, Pub. L. No. 116-93, Div. D., Tit. I, 133 Stat. 2317, 2502 (2019).

25.     The TVTP program is jointly administered by DHS, FEMA, and DHS's Center for Prevention Programs and Partnerships ("CP3").[4]

26.     The TVTP program is the only dedicated source of federal funding devoted to combatting targeted violence and terrorism at the state, local, and community level. Since 2020, the Program has provided nearly $90 million across five funding cycles via 178 awards, training over 38,000 people, and reaching over 28 million people across 41 states and the District of Columbia.[5]

27.     TVTP funding has enabled numerous law enforcement initiatives in the Plaintiff States, such as data collection and monitoring, training and public outreach, and the creation of innovative deradicalization programs—all with the singular purpose of decreasing the prevalence of targeted violence and terrorism across the United States.[6]

28.     For example, in Colorado, the CDPS administers its Preventing Targeted Violence Program ("CO-PTV") through the CIAC. The CO-PTV program combats violent terrorism through, *inter alia*, increasing bystander reporting, supporting targeted violence prevention efforts, and identifying community and

---

[4] CP3 was established in 2021 as a division of DHS to administer grant programs aimed at combatting targeted violence and terrorism, to include the TVTP program.
[5] *Targeted Violence and Terrorism Prevention Grant Program*, DHS (Mar. 28, 2025), https://www.dhs.gov/tvtpgrants.
[6] CP3, *Information Sheet on the TVTP Program* (2024), https://coag.gov/app/uploads/2026/02/CP3-TVTP-Information-Sheet.pdf.

regional stakeholders. The CO-PTV program also works on the development of behavioral threat assessment and crisis management teams with local law enforcement and medical providers. Through these initiatives, the CO-PTV program provides for greater collaboration, resource sharing, information gathering, and intelligence dissemination across the State. Far from being "political" or "partisan," the CO-PTV program partners with local jurisdictions, law enforcement partners, and community members across the State of Colorado, without regard to political affiliation.

29.    In Minnesota, MDPS's Bureau of Criminal Apprehension developed a Behavioral Threat Assessment and Management ("BTAM") team that provides threat mitigation, investigation, and training initiatives statewide. BTAM helps local law enforcement, mental health professionals, school administrators, faith leaders, and other community partners to recognize indicators of risk for targeted violence. BTAM shares information and implements de-escalation strategies to mitigate such incidents. Like Colorado's program, BTAM is nonpartisan and serves the entire State of Minnesota.

30.    In Hawaiʻi, the Office of Homeland Security completed the nation's first-ever Targeted Violence Prevention Implementation Plan in 2024, which contributes to the comprehensive and sustainable structure of its TVTP Program. Among other things, the Implementation Plan specifically addresses online aspects of domestic violent extremism, recidivism reduction, and reintegration capabilities. HOHS plans to expand its capabilities for providing information and support related to threats

against government officials. HOHS also aims to extend best practices, training, and resources for targeted violence prevention to the U.S. territory of Guam. Strengthening this aspect of Guam's security helps ensure the preparedness of the Pacific region against potential targeted violence and terrorism activities. HOHS is nonpartisan and serves the entire State of Hawai'i.

31.    Michigan's TVTP grants have funded the creation of a BTAM in that state. This pilot program in Ingham, Eaton, and Clinton counties and consists of a multidisciplinary, community-based team that follows a public health model to combat targeted violence and terrorism. With its FY 23 TVTP grant funding, Michigan intended to build on this foundation, which was established with its FY 21 TVTP funding, by offering additional training, engaging in further outreach, and continuing to raise public awareness of warning signs, resources, and reporting avenues. There have been multiple successful interventions since the creation of the BTAM. And, throughout both the FY 21 and FY 23 grant cycles, DHS praised MSP's BTAM program and asked MSP to share its successes with other states.

32.    In Rhode Island, TVTP grant funding established the Rhode Island Safe Places and People Project ("RISPP") to cultivate safe spaces and identify safe adults by promoting individual and societal protective factors. RISPP's activities increase societal awareness of risk factors, improve youth resilience and societal connectedness, strengthen state infrastructure, and promote media literacy. RISPP aims to provide trainings to local schools and community members to raise societal awareness, convene an advisory group in the State, educate the public on nonviolence

theory and resources available, align with other State initiatives such as the Rhode Island Suicide Prevention State Plan, and leverage other funding streams to support violence and terrorism prevention initiatives. RISPP's target population is youth and school staff/faculty, as prevention starts early. By working with youth and those who serve them, RISPP aims to make a larger long-term impact on the safety in the State.

33.     Likewise, in Maryland and Rhode Island, state agencies such as the emergency management and the health department used TVTP funds to mitigate threats of radicalism in their states.

