**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

STATE OF COLORADO; STATE OF
MARYLAND; STATE OF MINNESOTA;
STATE OF HAWAI'I; STATE OF
MICHIGAN; and STATE OF RHODE
ISLAND,

                         *Plaintiffs*,

       v.

UNITED STATES, *acting through its
executive agency*, the Department of
Homeland Security, *and its subagency*, the
Federal Emergency Management Agency,

                         *Defendant.*

No. 26-315
(Judge Somers)

<u>**MEMORANDUM IN SUPPORT OF PLAINTIFFS'
MOTION FOR PARTIAL SUMMARY JUDGMENT**</u>

**TABLE OF CONTENTS**

TABLE OF CONTENTS..............................................................................................i

TABLE OF AUTHORITIES......................................................................................ii

INTRODUCTION ..................................................................................................... 1

QUESTIONS PRESENTED ...................................................................................... 3

PROCEDURAL BACKGROUND ............................................................................. 3

LEGAL STANDARD ............................................................................................... 4

STATEMENT OF THE CASE.................................................................................. 5

    I.     Stipulations of fact & law. ....................................................................... 5

    II.    Other pertinent portions of the record. .................................................... 6

ARGUMENT ........................................................................................................... 11

    I.     DHS/FEMA breached the grant agreements when it terminated the grants based on an impermissible ground. ............................................................................... 11

        A.    The grant agreements specified the three grounds for termination in the expressly incorporated NOFOs. ...................................................................................... 12

        B.    The grant agreements do not otherwise incorporate "agency priorities" as a basis for termination. ................................................................................................ 14

        C.    Even if the Uniform Guidance had been fully incorporated, the grants could only be terminated on grounds that appeared clearly and unambiguously. ................................. 19

    II.    Plaintiffs are entitled to expectation damages for the breach, including the remaining balance of the grants. ................................................................................. 22

CONCLUSION ....................................................................................................... 28

i

# TABLE OF AUTHORITIES

**Cases**

*Agility Def. & Gov't Servs., Inc. v. United States*,
115 Fed. Cl. 247 (2014)...................................................................................................... 4

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) .......................................................................................................... 4

*Beta Sys., Inc. v. United States*,
838 F.2d 1179 (Fed. Cir. 1988) .................................................................................. 15, 16

*Boaz Hous. Auth. v. United States*,
994 F.3d 1359 (Fed. Cir. 2021) .................................................................................. 22, 27

*Butler v. United States,*
139 Fed. Cl. 617 (2018)..................................................................................................... 5

*Callaway Golf Co. v. Acushnet Co.*,
576 F.3d 1331 (Fed. Cir. 2009) ....................................................................................... 19

*Coast Fed. Bank, FSB v. United States*,
323 F.3d 1035 (Fed. Cir. 2003) ....................................................................................... 12

*Dana Corp. v. United States*,
174 F.3d 1344 (Fed. Cir. 1999) ......................................................................................... 5

*Glendale Fed. Bank, FSB v. United States*,
239 F.3d 1374 (Fed. Cir. 2001) ....................................................................................... 26

*Greene Cnty. Guidance Ctr., Inc. v. Greene-Clinton Comm. Mental Health Bd.*,
482 N.E. 2d 982 (Ohio. App. 1984) ................................................................................ 27

*Hearts with Haiti, Inc. v. Kendrick*,
No. 13-cv-00039, 2015 WL 4065185 (D. Me. July 2, 2015)........................................... 27

*Hercules Inc. v. United States*,
292 F.3d 1378 (Fed. Cir. 2002) ....................................................................................... 13

*Hills Materials Co. v. Rice*,
982 F.2d 514 (Fed. Cir. 1992) ......................................................................................... 21

*Hous. Auth. v. United States*,
125 Fed. Cl. 557 (2016)................................................................................................... 22

*Hughes Commc'ns Galaxy, Inc. v. United States*,
998 F.2d 953 (Fed. Cir. 1993)........................................................................................... 5

*Ingham Reg. Med. Ctr. v. United States*,
    163 Fed. Cl. 384 (2022) .................................................................................. 14, 16

*Leeward Constr., Inc. v. United States*,
    160 Fed. Cl. 446 (2022) ........................................................................................ 16

*Legal Aid Soc. of N.Y. v. United States*,
    92 Fed. Cl. 285 (2010) ........................................................................................... 14

*Lynch v. United States*,
    292 U.S. 571 (1934) ............................................................................................... 11

*McAbee Constr. Inc. v. United States*,
    97 F.3d 1431 (Fed. Cir. 1996) .......................................................................... 15, 16

*Mingus Constructors, Inc. v. United States*,
    812 F.2d 1387 (Fed. Cir. 1987) .............................................................................. 5

*Nat'l Insts. of Health v. Am. Pub. Health Ass'n*,
    145 S. Ct. 2658 (2025) ............................................................................................ 2

*Nicholson v. United States*,
    29 Fed. Cl. 180 (1993) ........................................................................................... 14

*Northrop Grumman Info. Tech., Inc. v. United States*,
    535 F.3d 1339 (Fed. Cir. 2008) ........................................................................ 16, 18

*Olivia v. United States*,
    961 F.3d 1359 (Fed. Cir. 2020) ............................................................................. 11

*Pennhurst State Sch. & Hosp. v. Halderman*,
    451 U.S. 1 (1981) ................................................................................................... 21

*Peterson Indus. Depot, Inc. v. United States*,
    140 Fed. Cl. 485 (2018) ......................................................................................... 16

*Premier Off. Complex of Parma, LLC v. United States*,
    916 F.3d 1006 (Fed. Cir. 2019) ............................................................................... 5

*Pub. Hous. Auths. Dirs. Ass'n v. United States*,
    130 Fed. Cl. 522 (2017) ......................................................................................... 19

*S. Cal. Edison v. United States*,
    58 Fed. Cl. 313 (2003) ........................................................................................... 12

*Smithson v. United States*,
    847 F.2d 791 (Fed. Cir. 1988) ............................................................................... 17

*Spectre Corp. v. United States*,
178 Fed. Cl. 1 (2025)..........................................................................................15, 16

*SSA Marine, Inc. v. United States*,
77 Fed. Cl. 662 (2007)............................................................................................. 5

*St. Christopher Assocs. v. United States*,
511 F.3d 1376 (Fed. Cir. 2008) ............................................................................. 16

*Stovall v. United States*,
94 Fed. Cl. 336 (2010)........................................................................................... 11

*The Sinking Fund Cases*,
99 U.S. 700 (1878) ................................................................................................ 28

*Trident Ctr. v. Conn. Gen. Life Ins. Co.*,
847 F.2d 564 (9th Cir. 1988)................................................................................. 15

*United Pac. Ins. Co. v. United States*,
497 F.2d 1402 (Ct. Cl. 1974)........................................................................... 13, 21

*United States v. Winstar Corp.*,
518 U.S. 839 (1996) .............................................................................................. 12

*Winstar Corp. v. United States*,
64 F.3d 1531 (Fed. Cir. 1995)............................................................................ 1, 22

**Other Authorities**

Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* (2012) .... 14

Grover C. Grismore, Principles of the Law of Contracts § 105 (1947)...................................... 13

Restatement (Second) of Contracts § 235(2) (1981) ..................................................................... 1

Restatement (Second) of Contracts § 344 (1981)................................................................... 22, 23

Restatement (Second) of Contracts § 347 (1981)........................................................... 23, 26, 27

Williston on Contracts § 63:1 (4th ed.)......................................................................................... 1

Williston on Contracts § 64:1 (4th ed.)....................................................................................... 23

**Rules**

RCFC 56(a)..................................................................................................................................... 4

**Regulations**

2 C.F.R. § 200.211 (2020) ................................................................................................. 20

2 C.F.R. § 200.340 (2020) ......................................................................................... passim

78 Fed. Reg. 78590 (Dec. 26, 2013) ................................................................................ 15

85 Fed. Reg. 49506 (Aug. 13, 2020) ............................................................................... 20

**<u>INTRODUCTION</u>**

Last summer, the United States issued boilerplate letters abruptly terminating federal grants awarded to the Plaintiff States under the Targeted Violence and Terrorism Prevention Program (the "TVTP Grants"). According to the government, the grantees' awards were terminated because they "no longer effectuate[] the program goals or agency priorities" of the Administration. The government ordered that the terminations take effect "immediately." The Administration took these actions not because the risks have abated, or because the programs were not worthy, but rather to punish certain disfavored states.

