# EXHIBIT #27

**DECLARATION OF KRISTINE CAMPAGNA**

I, KRISTINE CAMPAGNA, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1. I am a resident of the State of Rhode Island, and I am over the age of 18. If called as a witness, I could and would testify competently to the matters set forth below.

2. I am the Associate Director for Community and Health Equity ("CHE") Division at the Rhode Island Department of Health ("RIDOH"). I hold a Master's Degree in Education and have been with the RIDOH since 2009. I am a resident of the State of Rhode Island over the age of 18 and have personal knowledge of all the facts stated herein, including knowledge based on my experience and information provided to me. If called as a witness, I could and would testify competently to the matters set forth below.

3. I have held this position since January 2022. Prior to this role, I held the role of Chief Operating Officer for COVID Operations for the State of Rhode Island and have been working as a public health leadership participant in areas such as behavioral health, opioid and overdose prevention, and maternal and child health. As Associate Director, I oversee the application for and administration of federal grants within the RIDOH, to include oversight and provision of policy direction to staff and programs in the Division of Community, Health and Equity including the Targeted Violence and Terrorism Prevention Program. I work directly with the Director of the Rhode Island Department of Health and other executive leadership staff to implement RIDOH's mission to eliminate health disparities and achieve health equity for all Rhode Islanders.

4. I submit this declaration to provide information regarding the course of recent conduct by Department of Homeland Security ("DHS") and the Federal Emergency Management

1

Agency ("FEMA") regarding its administration of the RIDOH's grant funding under the Targeted Violence and Terrorism ("TVTP") grant program.

5.      I make this declaration based on personal knowledge and on my review of information and records gathered by agency staff.

6.      In recent years, Rhode Island has experienced several incidents that highlight the ongoing threat of targeted violence, terrorism and extremism, even in communities often perceived as relatively insulated from terrorism-related activity. Most notably, in 2024, a North Providence man intentionally set multiple fires around the exterior of Shiloh Gospel Temple Ministries, an act that federal prosecutors identified as a racially and religiously motivated hate crime. Investigators recovered extremist writings expressing white supremacist beliefs and violent intentions toward non-white individuals and religious institutions. Rhode Island officials have also responded to politically motivated bomb threats and swatting incidents targeting elected officials and residents. The culture of violent extremism has even been experienced on our local college and university campuses, with reports of swastikas and other hateful language or imagery being used in vandalism or in the distribution of materials that were later investigated by local authorities. These incidents demonstrate that targeted violence can emerge locally through hate-based ideologies, political intimidation, or extremist rhetoric, underscoring the importance of continued prevention efforts, community awareness, interagency coordination, and public health approaches to violence prevention in Rhode Island, all work and systems which would have been improved with the use of this funding. In the aftermath of these funds being terminated, Rhode Island has experienced several more extreme acts of targeted violence and terrorism: the December 13, 2025 mass shooting at Brown University, which resulted in the deaths of two students and the wounding of 9 others, a September 29, 2025 hazing incident at a local public

2

high school involving antisemitic epithets and conduct toward a Jewish student, and the February 16, 2026 mass shooting at the Pawtucket ice rink where several local schools were participating in a hockey game when a person with a firearm in the crowd killed several family members before taking his own life.

7.    As pertinent to the present lawsuit, in 2024, the RIDOH applied for grant funding through the TVTP program. The application, entitled the Rhode Island Safe People and Places Project ("RISPP"), and designated EMW-2024-GR-05250, explained the intended uses for the funds: Specifically, RIDOH, in collaboration with the United States Attorney District of Rhode Island Office, Department of Homeland Security's ("DHS") Center for Prevention Programs and Partnerships (CP3) Rhode Island Workgroup, SafeBAE, Courageous RI and the Nonviolence Institute, sought to address and prevent future incidents of violence by implementing programming on all three levels of prevention: primary, secondary, and tertiary. Funding was to establish the RISPP. RIDOH planned to leverage the existing connection with the CP3 workgroup to strategically partner with organizations in the State of Rhode Island, including other government entities, non-profit and community-based organizations. Partnerships were to include Certified Community Behavioral Health Centers (CCBHCs), the private sector, and community members. RIDOH sought to utilize DHS funding to provide trainings that raise societal awareness, convene an Advisory Group in the State, educate the public on nonviolence theory and resources available, align with other State initiatives such as the Rhode Island Suicide Prevention State Plan, and leverage other funding streams to support violence and terrorism prevention initiatives. The RIDOH expected that outcomes of the RISPP would be the development of a Targeted Violence Prevention State Plan and updated and enhanced Train the Trainer programming to prevent violence in a variety of audiences.