34.     As pertinent to the present lawsuit, Congress appropriated $20 million in funding for the 2022 TVTP Program; $20 million in funding for the 2023 TVTP Program; and $18 million in funding for the 2024 FY TVTP Program. Consolidated Appropriations Act, 2022, Pub. L. No. 117-103, Div. F, Tit. I, 136 Stat. 49, 312; Consolidated Appropriations Act, 2023, Pub. L. No. 117-328, Div. F., Tit. I, 136 Stat. 4459, 4726 (2022); Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, Div. C., Tit. I, 136 Stat. 406, 594.

35.     On or around April 14, 2022, DHS released a Notice of Funding Opportunity ("NOFO") for FY 2022 TVTP Grants. Applications were due to be submitted by May 18, 2022, with funding announcements projected by September 30, 2022. *See* Ex. 8.

36.    On or around March 7, 2023, DHS released a NOFO for FY 2023 TVTP Grants. Applications were due to be submitted on April 25, 2023, with funding announcements projected in September 2023.[7] *See* Ex. 9.

37.    On or around April 15, 2024, DHS released a NOFO for FY 2024 TVTP Grants. Applications were due to be submitted by May 17, 2024, with funding announcements projected in September 2024.[8] *See* Ex. 10.

## II.    Plaintiffs are awarded TVTP grants in FY 2022, 2023, and 2024, and they perform their obligations in full.

38.    Plaintiffs received Notices of Awards ("NOAs") and executed Grant Award Notifications ("GANs" or "Grant Agreements") for 2022 FY TVTP funds as follows:

a.    <u>Maryland</u>: On or around September 22, 2022, MDEM received a signed Grant Agreement (EMW-2022-GR-00056-S01) in the amount of $693,522.00, with a performance period initially running from October 1, 2022 through September 30, 2024. MDEM timely accepted the Grant Agreement. The Grant Agreement was subsequently amended by both parties to extend the period of performance, with the latest Grant Amendment (EMW-2022-GR-00056-A11), having an effective date of May 23, 2025, extending the budget

---

[7] Press Release, DHS, *DHS Releases FY23 Targeted Violence and Terrorism Prevention Notice of Funding* (Mar. 7, 2023), https://www.dhs.gov/archive/news/2023/03/07/dhs-releases-fy23-targeted-violence-and-terrorism-prevention-notice-funding.
[8] Press Release, DHS, *Applications Open for DHS FY24 Targeted Violence and Terrorism Prevention Grants* (Apr. 15, 2024), https://www.dhs.gov/archive/news/2024/04/15/applications-open-dhs-fy24-targeted-violence-and-terrorism-prevention-grants.

end date to September 30, 2025. A true and exact copy of Maryland's latest Grant Amendment is attached as Exhibit 1.

39.     Plaintiffs received NOAs and executed Grant Agreements for 2023 FY TVTP funds as follows:

a.      Colorado: On or around August 24, 2023, CDPS received a NOA in the amount of $775,720.00. CDPS timely accepted the Grant Agreement via the FEMA's electronic grant management system on or around September 7, 2023. Colorado's 2023 TVTP Award Summary has a performance period of October 1, 2023 through September 30, 2025. A true and exact copy of Colorado's 2023 Grant Agreement (EMW-2023-GR-00129) is attached as Exhibit 2.

b.      Minnesota: On or around August 23, 2023, MDPS received a NOA in the amount of $700,659.00. MDPS timely accepted the Grant Agreement via FEMA's electronic grant management system on or around September 13, 2023. Minnesota's 2023 TVTP award has a performance period of October 1, 2023 through September 30, 2025. A true and exact copy of Minnesota's 2023 Grant Agreement (EMW-2023-GR-00052-S01) is attached as Exhibit 3.

c.      Michigan: On or around August 28, 2023, MSP received a NOA in the amount of $425,845.00. MSP timely accepted the Grant Agreement via FEMA's electronic grant management system on or around August 29, 2023. Michigan's 2023 TVTP award has a performance period of October 1, 2023,

through September 30, 2025. A true and exact copy of Michigan's 2023 Grant Agreement (EMW-2023-GR-00015-S01) is attached as Exhibit 4.