The undisputed facts reveal a fundamental problem: The grant agreements identified the grounds for termination but changes to "program goals or agency priorities" were not on that list. The hornbook-level legal conclusion is clear: Termination on a basis not permitted by the agreements is a quintessential breach of contract. *Winstar Corp. v. United States*, 64 F.3d 1531, 1545 (Fed. Cir. 1995) ("Failure to perform a contractual duty when it is due is a breach of the contract." (citing Restatement (Second) of Contracts § 235(2) (1981)); Williston on Contracts § 63:1 (4th ed.) ("A breach of contract is a failure, without legal excuse, to perform any promise that forms the whole or part of the contract.").

The terminations yanked the rug out from under Plaintiffs' feet. Plaintiffs' TVTP Grants were a critical source of funding for the States' advancement of public safety measures and their pursuit of proactive initiatives to counter and prevent violent extremism in their communities. Plaintiffs used their grants in accordance with the Notices of Funding Opportunities ("NOFOs") and with their binding grant agreements.

For example, several of the states used TVTP funds to stand up and operate advanced intelligence fusion centers within their states. These sorts of centers collect, integrate, centralize, and disseminate various sources of intel on potential violent threats. Other states funded analyst

1

and behavioral threat assessment and management ("BTAM") positions. The states used their funds to put on law enforcement and community trainings, designed to improve the proactive identification and reporting of individuals posing a risk for targeted violence. Plaintiffs also used TVTP funds to promote community engagement efforts and public awareness campaigns. These kinds of predicative and preventive interventional efforts were precisely those Congress intended when it created the TVTP program. Indeed, Plaintiffs' TVTP-funded programs closely resemble those of other awardees whose funds were not terminated.

What is more, the terminations coincided with a rash of targeted violence and terrorism that continues to present a recognized, persistent, and insidious threat across the United States, including in the Plaintiff States. *See* Dkt.1 at ¶¶ 5–7 ("Complaint") (detailing mass shootings, assassinations, and violent attacks related to targeted violence and terrorism in Plaintiff States, all within the past year alone). These types of threats are real; they transcend political affiliation and party politics; and there was no reason for the government to act against Plaintiffs and their programs as Defendant did.

Even setting this troubling backdrop aside, this case ultimately presents nothing more than a straightforward breach of contract, albeit one that arises in perhaps less well-trodden territory for the Court of Federal Claims: federal grant programs. Nevertheless, the terms of the grant agreements are clear; the principles of contract construction are basic and familiar; and Plaintiffs are injured grantees who seek standard expectation damages. As such, this Court is well positioned to decide the issues at hand. *See Nat'l Insts. of Health v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658, 2660–62 (2025) (Barrett, J., concurring) (directing grant termination claims based on contract to the Court of Federal Claims).

Defendant's breach destroyed Plaintiffs' reasonable expectations under the grant agreements, upended Plaintiffs' fiscal planning, and undermined a traditionally strong state and federal partnership in a critical area of public import. Plaintiffs are entitled to full relief for the government's breach of its contractual obligations. They respectfully ask the Court to grant partial summary judgment and rule that, as a matter of law, Defendant breached the TVTP Grant agreements and that Plaintiffs are entitled to expectation damages that include the remaining unpaid balances of their grants, which is the amount they would have received but for the United States' breach.[1]

## QUESTIONS PRESENTED

1.    Did the United States breach its agreements with Plaintiffs when it terminated the TVTP Grants based on supposed changes to "agency priorities," when the agreements did not permit termination based on "agency priorities"?

2.    Are Plaintiffs entitled to the unpaid balance of the grants as expectation damages, which is the amount they would have received but for the United States' breach?

## PROCEDURAL BACKGROUND

On February 25, 2026, Plaintiffs filed the two-count Complaint alleging that the United States, acting by and through the Department of Homeland Security ("DHS") and its subagency, the Federal Emergency Management Agency ("FEMA"), breached contracts (Count 1) and acted in contravention of its implied duties of good faith and fair dealing (Count 2) when it terminated Plaintiffs' TVTP Grants on noncontemplated, unjustified, and factually inaccurate pretenses. Dkt. 1. The terminations were made only worse by the manner in which Defendant executed

---

1    Plaintiffs may seek incidental and consequential damages, but those damages are premature and beyond the scope of this briefing. Plaintiffs reserve the right to assert such damages at the appropriate juncture, or they may choose to waive such damages should the Court award the remaining value of the grants as Plaintiffs' expectation damages.

3

them, which also deprived Plaintiffs of requisite notice, any meaningful opportunity to respond, and any avenue for relief short of the judicial process. *Id*.

The parties do not dispute two of the four elements for a breach of contract claim (existence of a contract and duty). The only remaining issues in dispute are therefore limited to breach and damages. The parties have conferred and agree that there are threshold legal issues ripe for review, including: (1) whether the contracts permit termination based on "agency priorities"; and (2) the appropriate measure of damages.

Accordingly, under the scheduling order proposed by the parties, *see* Dkt. 19, Plaintiffs now move for partial summary judgment as to liability, specifically, on the grounds that the United States breached the terms of the grant agreements by terminating based on "agency priorities," when the contracts did not permit termination on this basis.[2] Plaintiffs also seek the Court's ruling that, as a matter of law, Plaintiffs are entitled to expectation damages, which includes the unpaid balance of the grants.

## LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." RCFC 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Agility Def. & Gov't Servs., Inc. v. United States*, 115 Fed. Cl. 247, 250 (2014).

---

2    Defendant intends to cross move for summary judgment on this issue, as detailed in the same scheduling order. Should the Court grant summary judgment in favor of Plaintiffs on liability, the parties will confer regarding next steps. Even so, if the Court were to rule in favor of Defendant on whether the grant agreements permit termination based on "agency priorities," that would not fully resolve liability. Plaintiffs' Complaint contains additional theories of breach of contract and breaches of the duties of good faith and fair dealing, as well as damages arguments, which would require discovery and are premature for disposition at this juncture. *See* Dkt. 1 at ¶¶ 91–93, ¶¶ 96–109.

4

"The moving party bears the burden of establishing the absence of any genuine issue of material fact and all significant doubt over factual issues must be resolved in favor of the party opposing summary judgment." *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1390 (Fed. Cir. 1987). "However, the party opposing summary judgment must show an evidentiary conflict on the record; mere denials or conclusory statements are not sufficient." *Id*. at 1390–91.

Because contract claims often turn, as here, only on undisputed facts and pure questions of law, they are "generally amenable to summary judgment." *Premier Off. Complex of Parma, LLC v. United States*, 916 F.3d 1006, 1011 (Fed. Cir. 2019) (internal quotations omitted); *Butler v. United States,* 139 Fed. Cl. 617, 625 (2018) (citing *Dana Corp. v. United States*, 174 F.3d 1344, 1347 (Fed. Cir. 1999)). Contract interpretation is likewise "a question of law, which may be decided on summary judgment." *SSA Marine, Inc. v. United States*, 77 Fed. Cl. 662, 665 (2007) (citing *Hughes Commc'ns Galaxy, Inc. v. United States*, 998 F.2d 953, 957 (Fed. Cir. 1993)).