3

8. These funds were important to the RIDOH's mission in the following ways:

a. Provided funding for various training courses in local public schools and communities including:

i. Nonviolence theory trainings/workshops for local schools, school resource officers, community members, and affiliates.

ii. Training initiatives to develop a comprehensive targeted violence and terrorism prevention training for schools and youth-serving organizations.

iii. Non-violence trainings and town hall events such as the "United Against Hate" to increase societal awareness of violence prevention.

iv. Increased trainings that help protect historically marginalized or underserved populations, including but not limited to, Jewish and Muslim religious groups, LGBTQIA+ individuals, and other disproportionately affected populations.

v. Media literacy trainings of at least 40 Rhode Island middle and high school staff and faculty, with a focus on mental health professionals, working towards incorporating this training into their lesson plans and providing media literacy programs to at least 160 students per school year.

b. Provided funding to expand RIDOH's Violence and Injury Prevention Program to include targeted violence prevention.

i. A part-time Program Coordinator was to be hired to establish and convene an advisory group to fill the gaps between existing programming by assessing, planning, and delivering programs that will decrease risk factors

4

and increase protective factors associated with violence and terrorism prevention.

c. Provided funding to enhance the current regulations to include minimum standards for Rhode Island's Behavioral Threat Assessment and Management Teams ("RI BTAMs") and to develop a Targeted Violence Prevention State Strategic Plan.

   i. A needs assessment to be completed by RIDOH was to be analyzed to help RIDOH identify areas of improvement within current RI BTAMs and to draft a document of recommendations to improve RI BTAMs regulations.

   ii. The document of recommendations of improvement would contribute to sustainability of the statewide terrorism and targeted violence prevention by codifying BTAMs' best practices for implementing a comprehensive approach to violence and terrorism prevention and encouraging continued quality improvement.

d. Provided additional funding to seven (7) of RIDOH's employees to implement the Targeted Violence and Terrorism Prevention grant activities.

9.    On September 10, 2024, RIDOH received a formal Notice of Award ("NOA") from DHS/FEMA in the amount of $637,065.00. RIDOH accepted the award on or about September 11, 2024, and began drawing down funds to advance the RISPP.

10.    At the time that this funding was terminated, Rhode Island had begun participating in a quarterly meeting of regional stakeholders including government officials, community-based organizations engaging in targeted violence and terrorism prevention activities, direct service providers, and local colleges/universities. Three community contracts were either fully executed and about to launch, or were in the final stages of becoming fully executed and work was set to

5

begin imminently. The team had also begun convening meetings with key multi-sectoral partners to initiate the development of an advisory committee and a statewide strategic plan for targeted violence and terrorism prevention, the strengthening of behavior threat assessment and management within school districts. Lastly, staff were in communication with partners to plan the trainings with school resource officers and other key personnel described in the project proposal. The TVTP Grant Program is the only federal grant program solely dedicated to helping local communities develop and strengthen these capabilities, and Rhode Island Department of Health was in the process of leveraging its public health approach in this area, to help people and protect communities by using primary, secondary, and tertiary prevention strategies for those on a pathway to violence before any harm occurs.

11.     RIDOH's project is operationally, methodologically, and legally similar to a wide range of grants that have been issued under the same program. The project shared the program's congressionally mandated public health framework, multi-disciplinary stakeholder engagement model, and counterterrorism prevention mission, to be effectuated by activities in the primary, secondary, and tertiary levels of prevention. Rhode Island's inclusion of a statewide strategic plan was directly consistent with a documented DHS programmatic priority. As of the time the TVTP grants were terminated, six states had previously published statewide targeted violence and terrorism prevention strategies, including Colorado, Florida, Hawaii, Illinois, New York and Texas. CP3/DHS provided guidance and support to state governments seeking to develop such plans, characterizing BTAM as a foundational element of state targeted violence and terrorism prevention strategies. Each published strategic plan was developed with CP3/DHS' explicit assistance, and in some cases, with direct TVTP grant funding – none of which was terminated on the same grounds as Rhode Island's funding award. Another extensively documented point of

6

comparison is around BTAM explicitly, as BTAM in K-12 settings was a DHS-championed priority that was repeated across several non-terminated awards: Auburn University's award (Alabama, $638,004 – FY 2024) included foundational training for community leaders from law enforcement, K-12 schools, higher education, and healthcare institutions to help create an East Alabama Threat Advisory Committee, a multi-disciplinary community BTAM team to provide support to individuals before an act of violence occurs. Weber-Morgan Health Department (Utah) proposed a school-district embedded BTAM implementation very similar to Rhode Island's school district component that was also not terminated. Overall, across all of the programmatic components of Rhode Island's terminated TVTP award and work plan, there were near-identical or structurally equivalent activities present in FY2024 and prior-cycle awards that were not terminated or that were able to complete their full performance periods.]