40.     Plaintiffs received NOAs and executed Grant Agreements for 2024 FY TVTP funds as follows:

    a.     Colorado: On or around September 9, 2024, the Colorado Department of Public Safety received a NOA in the amount of $427,915.00. CDPS timely accepted the Grant Agreement via FEMA's electronic grant management system on or around September 26, 2024. Colorado's 2024 TVTP award has a performance period of October 1, 2024 through September 30, 2026. A true and exact copy of Colorado's 2024 Grant Agreement (EMW-2024-GR-05398) is attached as Exhibit 5.

    b.     Hawai'i: On or around August 28, 2024, HDLE received an NOA in the amount of $803,330.00. HDLE timely accepted the Grant Agreement via FEMA's electronic grant management system on or around September 4, 2024. Hawaii's 2024 TVTP award has a performance period of October 1, 2024 through September 30, 2026. A true and exact copy of Hawaii's 2024 Grant Agreement (EMW-2024-GR-05133) is attached as Exhibit 6.

    c.     Rhode Island: On or around September 10, 2024, RIDOH received an NOA in the amount of $637,065.00. RIDOH timely accepted the Grant Agreement via FEMA's electronic grant management system. Rhode Island's 2024 TVTP award has a performance period of October 1, 2024 through

September 30, 2026. A true and exact copy of Rhode Island's 2024 Grant Agreement (EMW-2024-GR-05250) is attached as Exhibit 7.

41.    Relying on the obligated funds, grantees in the Plaintiff States established work plans, proposed budgets, and drew down TVTP funds on approved projects up until July 21, 2025.

42.    At all times, Plaintiffs complied with their obligations under the Grant Agreements.

43.    Prior to July 21, Plaintiffs and their grantees had not received any notice or warning from DHS of any material non-compliance.

## III.    Terms of the Grant Agreements & Incorporated Documents.

44.    The Grant Agreements are substantially similar in substance and format, differing only in the identity of the recipients, the date of the awards, the amount of funding, and the precise programs awarded.

45.    The Grant Agreements evidence offer, acceptance, and mutual consideration on both sides of the transaction. Specifically, Defendant agrees to provide funding to the award recipients in the amounts detailed; Plaintiffs, in turn, agree to fulfill the project objectives described in their awards and to be bound by certain reporting, notification, and other monitoring requirements.

46.    Each of the GANs was executed by the recipients via a duly authorized representative with legal authority to accept the award and, on behalf of Defendant, by a designated FEMA signatory official.

47.    The GANs do not expressly disavow money damages. Thus, monetary damages are presumptively available in the event of a breach. *See Columbus Reg'l Hosp. v. United States*, 990 F.3d 1330, 1338 (Fed. Cir. 2021).

48.    The Grant Agreements incorporate the NOFOs, which do not list changes to "program goals or agency priorities" as a permitted ground for termination.

    a.    <u>FY 2022 NOFO</u>: Article XXXV of the 2022 Grant Award Letter incorporates the terms of the associated NOFO. The FY 2022 NOFO provides that "FEMA may terminate a federal award in whole or in part for one of the following reasons": (a) "Noncompliance;" (b) "With the Consent of the Recipient;" or (c) on "Notification by the Recipient." *See, e.g.*, Ex. 8 at pp. 32–33 (Section H, Subsection 1).

    b.    <u>FY 2023 NOFO</u>: Article XXIX of the 2023 TVTP GAN incorporates the terms of the associated NOFO. The FY 2023 NOFO provides that "FEMA may terminate a federal award in whole or in part for one of the following reasons": (a) "Noncompliance;" (b) "With the Consent of the Recipient;" or (c) on "Notification by the Recipient." *See, e.g.*, Ex. 9 at pp. 37–38 (Section H, Subsection 1).

    c.    <u>FY 2024 NOFO</u>: Article 28 of the 2024 TVTP GAN also incorporates the terms of the associated NOFO. Like the previous years, the FY 2024 NOFO provides that "FEMA, in consultation with CP3, may terminate a federal award in whole or in part for one of the following reasons":

(a) "Noncompliance;" (b) "With the Consent of the Recipient;" or (c) on "Notification by the Recipient." *See, e.g.*, Ex. 10 at pp. 37–38 (Section H, Subsection 1).

49.    None of the TVTP NOFOs provide as a ground for termination that the award "no longer effectuate[s] the program goals or agency priorities."

50.    The Grant Agreements and NOFOs for all three years also incorporate the DHS Standard Terms. *See, e.g.*, Ex. 1 (FY 2022 GAN, Article VIII); Ex. 8 at p. 24 (FY 2022 NOFO, Article F.2.a); Exs. 2, 3, 4 (FY 2023 GANs, Articles I, XLIV); Ex. 9 at p. 27 (FY 2023 NOFO, Article F.2.a.); Exs. 5, 6, 7 (FY 2024 GANs, Articles 1, 43); Ex. 10 at p. 26 (FY 2024 NOFO, Article F.2.a.).

51.    Specifically, all three years' NOFOs specify that, "All *successful applicants* for DHS grant and cooperative agreements *are required to comply* with DHS Standard Terms and Conditions, which are available online at [an embedded hyperlink]. The applicable DHS Standard Terms and Conditions will be those in effect at the time the award was made. *What terms and conditions will apply for the award will be clearly stated in the award package at the time of award.*" Exs. 8, 9, 10 (emphasis added).