<u>**STATEMENT OF THE CASE**</u>

**I.      Stipulations of fact & law.**

The parties have reached the following joint stipulations, for purposes of this motion only:

1.      The TVTP Grant agreements at issue in Plaintiffs' Complaint are attached as Exhibits 1–7.

2.      The TVTP Grant agreements constitute valid contracts.

3.      The grants give rise to duties on the part of both DHS/FEMA and Plaintiffs. Those duties are subject to DHS/FEMA's right to terminate the grants. Exs. 1–7. The parties dispute the scope of DHS/FEMA's rights with respect to termination.

4.      The relevant terms and conditions in the grant agreements are materially similar in substance, differing only in the identity of the recipients, the date of the awards, the amount of funding, and the precise programs awarded. *See* Exs. 1–7.

5.      Each Grant Award Notification ("GAN") expressly incorporates by reference DHS/FEMA's Notices of Funding Opportunity. Ex. 1 (FY 2022 GAN, Article XXXV); Exs. 2, 3, 4 (FY 2023 GANs, Article XXIX); Exs. 5, 6, 7 (FY 2024 GANs, Article 28). The FY 2022 NOFO, the FY 2023 NOFO, and the FY 2024 NOFO are attached as Exhibits 8, 9, and 10, respectively, of Plaintiffs' motion.

6.      The NOFOs also provide that "All successful applicants for DHS grant and cooperative agreements are required to comply with DHS Standard Terms and Conditions, which are available online . . . ." Ex. 8 (FY 2022 NOFO, Article F.2.a); Ex. 9 (FY 2023 NOFO, Article F.2.a); Ex. 10 (FY 2024 NOFO, Article F.2.a). DHS's Standard Terms and Conditions for FY 2022, FY 2023, and FY 2024 are attached to Plaintiffs' motion as Exhibits 11, 12, and 13, respectively.

7.      On or around July 23, 2025, DHS and FEMA issued termination notices to each of the Plaintiffs' grantees which are identical in substance. The notices of termination are attached as Exhibits 15–24 of Plaintiffs' motion.

## II.    Other pertinent portions of the record.

Plaintiffs used their TVTP funding to make their states safer, precisely as Congress intended, and as DHS/FEMA directed them to do. Plaintiffs relied on these funds to implement programs intended to strengthen interagency cooperation and intelligence gathering. Ex. 22 Decl. of Michael Haney ¶¶ 9–10, 23; Ex. 23 Decl. of Frank J. Pace ¶¶ 9–10, 20; Ex. 24 Decl. of Russell J. Strickland ¶ 6, 9, 17; Ex. 25 Decl. of Kevin Sweeney ¶¶ 9, 13–16, 24–25; Ex. 26 Decl. of Stefanie Dressen ¶¶ 8–9, 18; Ex. 27 Decl. of Kristine Campagna ¶¶ 7–8, 10, 19, 21. TVTP funds were used

to help the states detect, assess, and mitigate threats of targeted violence and terrorism before harm occurred. Ex. 22 ¶ 10; Ex. 23 ¶ 10; Ex. 24 ¶ 9; Ex. 25 ¶¶ 9–10; Ex. 26 ¶¶ 8–9; Ex. 27 ¶¶ 8, 10. Take, for example, several states' use of TVTP Grants to launch and maintain intelligence fusion centers. Fusion centers serve as critical hubs for gathering, centralizing, and disseminating intelligence across law enforcement, health professionals, community partners and affiliated public-safety organizations. Their purpose is to ensure that essential threat information flows efficiently among potential intelligence sources and law enforcement. *See* Ex. 23 ¶ 6; Ex. 26 ¶ 8; Ex. 25 ¶ 7; Ex. 24 ¶ 6. TVTP funds also paid for the salaries of intelligence analysts embedded within these centers, as well as regional prevention coordinators and members of BTAM teams. *See* Ex. 26 ¶ 8; Ex. 22 ¶¶ 9–10; Ex. 27 ¶ 8. These professionals—spanning law enforcement, mental health professionals, educators, faith leaders, and other community-based organizations—work collaboratively to identify behavioral indicators and other warning signs of targeted violence. *See, e.g.*, Ex. 25 ¶ 7; Ex. 27 ¶ 10. Their intervention efforts, often deliberately quiet and preventative in nature, are proven to reduce incidents of mass violence, hate crimes, and ideologically motivated attacks. *See* Ex. 22 ¶ 8; Ex. 26 ¶ 9.

Beyond analytic resources and intervention personnel, Plaintiffs also used their grant awards to conduct law-enforcement trainings, community presentations, advertising and public awareness efforts, and additional outreach necessary to ensure threat-mitigation practices were understood and utilized throughout their states. *See* Ex. 22 ¶ 10; Ex. 26 ¶ 8; Ex. 24 ¶ 9; Ex. 27 ¶ 8. Indeed, a review of the publicly available grant abstracts on DHS's website shows that Plaintiffs' programs track closely the same types of activities funded in other states whose grants were not

terminated.[3] Ex. 22 ¶ 14. The indisputable evidence thus demonstrates that Plaintiffs carried out their grants appropriately and in accordance with congressional appropriations and with the agency directives of their grant agreements.

Plaintiffs reasonably relied on these funds in developing their programs and budgets. Ex. 22 ¶ 17; Ex. 23 ¶ 15; Ex. 24 ¶ 12; Ex. 25 ¶ 19; Ex. 26 ¶ 13; Ex. 27 ¶ 14. They also reasonably relied on the government's representations regarding the limited grounds for which their grants could be cancelled. Ex. 22 ¶ 15–16; Ex. 23 ¶ 13–14; Ex. 24 ¶ 10–11; Ex. 25 ¶ 17–18; Ex. 26 ¶11– 12; Ex. 27 ¶ 12–13. The grant agreements expressly incorporated "Termination Provisions" laid out in the NOFOs. Those controlling provisions enumerated three, and only three, grounds upon which DHS/FEMA could terminate an award: "FEMA may terminate a federal award in whole or in part for one of the following reasons:" "a. Noncompliance"; "b. With the Consent of the Recipient"; or "c. Notification by the Recipient." Ex. 8 (FY 2022 NOFO, Article H.1); Ex. 9 (FY 2023 NOFO, Article H.1); Ex. 10 (FY 2024 NOFO, Article H.1). The grant agreements did not contain any other termination provision. *Id.* Notably, none of the grant agreements or incorporated NOFOs listed the federal government's determination that a program "no longer effectuate[s] the program goals or agency priorities" as a permissible ground for termination. *See* Exs. 1–10.

DHS's Standard Terms and Conditions for FY 2022, FY 2023, and FY 2024 likewise did not contain any provision addressing grounds for termination of an award. *See* Exs. 11–13. DHS

---

3    *See, e.g., compare* FY 2024 TVTP Grantee Abstracts https://www.dhs.gov/fiscal-year-2024-targeted-violence-and-terrorism-prevention-grantee-abstracts (grant to Palm Beach County Sheriff's Office paid for, among other preventative efforts, the salary of a criminal intelligence analyst, crisis intervention and bystander trainings, and public awareness campaigns, and grant to Texas's Southwest Fusion Center supported intelligence coordination and BTAM teams); FY 2023 TVTP Grantee Abstracts, https://www.dhs.gov/fiscal-year-2023-targeted-violence-and-terrorism-prevention-grantee-abstracts (grant to Mississippi Office of Homeland Security to support law enforcement and community outreach trainings and to establish threat assessment teams).

later added a termination provision to its Standard Terms and Conditions in FY 2025, Ex. 14, but later versions of the Standard Terms and Conditions do not retroactively apply to the grants at issue.

Despite this clear contractual framework, DHS/FEMA issued termination notices that stated Plaintiffs' awards were terminated "effective immediately." The termination notices instructed grantees not to incur any additional costs under the awards, and they were directed to complete all closeout procedures. Exs. 15–21. The termination notices stated: "The decision by DHS/FEMA to terminate your award is **not appealable**." Exs. 15–21 at p. 2 (emphasis in original).