12.     Based on the NOA and the incorporated Notice of Funding Opportunity (NOFO), the grounds for termination of RIDOH's TVTP grant were limited to the following: (a) Noncompliance on the part of the recipient; (b) With the consent of the recipient; and (c) Notification by the recipient.  Changes to "agency priorities" was not a ground listed in the NOA nor in the NOFO.

13.     It was RIDOH's understanding that the grounds listed in the "Termination Provisions" were exclusive and that DHS/FEMA could not terminate the grants based on purported "changes to agency priorities."

14.     The grant agreement specified a period of performance, during which RIDOH was to complete its approved project and to be reimbursed for all submitted expenses up to the full amount awarded in the NOA. Had the grant not been terminated, RIDOH fully expected that it

would have completed all work, achieved the public purposes and benefits of the grant, and received the full amount of the award.

15.    On July 21, 2025, RIDOH received a letter from DHS/FEMA notifying the agency that its TVTP grant was being terminated on the basis of changes to "agency priorities," "effective immediately," and that termination was not appealable.

16.    The letter did not list as grounds for termination any of those circumstances laid out in the NOA and NOFO, and it is RIDOH's understanding that DHS/FEMA did not terminate based on any of those grounds. For example, prior to July 21, 2025, RIDOH received no indication that the agency's performance was unsatisfactory in any way. Likewise, RIDOH did not and has not consented to the termination of its TVTP grant, whether in whole or in part. RIDOH has never noticed DHS/FEMA of any intention to terminate its grant of its own volition, nor would it.

17.    At the time of the termination, RIDOH had drawn down $96,925.88 of funding, with $540,139.12 remaining.

18.    As a result of the termination, RIDOH followed DHS/FEMA's instructions and began the close out process.

19.    This unlawful termination detrimentally impacted RIDOH.  RIDOH was unable to obtain alternative state funds to continue the project and was therefore forced to cancel three contracts with community partners by issuing termination letters with stop-work notices. RIDOH was also forced to eliminate one contractor position, reconfigure salaries for full-time employees who were partially allocated on this grant, and was unable to accomplish the public purposes and benefits of the grant for the State.

20.    RIDOH also has not been able to obtain reimbursement for valid costs incurred prior to termination and during the closeout process. RIDOH has also incurred incidental and indirect damages as a result of the unlawful termination.

21.    Had DHS/FEMA upheld its promise to RIDOH, RIDOH would have spent its TVTP funds, in collaboration with Department of Homeland Security's Center for Prevention Programs and Partnerships (CP3) and key stakeholders, developing a statewide strategic plan for targeted violence and terrorism prevention, standing up an Advisory Group on this topic in the state, funding three external contracts to address and prevent future incidents of violence by implementing programs on all three levels of prevention: primary, secondary, and tertiary (including the Nonviolence Institute, who was deployed to provide direct services to victims of some of the aforementioned tragedies that have occurred since this funding was terminated), providing trainings to raise societal awareness, and leveraging partnerships, other funding streams and the Advisory Board to develop sustainable programming for the future. Instead, RIDOH had to stop all work that was in progress, including the development of the statewide strategic plan to prevent acts of targeted violence and terrorism prevention, terminate three community-based contracts that would have benefitted the state, eliminate a contractor position, and navigate the diversion of funds from other projects to make full—time employees who had been partially funded by this grant whole. The administrative burden of the time needed to draft and develop termination letters, communicate with funded and un-funded partners to stop work, and reconfigure staffing allocations due to funding loss were all drains to the organization. The abrupt termination of this award and the resulting discontinuation of contracts also carries significant reputational consequences and risks that may erode the trust RIDOH works diligently to cultivate with its community partners.

I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct.  Executed on May 27, 2026.

_____
KRISTINE CAMPAGNA
Division of Community Health & Equity
RI Department of Health

10