52.    The DHS Standard Terms that were in effect for FYs 2022, 2023, and 2024, in turn, are silent as to any grounds for termination. Exs. 11, 12, 13.

## IV.    The Uniform Guidance.

53.    The terminations cite to a provision of the Uniform Guidance to justify Defendant's actions. However, the Uniform Guidance, which includes 2 C.F.R. § 200.340, does not permit the grant terminations, because the Uniform Guidance

was not incorporated as a condition to any of the Grant Agreements. And, even if the Uniform Guidance applied, 2 C.F.R. § 200.340 is subject to key limitations that Defendant has completely ignored.

54. Article IX of the FY 2022 GANs, titled "Assurances, Administrative Requirements, Cost Principles, Representations and Certifications," provides that "DHS financial assistance *recipients* are required to follow the *applicable* provisions of the Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards located at Title 2, Code of Federal Regulations (C.F.R.) Part 200 and adopted by DHS at 2 C.F.R. Part 3002." Ex. 1 (emphasis added).

55. Article II(II) of the FY 2023 GANs, titled "Assurance, Administrative Requirements, Cost Principles, Representations and Certifications," provides that "DHS financial assistance *recipients* are required to follow the *applicable* provisions of the Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards located at Title 2, Code of Federal Regulations (C.F.R.) Part 200 and adopted by DHS at 2 C.F.R. Part 3002." Exs. 2, 3, 4 (emphasis added).

56. Similarly, Article 2 of the FY 2024 GANs, titled "General Acknowledgments and Assurances," provides in pertinent part that "*Recipients* are required to follow the *applicable* provisions of the Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards in effect as of the federal award date and located at 2 C.F.R. Part 200 and adopted by DHS at 2 C.F.R. § 3002.10." Exs. 5, 6, 7 (emphasis added).

57.    As of the dates the GANs were executed, the pertinent Uniform Guidance provisions related to Termination were identical and read as follows:

<u>2 C.F.R. 200.340</u>:

Subsection (a)(2): "The Federal award may be terminated in whole or in part . . . . By the Federal awarding agency or pass-through entity, to the greatest extent authorized by law, if an award no longer effectuates the program goals or agency priorities."

Subsection (b): "A Federal awarding agency *should clearly and unambiguously specify termination provisions applicable* to each Federal award, *in applicable regulations or in the award*, consistent with this section." (emphasis added).

58.    Subsection (b) of Part 200.340's notice to recipients regarding the grounds for termination is further buttressed in the Uniform Guidance's provision related to the "Information to be contained in a Federal award":

<u>2 C.F.R. 200.211</u>

Subsection (c)(1)(v): "Federal awarding agencies *must* make recipients aware, *in a clear and unambiguous manner*, of the termination provisions in § 200.34, *including the applicable termination provisions in the Federal awarding agency's regulations or in each Federal award*." (emphasis added).

59.    The Uniform Guidance also required DHS to maintain written procedures for processing objections, hearings, and appeals associated with grant terminations. *See* 2 C.F.R. § 200.342.

60.    The meaning and intent of these clauses in the Uniform Guidance can be further understood through the Office of Management and Budget's ("OMB") statements during the rulemaking process. In 2020, when OMB first promulgated Part 200.340, it explained that the provision permitted federal agencies to terminate grants where "additional evidence reveals that a specific award objective is *ineffective* at achieving program goals," or where "additional evidence . . . cause[s] the Federal awarding agency to *significantly question the feasibility* of the intended objective of the award." Guidance for Grants and Agreements 85 Fed. Reg. 49506, 49507–08 (Aug. 13, 2020) (emphasis added). OMB further advised in the final guidance that the provision did not permit agencies to terminate grants arbitrarily. *Id*. at 49509–10.[9]

## V.    DHS unilaterally terminates Plaintiffs' Grant Agreements in violation of their termination provisions.

61.    Reading all of these materials together, several principles are clear:

a.    First, the Grant Awards did not incorporate the Uniform Guidance in full. Instead, only grant *recipients* were "required to follow the *applicable* provisions" of the Uniform Guidance.

---

[9] Part 200.340 was further revised in 2023 and 2024. In final guidance issued in 2024, OMB reiterated its 2020 statements and further clarified that a federal agency can terminate "*pursuant to the terms and conditions of the Federal award*, including, to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities." 2 C.F.R. § 200.340(a)(4) (emphasis added).

b. Second, neither the Grant Awards, nor the NOFOs, nor the DHS Standard Terms, gave "clear and unambiguous" notice to Plaintiffs that Defendant could unilaterally terminate the grants if it later determined that the projects "no longer effectuate [] program goals or agency priorities."

c. Third, nothing in the grants or incorporated documents indicated in any manner that the grounds for termination listed in the NOFOs were anything other than the exclusive grounds permitted.

d. And finally, OMB's public rulemaking process confirms that an agency like DHS cannot use the Uniform Guidance's "agency priorities" term as a pretext to arbitrarily terminate a program. That means Defendant cannot terminate funding as a way to punish a state for its exercising its sovereign policy judgment.