The termination notices incorrectly claimed: "DHS/FEMA is making this termination pursuant to the terms and conditions of the grant award. These terms and conditions [of the grant agreements] include[d] the [TVTP NOFO] that applies to your grant and 2 C.F.R. § 200.340(a)(2) (2020), which authorizes DHS/FEMA to terminate your award 'to the greatest extent authorized by law, if an award no longer effectuates the program goals or agency priorities.'" Exs. 15–21 at p. 1. The termination notices stated that the terms and conditions of the grant included 2 C.F.R. § 200.340 (a)(2), but this provision was not included in the terms and conditions, nor was it referenced in the incorporated NOFOs. Exs. 8–13. Yet that statement constituted the entirety of DHS/FEMA's reasoning for the terminations provided to Plaintiffs. *See id.* And, as the termination letters made clear, since the agency's decisions were not appealable, Plaintiffs had no meaningful means, short of bringing this lawsuit, to challenge DHS/FEMA's actions.

Critically, none of the boilerplate termination notices accuse any grantee of noncompliance or violation of the terms and conditions of the awards. *See* Exs. 15–21. And Plaintiffs and their grantees did not consent to or request termination of their grant agreements, whether in whole or in part. Ex. 22 ¶ 19; Ex. 23 ¶ 17; Ex. 24 ¶ 14; Ex. 25 ¶ 21; Ex. 26 ¶ 15; Ex. 27 ¶ 16. Each Plaintiff

anticipated using and would have used the entirety of their grant awards, but for the government's wrongful termination. Ex. 22 ¶ 17; Ex. 23 ¶ 15; Ex. 24 ¶ 12, 20; Ex. 25 ¶ 19; Ex. 26 ¶ 13; Ex. 27 ¶ 14.

As a consequence, each Plaintiff State has been harmed. Ex. 22 ¶ 23; Ex. 23 ¶ 18; Ex. 24 ¶ 17; Ex. 25 ¶ 22; Ex. 26 ¶ 18. Given the critical nature of the public safety work supported by the TVTP funding, some states managed to reallocate funding to keep their programs going, at least in part. Other states had to discontinue their programs entirely. But regardless of how each state handled the budgetary shortfall, each Plaintiff describes programmatic adjustments, reductions, cancellations, and adverse public safety impacts caused by the loss of their TVTP funding. Ex. 22 ¶ 26; Ex. 23 ¶ 20; Ex. 24 ¶ 20; Ex. 25 ¶ 24–25; Ex. 26 ¶ 20; Ex. 27 ¶ 19–20. Some states have left important law enforcement and public safety positions vacant; others have been forced to terminate personnel. Ex. 22 ¶ 23; Ex. 23 ¶ 20(a); Ex. 25 ¶ 24. Trainings, conferences, and community engagement efforts have been cancelled. Ex. 23 ¶ 20; Ex. 24 ¶ 17; Ex. 26 ¶ 18. And these negative outcomes were caused by Defendant's actions. But for the government's breach, Plaintiffs would have upheld their ends of the grant agreements, but now, they cannot do so. Ex. 22 ¶ 25; Ex. 23 ¶ 23; Ex. 24 ¶ 20; Ex. 25 ¶ 19; Ex. 26 ¶ 20; Ex. 27 ¶ 21.

As reflected in the record, including the grant agreements and attached declarations, the seven grants at issue and the unpaid funding remaining are summarized as follows:

| State | Fiscal Year | Grant No. | Amount | Award Funds Remaining |
|---|---|---|---|---|
| Colorado | FY 2023 | EMW-2023-GR-00129 | $775,720.00 | $337,644.21 |
| Colorado | FY 2024 | EMW-2024-GR-05398 | $427,915.00 | $427,915.00 |

10

| State | Fiscal Year | Grant No. | Amount | Award Funds Remaining |
|---|---|---|---|---|
| Maryland | FY 2022 | EMW-2022-GR-00056-S01 | $693,522.00 | $267,585.49 |
| Minnesota | FY 2023 | EMW-2023-GR-00052-S01 | $700,659.00 | $445,311.28 |
| Hawai'i | FY 2024 | EMW-2024-GR-05133 | $803,330.00 | $762,910.36 |
| Michigan | FY 2023 | EMW-2023-GR-00015-S01 | $425,845.00 | $66,635.28 |
| Rhode Island | FY 2024 | EMW-2024-GR-05250 | $637,065.00 | $540,139.12 |
| | | | **Total Unpaid Awards:** | **$2,848,140.74** |

Ex. 22 ¶ 16; Ex. 23 ¶ 16; Ex. 24 ¶ 15; Ex. 25 ¶ 22; Ex. 26 ¶ 16; Ex. 27 ¶ 17.

## **ARGUMENT**

**I.      DHS/FEMA breached the grant agreements when it terminated the grants based on an impermissible ground.**

"When the United States enters into contract relations, its rights and duties therein are governed generally by the law applicable to contracts between private individuals." *Lynch v. United States*, 292 U.S. 571, 579 (1934). A breach of contract claim against the federal government has four elements: (1) a valid contract; (2) duties or obligations arising under the contract; (3) a breach of those duties or obligations; and (4) resulting damages. *Stovall v. United States*, 94 Fed. Cl. 336, 345 (2010); *Olivia v. United States*, 961 F.3d 1359, 1362 (Fed. Cir. 2020). The parties have stipulated as a matter of law to the first two elements, and they reserve further argument as to fourth element following determination of this threshold briefing. *See supra*. As shown here,

11

however, the undisputed facts clearly establish all four elements, and Plaintiffs are entitled to their requested relief.

DHS breached its contractual obligations to Plaintiffs by terminating the TVTP Grants on a basis not permitted by the parties' agreements. In the termination letters, DHS/FEMA stated that it was terminating the grants "pursuant to the terms and conditions of the grant award," and, in particular, based on a purported change in "agency priorities." Exs. 15–21. But the terms and conditions did not permit termination on this basis. DHS/FEMA cited two authorities for the termination in the termination letters—the TVTP NOFOs and 2 C.F.R. § 200.340(a)(2) (2020)— stating that they were "include[d]" in the terms and conditions and allowed termination based on changed "agency priorities." *Id.* Neither is correct. First, the TVTP NOFOs were expressly incorporated into the terms and conditions of the contract, and the NOFOs specified the limited grounds permitted for termination of the grants in a section titled "Termination Provisions." And "agency priorities" was not one of the three permissible grounds listed. Second, the TVTP Grant terms and conditions did not incorporate 2 C.F.R. § 200.340(a)(2) (2020) specifically nor the 2 CFR Part 200 regulations in full. Because termination based on changes to "agency priorities" therefore was not permitted by the terms and conditions, DHS/FEMA breached the contracts.

### A.   The grant agreements specified the three grounds for termination in the expressly incorporated NOFOs.

"[O]rdinary principles of contract construction and breach" that apply to any contract action between private parties apply likewise to government contracts. *United States v. Winstar Corp.*, 518 U.S. 839, 871 (1996). "The interpretation of a contract 'begins with the language of the written agreement.'" *S. Cal. Edison v. United States*, 58 Fed. Cl. 313, 321 (2003) (quoting *Coast Fed. Bank, FSB v. United States*, 323 F.3d 1035, 1038 (Fed. Cir. 2003)).

12

Here, the grant agreements contain incorporated termination provisions. Each grant agreement expressly and unambiguously incorporated the NOFOs. Ex. 1 (FY 2022 GAN, Article XXXV); Exs. 2, 3, 4 (FY 2023 GANs, Article XXIX); Exs. 5, 6, 7 (FY 2024 GANs, Article 28). Each NOFO contains a section titled "Termination Provisions" that lays out the grounds for termination. Ex. 8 (FY 2022 NOFO, Article H.1); Ex. 9 (FY 2023 NOFO, Article H.1); Ex. 10 (FY 2024 NOFO, Article H.1). Plaintiffs accepted the awards on those terms, performed, and did not receive any notices of noncompliance throughout the duration of their awards.