62. These principles cut to the core of Plaintiffs' expectation interests. Plaintiffs reasonably expected that the terms laid out in the Grant Agreements at the time they were executed would be those applied to their funds throughout the grants' lifecycle. Defendant's attempt to unilaterally and retroactively amend this material term of the contract, especially without any advance notice or opportunity to object, upset Plaintiffs' reasonable expectations. It also deprived the Plaintiffs of critical information that they could and would have taken into account when they decided to accept the TVTP funds and how they chose to use those funds.

63. Despite the clear terms applying to the Grant Agreements described above, on or around July 23, 2025, Plaintiff States' grant recipients received by email

termination notices signed by Christopher C. Pratt, Senior Official Performing the Duties of Under Secretary at the U.S. Department of Homeland Security, advising that grantees' TVTP awards were being terminated by DHS/FEMA "effective immediately." Ex. 14; *see also CIAC Notice: Targeted Violence and Terrorism Prevention Grant Cancellation*, CIAC (Aug. 12, 2025), https://dhsem.colorado.gov/press-release/ciac-notice-targeted-violence-and-terrorism-prevention-grant-cancellation.

64.     The boilerplate termination letters, which are substantially similar in substance and format, further advised that, "From the date of receipt of this letter . . . your organization is not permitted to incur any additional costs under this award."[10] Ex. 14. DHS advised grantees to complete all closeout procedures under the Uniform Administrative Requirements. Ex. 14.

65.     Across the board, DHS also stated "The decision by DHS/FEMA to terminate your award is **not appealable**." (emphasis in original). Ex. 14.

66.     The notices state:

The previous agency priorities under the Fiscal Years 2021-2024 Targeted Violence and Terrorism Prevention Grant Program, aimed at preventing targeted violence and terrorism, resulted in the funding of openly partisan and political organizations as well as the funding of projects within sanctuary jurisdictions that blatantly disregarded federal immigration law. For these reasons, DHS/FEMA is terminating your award.

Ex. 14.

---

[10] At least some of the letters are dated before the date they were transmitted. For example, Colorado's termination letters are dated July 21, but they were not sent until July 23. Defendant has not responded to Colorado's inquiries confirming the effective date of termination.

67.     DHS claimed that its actions were defensible under the terms and conditions of the GANs. According to DHS, "These terms and conditions include[d] the Targeted Violence and Terrorism Prevention Notice of Funding Opportunity (NOFO) that applies to your grant and 2 C.F.R. § 200.340(a)(2) (2020), which authorizes DHS/FEMA to terminate your award 'to the greatest extent authorized by law, if an award no longer effectuates the program goals or agency priorities.'" Ex. 14.

68.     The notifications did not accuse Plaintiffs of noncompliance or of violating the terms and conditions of the federal awards in any way.

69.     At the time of the terminations, Plaintiffs were compliant with their obligations under the Grant Agreements, and they have remained compliant, notwithstanding Defendant's wrongful terminations.

70.     Plaintiffs did not consent to termination of the Grant Agreements, whether in whole or in part.

71.     The terminations interfered with the Plaintiffs' performance and destroyed the Plaintiffs' reasonable expectations regarding the fruits of the contracts.

72.     Defendant's unlawful actions with respect to the TVTP grants are in line with numerous public announcements and directives issued by this Administration since January, in which the President has threatened repeatedly to punish so-called "sanctuary" jurisdictions through the calculated withholding and termination of federal funding.[11]

---

[11] *See, e.g.*, Exec. Order No. 14159, *Protecting the American People against Invasion*, § 17, 90 Fed. Reg. 8443, 8446 (Jan. 30, 2025); DHS, Memorandum from Secretary

73.     In recent months, multiple federal courts have struck down various means by which this Administration has attempted to withhold or terminate grants from states that have fallen into disfavor with the President. *See, e.g.*, *Illinois v. FEMA*, 801 F. Supp. 3d 75, 81–83 (D.R.I. 2025) (holding that DHS cannot lawfully condition the award of federal funds on "requiring state and local recipients to certify that they will assist in enforcing federal immigration law"); *Illinois v. Noem*, No. 1:25-cv-00495, 2025 WL 3707011 (D.R.I. Dec. 22, 2025) (granting States' motion for summary judgment and permanently enjoining DHS and FEMA from withholding federal funds); *Michigan v. Noem*, No. 6:25-cv-02053, 2025 WL 3720147 (Dec. 23, 2025) (issuing injunctive relief against population certification hold and performance period change); *New York v. Noem*, No. 25-cv-08106, 2025 WL 2939119 (S.D.N.Y. Oct. 16, 2025) (injunction issued against FEMA for wrongful withholding of transit security funds because city was allegedly a "sanctuary city" for noncitizens); *Illinois v. Vought*, No. 26-cv-01566, 2026 WL 404014 (N.D. Ill. Feb. 12, 2026) (temporary restraining order issued where termination of public-health grants due to unrelated policy dispute).