The NOFOs plainly specify three, and only three, exclusive reasons that the award may be terminated. They state: "FEMA may terminate a federal award in whole or in part for *one of the following reasons*" and then list:

"a. Noncompliance";

"b. With the Consent of the Recipient"; or

"c. Notification by the Recipient."

Ex. 8 (FY 2022 NOFO, Article H.1); Ex. 9 (FY 2023 NOFO, Article H.1); Ex. 10 (FY 2024 NOFO, Article H.1) (emphasis added).

"In contract interpretation, the plain and unambiguous meaning of a written agreement controls." *Hercules Inc. v. United States*, 292 F.3d 1378 (Fed. Cir. 2002) (citation omitted). Further, the inclusion of a specified list excludes any other reasons for termination. Under the doctrine of *expressio unius est exclusio alterius*, it is well-settled that "[w]here certain things are specified in detail in a contract, other things of the same general character relating to the same matter are generally held to be excluded by implication." Grover C. Grismore, Principles of the Law of Contracts § 105, at 164 (1947); *see, e.g.*, *United Pac. Ins. Co. v. United States*, 497 F.2d 1402, 1405 (Ct. Cl. 1974) (applying the rule of *expressio unius est exclusio alterius* to find when

13

language specifically provided where flashings were to be installed, it implied intention not to require installation of flashings elsewhere); *Nicholson v. United States*, 29 Fed. Cl. 180, 196 (1993) (explaining where particular things are specified in a contract, others of the same general character are impliedly excluded); *Legal Aid Soc. of N.Y. v. United States*, 92 Fed. Cl. 285, 299 (2010) (similar).

The "Termination Provisions" section is unambiguous and clear. And it does not include "agency priorities" as a basis for termination. To find otherwise would change the plain meaning of the contract, ignore the doctrine of *expressio unius est exclusio alterius*, and require adding language to the parties' agreement that does not appear. Ultimately, "it is no more the court's function to revise by subtraction than by addition." *Ingham Reg. Med. Ctr. v. United States*, 163 Fed. Cl. 384, 400 (2022) (quoting Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 174 (2012)). That is the beginning and the end of the question of breach. Because the government terminated the agreements on a basis not allowed under the parties' agreement, Defendant breached.

**B.      The grant agreements do not otherwise incorporate "agency priorities" as a basis for termination.**

Notwithstanding the plain language of the agreements, the termination notices asserted "this termination [is] pursuant to the terms and conditions of the grant award." Ex. 15–24 at p. 1. The notices further state these "terms and conditions include the [NOFO] and 2 C.F.R. § 200.340(a)(2) (2020), which authorizes DHS/FEMA to terminate your award 'to the greatest extent authorized by law, if an award no longer effectuates the program goals or agency priorities.'" *Id.* As addressed above, nothing in the NOFO authorized termination for "agency priorities." Further, contrary to the termination notices, the "terms and conditions" of the grant did not include 2 C.F.R. § 200.340(a)(2) (2020) anywhere as a term or condition of the agreement, let

14

alone as a basis for termination. That provision is part of OMB's "Uniform Guidance" for grant awards, located at 2 C.F.R. Part 200.[4] *See generally* 78 Fed. Reg. 78590 (Dec. 26, 2013). OMB's Uniform Guidance is not, and does not purport to be, binding on the public or on any grant recipient. Instead, it contains various instructions, suggestions, and limitations on federal agencies. Federal agencies *may* incorporate Uniform Guidance provisions, such as accounting principles, into the terms and conditions of their grant agreements, but they are not required to do so. In order to give Part 200, or any of its individual components, such effect, the agency must clearly and unambiguously incorporate Part 200, or selected portions of it, into a grant agreement.

In this case, DHS/FEMA did not incorporate by reference either 2 C.F.R. § 200.340(a)(2) (2020), or the Uniform Guidance as a whole, into the terms and conditions of the grant agreements.[5] The law is well settled that if a contract's "provisions are clear and unambiguous, they must be given their plain and ordinary meaning, and the court may not resort to extrinsic evidence to interpret them." *McAbee Constr. Inc. v. United States*, 97 F.3d 1431, 1435 (Fed. Cir. 1996) (citation omitted); *Beta Sys., Inc. v. United States*, 838 F.2d 1179, 1183 (Fed. Cir. 1988). "To permit otherwise would cast 'a long shadow of uncertainty over all transactions' and contracts." *McAbee Constr.*, 97 F.3d at 1435 (quoting *Trident Ctr. v. Conn. Gen. Life Ins. Co.*, 847 F.2d 564, 569 (9th Cir. 1988)); *see also Spectre Corp. v. United States*, 178 Fed. Cl. 1, 10

---

4    Unlike procurement contracts, grant agreements are not governed by the Federal Acquisition Regulation ("FAR"). Whereas Congress has statutorily required the development and use of the FAR for procurement contracts, *e.g.*, 41 U.S.C. § 1121, there is no similar statutory scheme for grants. Instead, Congress only authorized the Director of OMB to "issue supplementary interpretative guidelines to promote consistent and efficient use of . . . grant agreements . . . and cooperative agreements." 31 U.S.C. § 6307(1).

5    Because the Uniform Guidance is comprised of, in significant part, instructions to agencies, it would generally not make any sense to incorporate the Uniform Guidance as a whole into a grant agreement.

(2025). Just as a court cannot change the plain meaning of terms by adding language, nor can it change the contract's language through reference to extrinsic evidence. *Beta Sys.*, 838 F.2d at 1183; *see also McAbee Constr.*, 97 F.3d at 1435; *Ingham Reg. Med. Ctr.*, 163 Fed. Cl. 384; *Spectre Corp.*, 178 Fed. Cl. at 10. The only way around this rule is if the extrinsic evidence was clearly and unambiguously incorporated into the contract itself. Here, it was not.

As an initial principle, the Federal Circuit has cautioned against "find[ing] that statutory or regulatory provisions are incorporated into a contract with the government unless the contract explicitly provides for their incorporation." *St. Christopher Assocs. v. United States*, 511 F.3d 1376, 1384 (Fed. Cir. 2008). "[T]here is simply no Federal Circuit precedent holding that it is proper to read into a contract statutes, regulations, or agency guidance when they are not incorporated by reference into the contract." *Id.*

The Federal Circuit has established a two-part test for determining whether a contract incorporates extrinsic material, which emphasizes that "the incorporating contract must use language that is *express* and *clear*, so as to leave no ambiguity about the identity of the document being referenced, nor any reasonable doubt about the fact that the referenced document is being incorporated into the contract." *Northrop Grumman Info. Tech., Inc. v. United States*, 535 F.3d 1339, 1344 (Fed. Cir. 2008); *see also Leeward Constr., Inc. v. United States*, 160 Fed. Cl. 446, 455 (2022); *Peterson Indus. Depot, Inc. v. United States*, 140 Fed. Cl. 485, 491 (2018). This means that "the language used in a contract to incorporate extrinsic material by reference (1) must explicitly, or at least precisely, identify the written material being incorporated, and (2) must clearly communicate that the purpose of the reference is to incorporate the referenced material into the contract (rather than merely to acknowledge that the referenced material is relevant to the contract)." *Id.* at 1345 (citation modified).