74.     The Administration's current opinion of these grants and its disfavor of certain states is not a valid basis to terminate the grants.

---

Kristi Noem to All DHS Agencies and Offices, *Restricting Grant Funding for Sanctuary Jurisdictions* (Feb. 19, 2025), https://coag.gov/app/uploads/2026/02/DHS-Sanctuary-Jurisdictions-Memo.pdf; Press Release, Dep't of Just., *Justice Department Publishes List of Sanctuary Jurisdictions* (Aug. 5, 2025), https://www.justice.gov/opa/pr/justice-department-publishes-list-sanctuary-jurisdictions.

## VI.    DHS executes closeout process and harms Plaintiffs.

75.    Shortly after receiving the termination letters, Plaintiff States' electronic grant management accounts reflected a zero-dollar balance.

76.    Apart from costs incurred as part of the closeout process, the Plaintiffs have not been able to access their TVTP funds since on or around July 21, 2025. In certain instances, some Plaintiffs have been unable to secure reimbursement for costs incurred during the days between the terminations' purported effective date and the date the decisions were communicated to the grantees. Likewise, some Plaintiffs have been unable to secure a response from Defendant, let alone reimbursement, for valid closeout costs.

77.    As a consequence of Defendant's breach and the abrupt loss of their TVTP awards, Plaintiffs have suffered and will continue to suffer direct and consequential damages. For example, Colorado had not budgeted for state funding to maintain its PTV program without federal grants and, because of Defendant's illegal conduct, the State has been forced to search for alternative funding sources in order to avoid terminating two important Regional Prevention Coordinator positions.[12]

78.    Because its grant was terminated, Minnesota had to cancel a conference scheduled for the fall of 2025, where the State planned to train law enforcement and encourage statewide collaboration to help investigate and mitigate threats of targeted violence. Minnesota also now cannot fill a criminal intelligence analyst position.

---

[12] *CIAC Notice: Targeted Violence and Terrorism Prevention Grant Cancellation*, CIAC (Aug. 12, 2025), https://dhsem.colorado.gov/press-release/ciac-notice-targeted-violence-and-terrorism-prevention-grant-cancellation.

Additionally, Minnesota has reached out to Defendant multiple times about reimbursement for expenditures occurred from May 1, 2025 to July 21, 2025 (prior to the termination notice). Defendant has not responded.

79.     Hawaiʻi had to eliminate one (unfilled) position and draw on alternative funds to support another.

80.     In Michigan, with its grant termination, the BTAM program—which had been expanded statewide—is in flux. Michigan relied on its TVTP funding to pay for the MSP staff supporting its program. Defendant's abrupt termination has caused a great deal of uncertainty and no permanent funding for positions. Further, after receiving the termination letter, MSP requested reimbursement for allowable costs incurred prior to termination; however, that request has gone unanswered. MSP also cannot submit a final closeout report because Defendant has not approved its last progress report (despite MSP's request that it do so), essentially eliminating the possibility of recouping those funds as a result of Defendant's silence.

81.     Each of the Plaintiff States have incurred and will continue to incur substantial monetary damages. To the extent Plaintiffs have been unable to expend TVTP funds as anticipated under the Grant Agreements, the damages are, at a minimum, at least equal to the amount of funds that have been wrongfully withheld.

<u>**CLAIMS FOR RELIEF**</u>

**COUNT I**

**Breach of the TVTP Grant Agreements**

82.     Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs.

83. The elements of a claim for breach of contract are: "(1) a valid contract between the parties, (2) an obligation or duty arising out of the contract, (3) a breach of that duty, and (4) damages caused by the breach." *San Carlos Irrigation & Drainage Dist. v. United States*, 877 F.2d 957, 959 (Fed. Cir. 1989); *Trauma Serv. Grp. v. United States*, 104 F.3d 1321, 1326 (Fed. Cir. 1997).

84. The TVTP Grant Agreements are binding contracts that contemplate money damages.

85. The TVTP Grant Agreements were entered into by DHS officials with authority to bind the United States and, on the other side of the contract, by duly authorized representatives of the grant recipients with legal authority to accept the award on behalf of the Plaintiff States.

86. Under the TVTP Grant Agreements, DHS agreed to provide Plaintiffs with specified amounts of federal funds in exchange for Plaintiffs' agreement to accomplish the goals of their TVTP programs.