Applying this standard, the grant agreements do not incorporate by reference either 2 C.F.R. § 200.340(a)(2) (2020) alone, nor the Uniform Guidance as a whole. The grant agreements say only that "*recipients* are required to follow the *applicable* provisions of the [Uniform Guidance]."[6] Ex. 1 (FY 2022 GAN, Article IX); Exs. 2, 3, 4 (FY 2023 GANs, Article II); Exs. 5, 6, 7 (FY 2024 GANs, Article 2) (emphasis added). The agreements and the incorporated NOFOs then reference various applicable provisions of the Uniform Guidance in particular circumstances, but not 2 C.F.R. § 200.340(a)(2), and not as a basis for termination.[7] The NOFOs contain a further reference to the Uniform Guidance that is even more equivocal: "In addition to the requirements of this section and in this NOFO, FEMA *may* place specific terms and conditions on individual awards in accordance with 2 C.F.R. Part 200." Ex. 8 (FY 2022 NOFO, Article F.2); Ex. 9 (FY 2023 NOFO, Article F.2); Ex. 10 (FY 2024 NOFO, Article F.2) (emphasis added).

These references cannot meet either prong of the Federal Circuit's test. *See Smithson v. United States*, 847 F.2d 791, 794 (Fed. Cir. 1988) (holding that the incorporation by *implication* of statutes and regulations into government contracts would improperly impose new contractual

---

6    *See also, accord* Ex. 8 (FY 2022 NOFO, Article F.2.a); Ex. 9 (FY 2023 NOFO, Article F.2.a); Ex. 10 (FY 2024 NOFO, Article F.2.a) ("All successful *applicants* for DHS grant and cooperative agreements are required to comply with DHS Standard Terms and Conditions, which are available online." (emphasis added)); Ex. 8 (FY 2022 NOFO, Article F.5); Ex. 9 (FY 2023 NOFO, Article F.5); Ex. 10 (FY 2024 NOFO, Article F.5) ("In terms of overall award management, *recipient and subrecipient responsibilities* include . . . ensuring overall compliance with the terms and conditions of the award or subaward, *as applicable,* including the terms of 2 C.F.R. Part 200." (emphasis added)).

7    Notably, the incorporated "Termination Provisions" also state: "To the extent that subawards are permitted under this NOFO, pass-through entities should refer to 2 C.F.R. § 200.340 for additional information on termination regarding subawards." Ex. 8 (FY 2022 NOFO, Article H.1); Ex. 9 (FY 2023 NOFO, Article H.1); Ex. 10 (FY 2024 NOFO, Article H.1). But this only underscores that DHS/FEMA specified the specific grounds for termination rather than incorporating by reference the potential grounds listed in 2 C.F.R. § 200.340.

obligations). To hold otherwise would contradict ordinary principles of contract interpretation, including the rule against surplusage.

For one, the reference only to the "applicable" provisions of the Uniform Guidance leads to the logical conclusion that DHS/FEMA only intended to apply certain parts of the Uniform Guidance, specifically those parts cited in the grant agreements and in the NOFOs. Indeed, without anchoring to the grant agreements and the NOFOs, there would be no way for parties to the contracts to understand which parts of 2 C.F.R. 200 are in fact "applicable."

For another, the language only requires grant recipients to comply with the Uniform Guidance; it says nothing about DHS/FEMA's obligation to do so. The reference only to recipients must be read plainly as a decision to bind only one side of the grant agreement (the grantee) to the Uniform Guidance, while not imposing the same duty on DHS/FEMA.

And finally, reading additional terms into the contract would do violence to the NOFOs' "Termination Provisions" section, a section that was expressly incorporated as a term of the contract, and which specified a bounded list of only three permissible grounds for termination.

While there are no "magic words" that the Federal Circuit requires to meet the incorporation-by-reference test, the caselaw provides a deep well of "widely-used and judicially-approved language of incorporation" that agencies can adopt to "avoid or at least minimize the risk of having to litigate this issue." *Northrop*, 535 F.3d at 1346. (citing examples such as "is hereby incorporated by reference" or "is hereby incorporated as though fully set forth herein"). Notably, such language was not used in the case of the TVTP Grants and Part 200's grounds for termination.

This Court need look no further than the four corners of the grant agreements to conclude that DHS/FEMA knew how to incorporate a document by reference. Take, for one obvious

18

example, the language used in the grant agreements to incorporate the NOFOs. *See, e.g.*, Exs. 5, 6, 7 (FY 2024 GANs, Article 28) ("All the instructions, guidance, limitations, scope of work, and other conditions set forth in the Notice of Funding Opportunity (NOFO) for this federal award are incorporated by reference."); Exs. 2, 3, 4 (FY 2023 GANs, Article XXIX) ("All the instructions, guidance, limitations, and other conditions set forth in the Notice of Funding Opportunity (NOFO) for this program are incorporated here by reference in the award terms and conditions."); Ex. 1 (FY 2022 GAN, Article XXXV) (same).

That DHS did not use this or similar language when referencing the Uniform Guidance or its termination provisions cannot simply be overlooked. For example, in *Pub. Hous. Auths. Dirs. Ass'n v. United States*, 130 Fed. Cl. 522, 535 (2017), the court noted that the federal agency used "the kind of express language of incorporation that [the cases] require" to incorporate certain regulations but failed to do so elsewhere. This discrepancy defeated the agency's arguments for incorporation where the agency failed to use the appropriate language. There, as here, the cursory and cabined references to the Uniform Guidance all the more clearly fail the incorporation-by-reference test. *Callaway Golf Co. v. Acushnet Co.*, 576 F.3d 1331, 1346 (Fed. Cir. 2009) ("[M]ere *reference* to another [document] is not an *incorporation* of anything therein." (citation omitted)).

In sum, the grant agreements did not incorporate by reference either 2 C.F.R. § 200.340(a)(2) (2020) or the Uniform Guidance as a whole into the terms and conditions. Instead, the grounds for termination were laid out in the expressly incorporated "Termination Provisions" set forth in the NOFOs, which did not include "agency priorities" as a ground for termination.

### C. Even if the Uniform Guidance had been fully incorporated, the grants could only be terminated on grounds that appeared clearly and unambiguously.

Even if the Uniform Guidance had been incorporated in full, the conclusion remains the same. The agency breached the contracts because even the Uniform Guidance, by its own terms,

19

limited the grounds for termination to those that appeared clearly and unambiguously in the award's terms and conditions.

In developing the Uniform Guidance, OMB recognized the special importance and the necessity that both sides of a grant agreement understand the terms by which a grant could be terminated early. As a result, the Uniform Guidance's termination provisions imposed heightened obligations on the awarding agency not found anywhere else in the regulations. For example, the Uniform Guidance advised that an awarding agency "must make recipients aware, in a clear and unambiguous manner" of "the termination provisions" set forth in § 200.340, "including the *applicable* termination provisions in the Federal awarding agency's regulations or in each Federal award."[8] *See* 2 C.F.R. § 200.211 (2020) ("Information Contained in a Federal Award") (emphasis added); 85 Fed. Reg. 49506, 49507 (Aug. 13, 2020) ("Federal awarding agencies must clearly and unambiguously articulate the conditions under which a Federal award may be terminated in their applicable regulations and in the terms and conditions of Federal awards."). Section 200.340(b) reiterated this obligation: "A Federal awarding agency should clearly and unambiguously specify termination provisions applicable to each Federal award, in applicable regulations or in the award, consistent with this section." 2 C.F.R. § 200.340(b) (2020).

Read together, these provisions make clear that agencies may only terminate grants under limited circumstances, and that the agency is obligated to set forth those circumstances in clear and unambiguous language. In this respect, OMB's guidance to awarding agencies aligns neatly with the general principles of contractual construction and the caselaw outlined above. Whether the Uniform Guidance is incorporated or not, DHS/FEMA's obligations remained the same: The

---

8    As noted above, the Uniform Guidance does not require agencies to include "agency priorities" as a ground for terminating every grant award.

agency needed to clearly and unambiguously set forth the grounds for termination, so as to give the grantees notice—before accepting their awards—of the applicable circumstances under which their funding could be terminated. This is also consistent with Spending Clause limitations, which require that any grant conditions imposed must be unambiguous, enabling States to knowingly exercise their sovereign choice to participate. *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981).