87. Each Plaintiff State satisfied its obligations under its TVTP Grant Agreement and the incorporated documents.

88. DHS and the Plaintiffs mutually agreed to limit DHS's termination rights to those laid out in the Notice of Funding Opportunities, as incorporated in the Grant Agreements. Specifically, the termination provision limited DHS's termination authority to (a) "Noncompliance;" (b) "With the Consent of the Recipient;" or (c) on "Notification by the Recipient."

89.     The TVTP Grant Agreements did not incorporate the "agency priorities" provision of the Uniform Guidance, let alone clearly and unambiguously, and thus do not permit unilateral termination by the federal government based on changes to Defendant's "program goals or agency priorities."

90.     Because DHS unilaterally terminated the grants based on a provision of the Uniform Guidance that was not incorporated into the Grant Agreements, DHS breached the contracts.

91.     In the alternative, even if the TVTP Grant Agreements had incorporated the Uniform Guidance's "agency priorities" termination provision, DHS never explained why these specific programs fail to accomplish agency objectives, beyond raising general and boilerplate concerns about "partisan" programming and "sanctuary" jurisdictions. The arbitrary grounds provided by DHS do not meet that provision's standard, provide a grant-specific lawful basis for termination, or align with OMB's interpretative guidance during the rulemaking process that was used to promulgate the Uniform Guidance.

92.     Thus, even if the Uniform Guidance applies, DHS still breached the contracts.

93.     Moreover, had the TVTP Grant Agreements fully incorporated the Uniform Guidance, then DHS further breached the contracts by failing to provide the required opportunities to object and challenge the action. *See* 2 C.F.R. § 200.342.

94.     DHS's breach of each TVTP Grant Agreement has caused damages to the Plaintiff States in an amount to be determined at trial.

95.    The Grant Agreements at issue, and their status at the time of the illegal

terminations, are summarized as follows:

| State | Grant No. | Award Amount | Amount Drawn Down as of this Filing | Award Funds Withheld/ Remaining |
|---|---|---|---|---|
| Colorado (FY 2023) | EMW-2023-GR-00129 | $775,720.00 | $438,075.79 | $337,644.21 |
| Colorado (FY 2024) | EMW-2024-GR-05398 | $427,915.00 | $0.00 | $427,915.00 |
| Maryland (FY 2022) | EMW-2022-GR-00056-S01 | $693,522.00 | $425,936.51 | $267,585.49 |
| Minnesota (FY 2023) | EMW-2023-GR-00052-S01 | $700,659.00 | $255,347.72 | $445,311.28 |
| Hawai'i (FY 2024) | EMW-2024-GR-05133 | $803,330.00 | $40,419.64 | $762,910.36 |
| Michigan (FY 2023) | EMW-2023-GR-00015-S01 | $425,845.00 | $359,209.72 | $66,635.28 |

| State | Grant No. | Award Amount | Amount Drawn Down as of this Filing | Award Funds Withheld/ Remaining |
|---|---|---|---|---|
| Rhode Island (FY 2024) | EMW-2024-GR-05250 | $637,065.00 | $96,925.88 | $540,139.12 |
| | | | Total: | $2,848,140.74 |

## COUNT II

### Breach of the Duty of Good Faith and Fair Dealing

96.　Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs.

97.　"Every contract, including one with the federal government, imposes upon each party an implied duty of good faith and fair dealing in its performance and enforcement." *Dobyns v. United States*, 915 F.3d 733, 739 (Fed. Cir. 2019) (citing *Metcalf Constr. Co. v. United States*, 742 F.3d 984, 990 (Fed. Cir. 2014)).

98.　The implied duty of good faith and fair dealing "includes 'the duty not to interfere with the other party's performance and not to act so as to destroy the reasonable expectations of the other party regarding the fruits of the contract.'" *Id.* (quoting *Centex Corp. v. United States*, 395 F.3d 1283, 1304 (Fed. Cir. 2005)).

99.　Each TVTP Grant Agreement is a binding contract that contemplates money damages.

100.　The TVTP Grant Agreements were entered into by DHS officials with authority to bind the United States and, on the other side of the contract, by duly

authorized representatives of the grant recipients with legal authority to accept the award on behalf of the Plaintiff States.

101.    Under the TVTP Grant Agreements, DHS agreed to provide Plaintiffs with specified amounts of federal funds in exchange for Plaintiffs' agreement to accomplish the goals of their TVTP programs.

102.    Each Plaintiff satisfied its obligations under its TVTP Grant Agreement and the incorporated documents.

103.    Plaintiffs entered into the TVTP Grant Agreements under the reasonable expectation that DHS would comply with the terms of the Grant Agreements and that DHS would act in good faith and deal fairly with Plaintiff States. To the extent the Uniform Guidance applies, Plaintiffs also reasonably relied on guidance issued by OMB during the rulemaking process, which advised that terminations for policy changes would not be applied arbitrarily nor capriciously, and that any terminations would abide by the Uniform Guidance's notice and comment provisions.