In the case of the TVTP Grants, DHS/FEMA complied with this obligation through an expressly incorporated "Termination Provisions" that clearly and unambiguously articulated the conditions under which the grants could be terminated. DHS/FEMA could have included termination for "agency priorities" or cited to Section 200.340(a)(2) as a ground for termination, but they did not. As such, the only "clear" and "unambiguous" grounds for termination were the three listed grounds in the incorporated "Termination Provisions."

This Court can similarly consider that DHS/FEMA was the drafting party. The agency drafted "Termination Provisions" expressly laying out the applicable grounds for terminating the grants but excluded "agency priorities" as a basis. Plaintiffs were entitled to rely on those clear and unambiguous grounds. DHS/FEMA's attempt to claim post hoc additional bases for termination must be rejected.[9] *See, e.g.*, *United Pac. Ins. Co.* 497 F.2d at 1407 ("The Government as drafter of the contract had a duty to shoulder the major task of seeing within a zone of reason that words of the contract correctly and concisely communicate the proper notions intentions of the parties, and the Government must bear the burden of a failure to carry that responsibility."); *Hills Materials Co. v. Rice*, 982 F.2d 514, 516–17 (Fed. Cir. 1992) (explaining that the rule

---

9    DHS's subsequent amendment to its Standard Terms and Conditions, which added a termination provision for "agency priorities" in 2025, underscore the point. Such amendment would not have been necessary if the applicable documents already included such provisions.

construing ambiguous terms against the drafter "promotes care and completeness by drafters of contracts").

In sum, the contracts did not clearly and unambiguously permit termination based on "agency priorities." Instead, they clearly and ambiguously listed the three conditions upon which the grants could be terminated, expressly not including "agency priorities" as basis. As a result, DHS/FEMA breached the contracts by terminating them based on a ground not clearly and unambiguously permitted by the contracts.

## II.    Plaintiffs are entitled to expectation damages for the breach, including the remaining balance of the grants.

Because the United States wrongfully breached the agreements by terminating them, Plaintiff States are entitled to their expectation damages. These expectation damages include the unpaid balances of the grants, which is the amount Plaintiffs would have received but for the United States' breach of the parties' agreements.

Under first principles of contract law, Plaintiffs are entitled to be placed "in as good of a position as [they] would have been in had the contract been performed." Restatement (Second) of Contracts § 344 (1981) (defining expectation damages); *see also Boaz Hous. Auth. v. United States*, 994 F.3d 1359, 1363, 1369–70 (Fed. Cir. 2021) (applying expectation damages and this rule in the context of public housing subsidies); *see also Hous. Auth. v. United States*, 125 Fed. Cl. 557, 569–70 (2016) (similar). "[D]amages are always the default remedy for breach of contract." *Boaz*, 994 F.3d at 1364 (quoting *United States v. Winstar Corp.*, 518 U.S. 839, 885 & n.30 (1996) (plurality opinion)). And expectation damages are generally considered to be the default method for measuring the injured party's damages. Restatement (Second) of Contracts § 344, cmt. a. Expectation damages are appropriate here and easily calculated for the breach of the TVTP Grants.

22

The measurement of expectation damages is well established black-letter contract law. *See* Restatement (Second) of Contracts § 347. First, assess the loss in value to the injured party of the breaching party's nonperformance. Then, add any other losses, including incidental or consequential losses, caused by the breach.[10] Finally, subtract any costs or other losses avoided by the injured party by not having to perform on the contract. *Id.*

In assessing that lost value, "a party's expectation interest represents the actual worth of the contract *to him* rather than to some reasonable third person." Restatement (Second) of Contracts § 344, cmt. b (emphasis added). "Damages based on the expectation interest therefore take account of any special circumstances that are peculiar to the situation of the injured party, including his personal values and even his idiosyncrasies, as well as his own needs and opportunities." *Id*. In other words, the lost value is "the value *to the promisee* of the promise that was broken." Williston on Contracts § 64:1 (4th ed. 2025) (emphasis added).

Accordingly, in this instance, the value of the TVTP Grants is based on their value *to Plaintiffs*. That value is the remaining balance of the grants, or stated differently, what Plaintiffs would have received to accomplish the public purposes of the grants, but for the government's breach. As detailed in the declarations, each Plaintiff understood the value of its grant to be the total amount offered and accepted in the Notice of Award and each Plaintiff designed its programs and performed based on that reasonable understanding. *See* Ex. 22 ¶ 17; Ex. 23 ¶ 15; Ex. 24 ¶ 12; Ex. 25 ¶19; Ex. 26 ¶13; Ex. 27 ¶ 14. Likewise, it is undisputed that each Plaintiff State intended to use the full amount of its grant funding within the applicable period of performance. *Id*.

---

10    As noted above, an assessment of incidental and consequential damages would require discovery and is thus premature for disposition at this time. Plaintiffs reserve the right to seek such discovery and further briefing, as necessary, or to negotiate as appropriate with the government for a proper resolution.

Once the government breached, Plaintiff States' expectations were destroyed. Those expectations were that Plaintiff States would be able to accomplish the agreed upon public purposes of the grants for their states *and* that they would receive full payment of the value of the grants in furtherance of those public purposes. After the government breached, Plaintiffs were left with limited and unsatisfactory options.

Given the importance of the work supported by TVTP funding, some Plaintiffs managed to find alternative state funding to continue, at least to some degree, the projects funded with TVTP Grants. *See, e.g.*, Ex. 22 ¶ 23 (describing Colorado DHSEM's efforts to find other funding sources for critical regional prevention coordinator positions, which covered only some of those positions); Ex. 23 ¶ 20(a) (explaining how state general funds were used to continue threats program manager position); Ex. 25 ¶ 24 (Michigan's MSP temporarily funded BTAM specialist position in order to maintain continuity of operations). But even those Plaintiffs had to scale back programming and divert resources from other State objectives and programs.[11] *See, e.g.*, Ex. 22 ¶ 23 (noting that one threats program manager position was eliminated in its entirety and resources were diverted to cover other positions); Ex. 23 ¶ 20 (explaining service reduction implications of combining positions and reduced programming); Ex. 25 ¶ 24 (describing service impacts to MSP caused by diverted resources). For those Plaintiffs, their loss was not receiving the contractual payments owed for continuing the TVTP programs and the public purposes of the grants.

---

11      The diversion of funding from other public purposes was a natural consequence that the government should have foreseen, given the standard requirement that federal funding supplant, rather than supplement, other available funding sources. *See, e.g.*, Ex. 1 (FY 2022 GAN, Article XXXIV); Exs. 2, 3, 4 (FY 2023 GANs, Article XXVIII); Exs. 5, 6, 7 (FY 2024 GANs, Article 27).

For other Plaintiff States, they were not able to come up with alternative state funding and had to abandon their TVTP-funded projects, leaving them unable to accomplish the public purposes of the grants on behalf of their citizens. For example, Minnesota was unable to fill a criminal intelligence position as a result of its loss of federal funding. Ex. 26 ¶ 18. In addition, the state was forced to cancel a conference designed to train law enforcement and to encourage statewide collaboration on investigation and mitigation of targeted violence threats. *Id*. Hawaiʻi and Rhode Island suffered similar harms. Ex. 23 ¶ 20; Ex. 27 ¶ 19–20.

Those states equally suffered damages, which are measurable based on the amount agreed upon by both parties to accomplish the public purposes of the grants (i.e., the remaining balance of the grants).[12] Take, for example, Minnesota, which has been unable to fill a criminal analyst position as a result of losing its TVTP Grant. The damages that state suffered are equal to the amount that would be required to refill that criminal analyst's job. The same conclusion can be reached for Colorado, Michigan, and Hawaiʻi, all of which diverted funding in order to save similar roles. In their cases, those states are entitled to the replacement costs of funding that was diverted and would have been used elsewhere.