104.    DHS breached the TVTP Grant Agreements' implied duty of good faith and fair dealing by: (1) unilaterally terminating the contracts on a basis that was not provided for in the contracts; (2) unilaterally terminating the contracts on the basis of a regulation that was not provided for in the contracts; (3) refusing to provide advance notice of the termination and refusing to provide an opportunity to appeal DHS's decision administratively; (4) terminating the agreement without adequate explanation; (5) terminating the agreement using disjunctive, boilerplate language

that deprived grantees of sufficient information to understand the reasons for termination; (5) preventing Plaintiffs from spending money already awarded to them; (6) imposing new terms and conditions on Plaintiffs; (7) closing out awards before resolving Plaintiff States' disputes or attempting to meaningfully engage with Plaintiffs to resolve this dispute outside of litigation; and (8) failing to engage with Plaintiffs in a timely fashion during the closeout process.

105.    DHS's actions destroyed the reasonable expectations of the Plaintiffs regarding the fruits of the contract.

106.    DHS's actions targeted Plaintiffs for the specific purpose of eliminating an express, bargained-for benefit in the contracts. DHS's actions were based on an erroneous and unreasonable interpretation of the Grant Agreements and the regulations.

107.    As demonstrated by the unsupported, vague, and politically motivated allegations in the form termination letters, DHS's actions also were premised on a factually erroneous, unreasonable, biased, and partisan opinion of both the States and the nature of programs that they support with TVTP funds.

108.    Upon information and belief, DHS's actions were intended to interfere with Plaintiffs' operation of TVTP programs, despite lacking any legal authority to do so.

109.    DHS's terminations caused Plaintiffs to suffer substantial damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in their favor and against Defendant as follows:

    a.  Awarding money damages to Plaintiffs in an amount to be determined at trial;

    b.  Awarding Plaintiffs interest and their reasonable fees, costs, and expenses, including attorney's fees, pursuant to 28 U.S.C. § 2412; and

    c.  Granting such other relief as the Court deems just and proper.

Dated: February 25, 2026.                    Respectfully Submitted,

**PHILIP J. WEISER**                         **ANTHONY G. BROWN**
ATTORNEY GENERAL OF COLORADO                  ATTORNEY GENERAL OF MARYLAND

By: */s/ Sarah H. Weiss*                      By: */s/ Robert Brewer*
David Moskowitz                              Robert Brewer*
    *Deputy Solicitor General*               Steven Goldstein*
Sarah H. Weiss                                   *Assistant Attorneys General*
    *Senior Assistant Attorney*              Office of the Attorney General
    *General*                                200 Saint Paul Place
1300 Broadway, 10th Floor                     Baltimore, Maryland 21202
Denver, CO 80203                              (410) 576-7057
(720) 508-6000                                rbrewer@oag.maryland.gov
david.moskowitz@coag.gov                      sgoldstein@ag.maryland.gov
sarah.weiss@coag.gov

*Counsel for the State of Colorado*          *Counsel for the State of Maryland*

**KEITH ELLISON**
ATTORNEY GENERAL OF MINNESOTA

By: */s/ Katherine Bies*
Katherine Bies*
Brian S. Carter
  *Special Counsels*
445 Minnesota Street, Suite 1400
St. Paul, Minnesota 55101
(651) 300-0917
katherine.bies@ag.state.mn.us
brian.carter@ag.state.mn.us

*Counsel for the State of Minnesota*

**DANA NESSEL**
Attorney General of Michigan

By: */s/ Neil Giovanatti*
Neil Giovanatti
  *Assistant Attorney General*
Michigan Department of Attorney
General
525 W. Ottawa
Lansing, MI 48909
(517) 335-7603
giovanattin@michigan.gov

*Counsel for the State of Michigan*

**ANNE E. LOPEZ**
ATTORNEY GENERAL OF HAWAIʻI

By: */s/Kalikoʻonālani D. Fernandes*
David D. Day*
  *Special Assistant Attorney General*
Kalikoʻonālani D. Fernandes*
  *Solicitor General*
Hawaiʻi Department of the Attorney General
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
david.d.day@hawaii.gov
kaliko.d.fernandes@hawaii.gov

*Counsel for the State of Hawaiʻi*

**PETER F. NERONHA**
ATTORNEY GENERAL OF RHODE ISLAND

By: */s/ Chelsea Baittinger*
Chelsea Baittinger*
  *Special Assistant Attorney General*
Sarah Rice*
  *Deputy Chief, Public Protection Bureau*
150 South Main Street
Providence, RI 02903
(401) 274-4400
cbaittinger@riag.ri.gov
srice@riag.ri.gov

*Counsel for the State of Rhode Island*

*\* Pro hac vice application forthcoming*