In short, regardless of which undesirable choice each Plaintiff took, none can be said to be in as good of a position as they would have been had the United States performed its obligations as promised. Either a state is out funding diverted from other sources, or they were unable to accomplish the public purpose they were promised, or some combination.[13] Just as in traditional,

---

12    The fact that both parties agreed upon an amount certain ahead of time makes this measure of damages all the more reasonable and foreseeable. *See* Restatement (Second) of Contracts § 351 (requiring expectation damages to be reasonable and foreseeable).

13    In some circumstances, Plaintiffs were able to find some alternative state funding to continue parts of their TVTP programs and accomplish some of the public purposes. This hybrid

for-profit contexts, a breaching party cannot simply walk away from liability by noticing termination: the breaching party remains liable for all damages required to place the injured party in as good a position as it would have been in had the contract been performed. As a result, the expectation damages encompass the remaining balance of the grants. And in these circumstances, there are no costs avoided by the termination because had the contract been performed, Plaintiffs would have been entitled to full reimbursement of costs under the agreements.

Accounting for the value of the grants from the Plaintiffs' perspective likewise means Plaintiffs' damages are not limited to so-called "lost profits." That conclusion is entirely consistent with the Restatement and longstanding contract principles, as well as the nature of federal grants and Plaintiffs' unique status as sovereigns entrusted to work for the public benefit of their citizens. *See, e.g.*, *Glendale Fed. Bank, FSB v. United States*, 239 F.3d 1374, 1380 (Fed. Cir. 2001) (citing Restatement (Second) of Contracts § 347)) (recognizing that expectation damages are often equated with the term lost profits, but that the two are not necessarily the same).

As reflected directly in the U.S. code, a grant agreement must be used "as the legal instrument reflecting a relationship between the United States Government and a State" where "the principal purpose of the relationship is to transfer a thing of value to the State . . . to carry out a public purpose . . . authorized by a law of the United States instead of acquiring (by purchase, lease, or barter) property or services for the direct benefit or use of the United States Government." 31 U.S.C. § 6304. When the government breached, Plaintiff States lost out on the complete transfer of the thing of value, which they were contractually entitled to receive, and now they are entitled to receive the remaining balance as compensation.

---

situation likewise yields the same result: those Plaintiffs are entitled to the remaining balance of the grants as expectation damages.

Nor does it matter that Plaintiff States are not profit-making enterprises. To the contrary, as the wronged parties, they are equally entitled to be placed "in as good a position as [they] would have been had the breaching party fully performed its obligation." *Boaz*, 994 F.3d at 1369. Thus, for example, in *Boaz*, state and local public housing authorities sued because the United States failed to provide the full amount of housing subsidies that the state and local governments were supposed to receive for use to benefit their citizens. The Federal Circuit recognized that these governmental entities were entitled to compensatory damages in the difference between what should have been paid had the contract been fully performed and what was actually paid because "the difference places them in as good a position as they would have been had HUD fully performed its obligation." *Id.* at 1370; *see also, e.g.*, *Hearts with Haiti, Inc. v. Kendrick*, No. 13-cv-00039, 2015 WL 4065185, at *3 (D. Me. July 2, 2015) (rejecting that nonprofits cannot obtain damages); *Greene Cnty. Guidance Ctr., Inc. v. Greene-Clinton Comm. Mental Health Bd.*, 482 N.E. 2d 982 (Ohio. App. 1984) (same).

So, too, here. Plaintiff States are entitled to the remaining balance of the grants, because that difference places them in as good a position as they would have been had the government fully performed its obligations under the grant agreements.[14] *See* Restatement (Second) of Contracts § 347, cmt. b (noting in cases of partial performance "the loss in value caused by the breach is equal to the difference between the value that the performance would have had if there had been no breach and the value of such performance as was actually rendered"). Anything less does not hold the government accountable for the promises of the legal instrument it executed.

---

14    Prior to the terminations, the United States partially performed on nearly every grant. Plaintiffs seek only the remaining balance and do not seek any improper windfall for sums already paid.

In sum, as detailed in the Table *supra*, and as supported by the sworn declarations, the undisputed facts show that the remaining balance of the grants is approximately $2.85 million, with the amount remaining specified for each grant and grantee. Ex. 22 ¶ 16; Ex. 23 ¶ 16; Ex. 24 ¶ 15; Ex. 25 ¶ 22; Ex. 26 ¶ 16; Ex. 27 ¶ 17. The Court should grant partial summary judgment in favor of Plaintiffs, holding Plaintiffs are entitled to receive their expectation damages including the remaining unpaid balances of the grants.

## CONCLUSION

Nearly 150 years ago, the Supreme Court recognized:

> The United States are as much bound by their contracts as are individuals. If they repudiate their obligations, it is as much repudiation, with all the wrong and reproach that term implies, as it would be if the repudiator had been a State or a municipality or a citizen.

*The Sinking Fund Cases*, 99 U.S. 700, 718–19 (1878). Said in a more modern way: A deal is a deal. Plaintiffs ask this Court to affirm the United States' enduring duty to uphold the benefit of the legal instruments it executes. By terminating the TVTP grants on a basis not provided for in the grant agreements, the United States repudiated its obligations to its grantees. Plaintiffs are entitled to full compensation for that breach. Plaintiffs therefore respectfully request the Court grant partial summary judgment, holding that the United States is liable for terminating the grants in contravention of the terms of the agreements, and that Plaintiffs are entitled to their full expectation damages, to include the undisbursed balances of the awards.

28

Dated: May 29, 2026.                    Respectfully Submitted,


**PHILIP J. WEISER**
ATTORNEY GENERAL OF COLORADO


By: */s/Sarah H. Weiss*
David Moskowitz
    *Deputy Solicitor General*
Sarah H. Weiss
    *Senior Assistant Attorney General*
1300 Broadway, 10th Floor
Denver, CO 80203
(720) 508-6000
david.moskowitz@coag.gov
sarah.weiss@coag.gov


*Counsel for the State of Colorado*


**ANTHONY G. BROWN**
ATTORNEY GENERAL OF MARYLAND


By: */s/ Robert Brewer*
Robert Brewer
    *Assistant Attorney General*
Office of the Attorney General
200 Saint Paul Place
Baltimore, Maryland 21202
(410) 576-7057
rbrewer@oag.maryland.gov


*Counsel for the State of Maryland*


**KEITH ELLISON**
ATTORNEY GENERAL OF MINNESOTA


By: */s/ Brian S. Carter*
Katherine Bies
Brian S. Carter
    *Special Counsel*
445 Minnesota Street, Suite 1400
St. Paul, Minnesota 55101
(651) 300-0917
katherine.bies@ag.state.mn.us
brian.carter@ag.state.mn.us


*Counsel for the State of Minnesota*


**ANNE E. LOPEZ**
ATTORNEY GENERAL OF HAWAIʻI


By: */s/Kalikoʻonālani D. Fernandes*
David D. Day
    *Special Assistant Attorney General*
Kalikoʻonālani D. Fernandes
    *Solicitor General*
Hawaiʻi Department of the Attorney General
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
david.d.day@hawaii.gov
kaliko.d.fernandes@hawaii.gov


*Counsel for the State of Hawaiʻi*

**DANA NESSEL**
ATTORNEY GENERAL OF MICHIGAN

By: */s/ Neil Giovanatti*
Neil Giovanatti
    *Assistant Attorney General*
Michigan Department of Attorney General
525 W. Ottawa
Lansing, MI 48909
(517) 335-7603
giovanattin@michigan.gov

*Counsel for the State of Michigan*

**PETER F. NERONHA**
ATTORNEY GENERAL OF RHODE ISLAND

By: */s/ Chelsea Baittinger*
Chelsea Baittinger
    *Special Assistant Attorney General*
150 South Main Street
Providence, RI 02903
(401) 274-4400
cbaittinger@riag.ri.gov

*Counsel for the State of Rhode Island*