No. 26-315
(Judge Somers)

---

## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---

STATE OF COLORADO, STATE OF MARYLAND, STATE OF MINNESOTA, STATE OF HAWAI'I, STATE OF MICHIGAN, STATE OF RHODE ISLAND,

Plaintiffs,

v.

THE UNITED STATES,
Defendant.

---

## DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT

---

BRETT A. SHUMATE
Assistant Attorney General

PATRICIA M. McCARTHY
Director

MARTIN F. HOCKEY, JR.
Deputy Director

MATTHEW J. CARHART
Senior Trial Counsel
Commercial Litigation Branch
Civil Division, U.S. Department of Justice
PO Box 480, Ben Franklin Station
Washington, DC 20044
Tel: (202) 307-0313
Email: Matthew.Carhart@usdoj.gov

June 29, 2026                    Attorneys for Defendant

**TABLE OF CONTENTS**

INTRODUCTION ...........................................................................................................................1

STATEMENT OF THE ISSUES ...................................................................................................4

STATEMENT OF THE CASE .......................................................................................................4

ARGUMENT..................................................................................................................................9

  I.      Standard of Review ................................................................................................9

  II.     The United States Is Entitled To Summary Judgment On Liability........................10

          A.      The Termination Provisions In Section 200.340—Including The "Agency
          Priorities" Provision—Were Incorporated Into The Grant Agreements ........................10

                  1.      Section 200.340's Termination Provisions Are Incorporated By Reference Into
                  The Grant Agreements.................................................................................................10

                  2.      Alternatively, Section 200.340's Termination Provisions Are Incorporated As
                  A Matter of Law Via The Christian Doctrine............................................................14

          B.      Plaintiffs' Arguments To The Contrary Are Unavailing.....................................16

  III.    The United States Is Entitled To Summary Judgment With Respect To Plaintiffs'
  Alleged Damages.........................................................................................................................20

          A.      Plaintiffs' View Of Their Expectation Interests Is Based Upon A
          Misunderstanding Of The Grant Agreements ...............................................................21

          B.      Plaintiffs Fail To Account For Their Duty To Mitigate And Fail To Identify
          Damages That Can Be Proven With Reasonable Certainty ..........................................24

          C.      Plaintiffs Cannot Recover Any Consequential Damages Or Incidental Damages
          Apart From Those That Are Compensable Under The Uniform Guidance's Cost
          Principles ..............................................................................................................................28

CONCLUSION ..............................................................................................................................30

# TABLE OF AUTHORITIES

Page(s)

*Cases*

*A.A.B. Joint Venture v. United States, Nos. 04–1719 C, 05–114 C, 05–1172 C, 06–49 C,*
  2008 WL 4415054 (2008) ........................................................................................ 17

*Blue & Gold Fleet v. United States,*
  492 F.3d 1308 (Fed. Cir. 2007) .............................................................................. 19

*Blue Tech Inc. v. United States,*
  155 Fed. Cl. 229 (2021) ........................................................................................... 18

*Bluebonnet Sav. Bank, F.S.B. v. United States,*
  339 F.3d 1341 (Fed. Cir. 2003) .............................................................................. 23

*Boaz Housing Authority v. United States,*
  994 F.3d 1359 (Fed. Cir. 2021) .............................................................................. 22

*Bridges v. United States,*
  156 Fed. Cl. 129 (2021) ........................................................................................... 14

*Celotex Corp. v. Catrett,*
  477 U.S. 317 (1986) ................................................................................................. 10

*Champagne v. McDonough,*
  122 F.4th 1325 (Fed. Cir. 2024) ............................................................................. 17

*Columbus Regional Hospital v. United States,*
  990 F.3d 1330 (Fed. Cir. 2021) .............................................................................. 22

*Dairyland Power Coop. v. United States,*
  16 F.3d 1197 (Fed. Cir. 1994) ................................................................................ 10

*Earman v. United States,*
  114 Fed. Cl. 81 (2013) ............................................................................................. 15

*Fields v. United States,*
  147 Fed. Cl. 352 (2020) ........................................................................................... 26

*Fisher v. United States,*
  402 F.3d 1167 (Fed. Cir. 2005) (en banc) ............................................................. 19

*G. L. Christian and Assocs. v. United States,*
  312 F.2d 418 (Ct. Cl. 1963) .................................................................................... 15

*Gates v. United States*,
33 Fed. Cl. 9 (1995) ............................................................................................................. 28

*Globe Savings Bank, F.S.B. v. United States*,
65 Fed. Cl. 330 (2005) ....................................................................................................... 29

*Hymas v. United States*,
810 F.3d 1312 (Fed. Cir. 2016) ......................................................................................... 16

*Ind. Mich. Power Co. v. United States*,
422 F.3d 1369 (Fed. Cir. 2005) ......................................................................................... 24

*Information Systems & Networks Corp. v. United States*,
64 Fed. Cl. 599–07 (2005) ................................................................................................. 23

*INSLAW, Inc. v. United States*,
39 Fed. Cl. 307 (1997) ....................................................................................................... 19

*McDonnell Douglas Corp. v. United States*,
37 Fed. Cl. 295 (1997) ....................................................................................................... 22

*Metro. Transp. Auth. v. Duffy, 25-cv-1413*,
2026 WL 588117 (S.D.N.Y. Mar. 3, 2026) ...................................................................... 13

*Metro. Transp. Auth. v. Duffy*,
784 F.Supp.3d 624 (S.D.N.Y. 2025) ................................................................................. 15

*Nat'l Pork Producers Council v. Ross*,
143 S.Ct. 1142 (2023) ........................................................................................................ 16

*Newsom v. United States*,
676 F.2d 647 (Ct. Cl. 1982) ............................................................................................... 18

*Northrop Grumman Info. Tech. v. United States*,
535 F.3d 1339 (Fed. Cir. 2008) ......................................................................................... 11

*Robinson v. United States*,
305 F.3d 1330 (Fed. Cir. 2002) ......................................................................................... 24

*Rumsfeld v. Applied Companies, Inc.*,
325 F.3d 1328 (Fed. Cir. 2003) ......................................................................................... 26

*San Carlos Irr. and Drainage Dist. v. United States*,
111 F.3d 1557 (Fed. Cir. 1997) ......................................................................................... 25

*Simanski v. Sec'y of Health & Human Servs.*,
671 F.3d 1368 (Fed. Cir. 2012) ......................................................................................... 10

*Tex. Advanced Optoelectronic Solutions  v. Renesas Elec. Am.*,
895 F.3d 1304 (Fed. Cir. 2018) ......................................................................................... 30

*Tolliver Grp. v. United States*,
140 Fed. Cl. 520 (2018) ........................................................................................ 14

*Wells Fargo Bank N.A. v. United States*,
88 F.3d 1012 (Fed. Cir. 1996) ............................................................................. 29

*White v. Delta Constr. Int'l v. United States*,
285 F.3d 1040 (Fed. Cir. 2002) ..................................................................... 23, 27

*Willems Indus. v. United States*,
295 F.2d 822 (Ct. Cl. 1961) .......................................................................... 23, 26

*Regulations*

2 C.F.R. § 200.100 ......................................................................................................... 6
2 C.F.R. § 200.211 ................................................................................................. passim
2 C.F.R. § 200.340 ................................................................................................. passim
2 C.F.R. § 200.343 ....................................................................................................... 29
2 C.F.R. § 200.344 ......................................................................................................... 9
2 C.F.R. § 200.345 ......................................................................................................... 6
2 C.F.R. § 200.346 ............................................................................................... 6, 21, 23
2 C.F.R. § 200.401 ......................................................................................................... 6
2 C.F.R. § 200.403 ................................................................................................. 6, 7, 21
2 C.F.R. § 200.404 ................................................................................................. 6, 7, 21
2 C.F.R. § 200.405 ................................................................................................. 6, 7, 21
2 C.F.R. § 200.410 ....................................................................................................... 21
2 C.F.R. § 200.472 ................................................................................................... 9, 29
2 C.F.R. § 200.504 ................................................................................................... 6, 21
2 C.F.R. § 200.516 ................................................................................................... 6, 21
2 C.F.R. § 200.521 ................................................................................................... 6, 21
2 C.F.R. § 3002.10 .................................................................................................. 6, 14
17 C.F.R. § 202.5 ....................................................................................................... vii
FAR 16.301-1 ............................................................................................................ 22
FAR 31.103 ............................................................................................................... 22
85 Fed. Reg. 3766-01 (Jan. 22, 2020) ........................................................................ 8
89 Fed. Reg. 30046-01  (April 22, 2024) .................................................................... 8
91 Fed. Reg. 32198-01 (May 29, 2026) ...................................................................... 8

*Secondary Sources*

3 E. Allan Farnsworth and Zachary Wolfe, *Farnsworth on Contracts* § 12.08 (4th ed. 2019)

*Restatement (Second) of Contracts*
  § 347 (1981) ................................................................................................. 27

*Restatement (Second) of Contracts*
  § 353 (1981) ................................................................................................. 26

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| STATE OF COLORADO; STATE OF MARYLAND; STATE OF MINNESOTA STATE OF HAWAI'I; STATE OF MICHIGAN; STATE OF RHODE ISLAND, | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | No. 26-315 (Judge Somers) |
| THE UNITED STATES, | ) ) | |
| Defendant. | ) ) | |

**DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT**

Pursuant to Rule 56 of the Rules of the United States Court of Federal Claims (RCFC), defendant, the United States, respectfully requests that this Court grant summary judgment to the United States with respect to the claims brought by plaintiffs, State of Colorado, State of Maryland, State of Minnesota, State of Hawai'i, State of Michigan, and State of Rhode Island.

**INTRODUCTION**

Plaintiffs were recipients of grant agreements awarded by the Department of Homeland Security, Federal Emergency Management Agency (DHS) under the Targeted Violence and Terrorism Prevention (TVTP) grant program. They allege that DHS breached their grant agreements by terminating them based upon a determination that the grant agreements no longer effectuated program goals or agency priorities. Plaintiffs seek summary judgment on two issues: first, they ask the Court to rule that the grant agreements did not authorize DHS to terminate awards on the grounds that they no longer effectuated program goals or agency priorities; and

second, they ask the Court to rule that they are entitled to the budgeted total value of their grants as damages.

With respect to both liability and damages, the Court should deny plaintiffs' motion for summary judgment and grant summary judgment in favor of the United States.

With respect to liability, plaintiffs' summary judgment motion is predicated upon their view that 2 C.F.R. § 200.340(a)(2), which allowed DHS to terminate agreements that no longer effectuated agency priorities, was not incorporated into the grant agreements. But this view is incorrect. In fact, the Notice of Funding Opportunities (NOFOs) (which were themselves incorporated into the grant agreements) required awardees to comply with 2 C.F.R. Part 200 (the Uniform Guidance). Moreover, the grant agreements incorporated DHS's Standard Terms and Conditions, which also required grantees to "follow the applicable provisions" of the Uniform Guidance. As a result, the Uniform Guidance—including 2 C.F.R. § 200.340(a)(2)—was incorporated into the grant agreements by reference.

Alternatively, the Court should recognize that the grant agreements incorporated 2 C.F.R. § 200.340(a)(2) as a matter of law. Under the *Christian* doctrine, mandatory provisions that express deeply ingrained strands of Government procurement policy are incorporated into contracts with the Government as a matter of law. Here, 2 C.F.R. § 200.211(c) requires that "[f]ederal agencies must inform recipients of the termination provisions in § 200.340[,]" which establishes that the termination provisions in section 200.340 are mandatory provisions. Moreover, as *Christian* itself recognized, the Government's need for flexibility in ending contracts is a deeply ingrained strain of public policy. Whether 2 C.F.R. § 200.340(a)(2) was incorporated by reference or as a matter of law, we are entitled to summary judgment on liability.

2

With respect to damages, plaintiffs' motion is based upon their contention that their expectation interests equal the full budgeted value of the grant. But this misconstrues the nature of the governing agreements. The grant agreements are limited promises to reimburse grantees' incurred costs to the extent that the costs are recoverable under the Uniform Guidance. Plaintiffs cannot recover more than the costs that they have incurred, given that the grant agreements limited plaintiffs' recovery to costs they incurred (among other limitations). The Court should reject plaintiffs' request for damages that they could not have received under the grant agreements.

Moreover, plaintiffs seek costs for work they performed after the grant agreements were terminated. But they fail to account for their duty to mitigate that arose after they received a termination notice, which prevented them from continuing to run up costs under terminated grant agreements. And finally, plaintiffs have not quantified with reasonable certainty the harm they suffered as a result of the alleged breach. Instead, plaintiffs have used the costs they would have incurred (but did not in fact incur) had the United States not terminated the grant agreements. They identify no authority that allows them to use avoided costs, which typically reduce recoveries, as a proxy for the value of the terminated portion of the grant agreements.

Finally, plaintiffs suggest that they are entitled to consequential damages and incidental damages, though they are not seeking summary judgment on these theories. But precedent establishes that consequential damages are not recoverable in the Court of Federal Claims. And incidental damages are limited to those recognized by the Uniform Guidance, which requires (as with other damages) that plaintiffs seek any such costs through the procedures established by regulation. The United States is entitled to summary judgment as to these theories as well.

We are thus entitled to summary judgment both on liability and damages.

3

## STATEMENT OF THE ISSUES

1.      Whether 2 C.F.R. § 200.340(a)(2) was incorporated into the governing grant agreements and thus authorized the termination of plaintiffs' grant agreements based upon DHS's determination that the awards no longer effectuated agency priorities.

2.      With respect to plaintiffs' claimed damages,

        a.   whether plaintiffs are entitled to any damages beyond costs (i) incurred (ii) for which plaintiffs sought reimbursement through the closeout process, (iii) that are recoverable under the Uniform Guidance's Cost Principles.

        b.   whether plaintiffs' damages calculations are required to exclude avoidable costs that plaintiffs incurred after receipt of the termination notice.

        c.   whether plaintiffs have plausibly alleged the amount of their damages with reasonable certainty.

        d.   whether plaintiffs can recover consequential or incidental damages.

## STATEMENT OF THE CASE

This case involves grant agreements awarded by the United States, acting through DHS's Federal Emergency Management Agency (FEMA),[1] to six states under the TVTP grant program.

For Fiscal Years (FY) 2022, 2023, and 2024, DHS issued NOFOs for the TVTP grant program.  Pl. Ex. 8-10.  The NOFOs were issued pursuant to the Department of Homeland Security Appropriations Acts.  *See id.*  The NOFOs addressed "[d]omestic violent extremists (DVE)," which the NOFOs described as "the most persistent terrorism-related threat facing the United States."  *E.g.,* Pl. Ex. 8 at 5.  The NOFOs indicated that "racially or ethnically motivated

---

[1] FEMA is an operational component of DHS that is responsible for administering the TVTP grant program.  Throughout this brief, we use "FEMA" and "DHS" interchangeably.

violent extremists, including white supremacists, likely will remain the most lethal DVE threats in the United States." *Id.* at 5-6. It continued that "[s]ince 2020, however, we have also seen a significant increase in anti-government and anti-authority violent extremism, particularly from militia violent extremists, which typically target law enforcement, elected officials, and government personnel and facilities." *Id.* at 6. The NOFOs indicated that the "TVTP Grant Program seeks to support the development of local prevention programs and online prevention capabilities . . . ." *Id.* It set forth a series of objectives, including "[r]aising awareness of all aspects of why and how individuals radicalize to violence[.]" *Id.* It also set forth a series of priorities, including "Advancing Equity in Awards and Engaging Underserved Communities in Prevention[.]" *Id.* at 7. The NOFOs provided instructions on how prospective applicants, including states, must apply for the award.

The six plaintiff states were among the applicants for TVTP grants. The governing grant agreements are attached as Exhibits 1 through 7 of plaintiffs' motion for summary judgment. The parties agree that, by accepting the terms of the NOFOs, which were incorporated into the award agreements, plaintiffs entered into a binding contract with the United States. Pl. Mot. 5-6.

Each of the grant agreements provided that the DHS Standard Terms and Conditions applicable to a particular fiscal year "apply to all new federal financial awards funded" in that fiscal year. *E.g.*, Pl. Ex. 3 at 5.[2] Further, the NOFOs repeatedly referenced the requirements in 2 C.F.R. Part 200. For instance, the NOFOs indicated that "[i]n terms of overall award management, recipient and subrecipient responsibilities include, but are not limited to: accounting of receipts and expenditures, cash management, maintaining adequate financial

---

[2] For purposes of this case, there is no material difference between the versions of the DHS Standard Terms and Conditions that governed the relevant agreements.

records, reporting and refunding expenditures disallowed by audits, monitoring if acting as a pass-through entity, or other assessments and reviews, and ensuring overall compliance with the terms and conditions of the award or subaward, as applicable, *including the terms of 2 C.F.R. Part 200*." Pl. Ex. 8 at 32 (emphasis added).

The DHS Standard Terms and Conditions incorporate the Uniform Guidance. They provide that "DHS financial assistance recipients are required to follow the applicable provisions of the Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards, located at Title 2, Code of Federal Regulations (C.F.R. Part 200) and adopted by DHS at 2 C.F.R. Part 3002." *E.g.*, Pl. Ex. 12 at 2. Part 3002, in turn, provides as follows: "Under the authority listed above, the Department of Homeland Security adopts the Office of Management and Budget (OMB) Guidance in 2 CFR part 200." 2 C.F.R. § 3002.10.

The Uniform Guidance's cost regulations extensively cover "allowable" costs, "reasonable" costs, and "allocable" costs. *E.g.*, 2 C.F.R. §§ 200.403, 200.404, 200.405; *see generally* 2 C.F.R. Part 200, Subpart E. Any payments for costs that are determined unallowable "must be refunded with interest to" DHS. *Id.* § 200.410. Mandatory audits performed annually during the life of the grant, for instance, may result in audit findings of "questioned costs" that result in a grantee being required "to repay disallowed costs[.]" *Id.* §§ 200.504, 200.516, 200.521. Even after closeout of a grant, DHS is entitled "to disallow costs and recover funds on the basis of a later audit or review." *Id.* § 200.345(a)(1). And "any Federal funds paid to the [grantee] in excess of the amount to which the [grantee] is finally determined to be entitled under the terms of the Federal award constitute a debt to the Federal Government." *Id.* § 200.346. The cost regulations strictly govern "Federal awards," *id.* § 200.100(a)(1), and "must apply … in determining allowable costs under Federal awards," *id.* § 200.401(a).

6

The grant agreements contain two provisions that govern terminations.  First, the NOFO calls attention to certain permitted bases for termination.  It explains that "FEMA may terminate a federal award in whole or in part for one of the following reasons."  Pl. Ex. 8 at 33.  "FEMA and the recipient must still comply with closeout requirements at 2 C.F.R. §§ 200.344-200.345 even if an award is terminated in whole or in part."  *Id.*  The NOFO references three bases for termination: a recipient's noncompliance, FEMA's termination with the consent of the recipient, and notification by the recipient to FEMA that it was terminating the award.  *Id.*  In addition, the Uniform Guidance (to which, as noted above, the awardees were subject) set forth the following bases for termination:

> The Federal award may be terminated in whole or in part as follows:
>
> (1) By the Federal awarding agency or pass-through entity, if a non–Federal entity fails to comply with the terms and conditions of a Federal award;
>
> (2) By the Federal awarding agency or pass-through entity, to the greatest extent authorized by law, if an award no longer effectuates the program goals or agency priorities;
>
> (3) By the Federal awarding agency or pass-through entity with the consent of the non–Federal entity, in which case the two parties must agree upon the termination conditions, including the effective date and, in the case of partial termination, the portion to be terminated;
>
> (4) By the non–Federal entity upon sending to the Federal awarding agency or pass-through entity written notification setting forth the reasons for such termination, the effective date, and, in the case of partial termination, the portion to be terminated. However, if the Federal awarding agency or pass-through entity determines in the case of partial termination that the reduced or modified portion of the Federal award or subaward will not accomplish the purposes for which the Federal award was made, the Federal awarding agency or pass-through entity may terminate the Federal award in its entirety; or

7

(5) By the Federal awarding agency or pass-through entity
pursuant to termination provisions included in the Federal award.

2 C.F.R. § 200.340(a) (2020).[3]

*Termination notices and closeout.*  On July 21, 2025, Christopher Pratt, DHS's senior official performing the duties of under secretary, sent letters to each of the plaintiff states indicating that their TVTP award was terminated.  Pl. Ex. 15-21.  Mr. Pratt also instructed the states that "[f]rom the date of receipt of this letter – July 21, 2025 – your organization is not permitted to incur any additional costs under this award."  Pl. Ex. 15 at 2.

The termination notices explained that "DHS/FEMA is making this termination pursuant to the terms and conditions of the grant award."  *Id.*  "These terms and conditions [of the grant agreements] include[d] the [TVTP NOFO] that applies to your grant and 2 C.F.R. § 200.340(a)(2) (2020), which authorizes DHS/FEMA to terminate your award 'to the greatest extent authorized by law, if an award no longer effectuates the program goals or agency priorities.'"  *Id.*  The notices further explained that "[t]he Department, consistent with President Trump's direction, is focused on advancing the essential mission of enforcing immigration laws, securing the border, and combating anti-Semitism."  *Id.*  "Consequently, grant projects that

---

[3]  Throughout, when we refer to section 200.340, we are referring to the version of the regulation codified in 2020, which is the version that was incorporated into the grant agreements, and which the relevant termination notices cite.  *See* Guidance for Grants and Agreements, 85 Fed. Reg. 3766-01, 3801 (Jan. 22, 2020); Pl. Ex. 15 at 2.  A different version of the regulation, which was originally codified in 2024, is currently in effect.  *See* 2 C.F.R. § 200.340(a)(4) (allowing termination "[b]y the Federal agency or pass-through entity pursuant to the terms and conditions of the Federal award, including, to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities."); *see* Guidance for Federal Financial Assistance, 89 Fed. Reg. 30046-01, 30168-69  (April 22, 2024).  OMB has recently proposed revisions to the Uniform Guidance which, among other revisions, would alter the language of section 200.340.  *See* Regulation for Federal Financial Assistance, 91 Fed. Reg. 32198-01 (May 29, 2026).  The amended regulations, if finalized, would continue to recognize agencies' authority to terminate grants based upon a determination that a grant no longer effectuates program goals or agency priorities.  *Id.* at *32226.

support, or have the potential to support, activities not aligned with DHS's current focus do not effectuate the agency's current priorities." *Id.* "The previous agency priorities under the Fiscal Years 2021-2024 Targeted Violence and Terrorism Prevention Grant Program, aimed at preventing targeted violence and terrorism, resulted in the funding of openly partisan and political organizations as well as the funding of projects within sanctuary jurisdictions that blatantly disregarded federal immigration law." *Id.*

The notices instructed the awardees to proceed through the closeout process in accordance with 2 C.F.R. § 200.344 and indicated that DHS would be making determinations as to whether the claimed costs were allowable. *Id.* at 2-3. It further indicated that, to the extent that the states had any allowable termination costs under 2 C.F.R. § 200.472, they were required to notify DHS in writing and identify the costs within seven days of the letter. *Id.* Finally, the notices indicated that the termination decision was not appealable. *Id.*

After receiving the termination notices, the plaintiffs participated in the closeout process. *E.g.*, Pl. Ex. 22 ¶ 22 (declaration on behalf of Colorado). The closeout process required plaintiffs to provide records of their costs to the Government for a determination of how much they were owed by, or owed to, the Government. *See generally* 2 C.F.R. § 200.344. Plaintiffs aver that certain costs they submitted have not been reimbursed. *E.g.*, Pl. Ex. 27 ¶ 20 (declaration on behalf of Rhode Island). Neither we nor plaintiffs are seeking summary judgment as to unreimbursed costs that plaintiffs submitted through the closeout process.

## ARGUMENT

### I.    Standard of Review

Summary judgment is appropriate if the evidence shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

9

RCFC 56(a).  The moving party bears the burden of showing that there is an absence of any genuine issue of material fact, and the Court must view the evidence in the light most favorable to the non-movant and draw all reasonable inferences in favor of that party.  *See Dairyland Power Coop. v. United States*, 16 F.3d 1197, 1202 (Fed. Cir. 1994) (citations omitted).  "The moving party, however, need not produce evidence showing the absence of a genuine issue of material fact[.]"  *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).  Rather, "when the non-moving party bears the burden of proof on an issue, the moving party can simply point out the absence of evidence creating a disputed issue of material fact" and thereby shift the burden to "the non-moving party to produce evidence showing that there is such a disputed factual issue in the case."  *See Simanski v. Sec'y of Health & Human Servs.*, 671 F.3d 1368, 1379 (Fed. Cir. 2012) (citations omitted).

## II.      The United States Is Entitled To Summary Judgment On Liability

Plaintiffs contend that the United States breached the governing grant agreements by terminating the awards on the grounds that they no longer effectuated program goals or agency priorities.  The United States is entitled to summary judgment on this claim.

### A.      The Termination Provisions In Section 200.340—Including The "Agency Priorities" Provision—Were Incorporated Into The Grant Agreements

The Uniform Guidance's termination provisions were incorporated into the grant agreements by reference or, alternatively, as a matter of law under the *Christian* doctrine.

#### 1.      Section 200.340's Termination Provisions Are Incorporated By Reference Into The Grant Agreements

Under governing precedent, the termination provisions of section 200.340 were incorporated into the grant agreements.

As plaintiffs note, the Federal Circuit has established a two-part test for determining whether a contract incorporates extrinsic material.  According to this test, "the incorporating contract must use language that is *express* and *clear*, so as to leave no ambiguity about the identity of the document being referenced, nor any reasonable doubt about the fact that the referenced document is being incorporated into the contract."  *Northrop Grumman Info. Tech. v. United States*, 535 F.3d 1339, 1344 (Fed. Cir. 2008).  This means that "the language used in a contract to incorporate extrinsic material by reference (1) must explicitly, or at least precisely, identify the written material being incorporated, and (2) must clearly communicate that the purpose of the reference is to incorporate the referenced material into the contract (rather than merely to acknowledge that the referenced material is relevant to the contract, e.g., as background law or negotiating history)."  *Id.* at 1345.  That said, "a requirement that contract language be explicit or otherwise clear and precise does not amount to a rule that contracting parties must use a rote phrase or a formalistic template to effect an incorporation by reference."  *Id.*

This test is met as to the Uniform Guidance.  Here, the incorporation "leave[s] no ambiguity about the identity of the document being referenced, nor any reasonable doubt that the referenced document is being incorporated into the contract."  *Id.* at 1344.  In particular, there is no ambiguity that, first, the DHS Standard Terms and Conditions reference the Uniform Guidance, which they refer to by citing their location in the Code of Federal Regulations, *see* Pl. Ex. 11 at 2; or second, the NOFO references the Uniform Guidance when it establishes that grantees are responsible for "ensuring overall compliance with the terms and conditions of the award or subaward, as applicable, including the terms of 2 C.F.R. Part 200."  Pl. Ex. 8 at 32. Nor is there any reasonable doubt that the intent is to incorporate these regulations as against the

11

grantees. By providing that "recipients are required to follow the regulations," Pl. Ex. 11 at 2, the DHS Standard Terms and Conditions makes clear that the "referenced document is being incorporated into the contract" as establishing duties for plaintiffs. By the same token, the NOFOs' reference to 2 C.F.R. Part 200 makes clear that grantees must "ensur[e] overall compliance" with these regulations. Pl. Ex. 8 at 32. Of note, incorporation by reference is consistent with the regulation governing mandatory provisions in grant agreements, which provides that "the following general terms and conditions"—including the termination provisions—must be incorporated "either in the Federal award *or by reference*, as applicable." 2 C.F.R. § 200.211 (c)(1) (emphasis added).

Plaintiffs read the "applicable provisions" language in the DHS Standard Terms and Conditions as excluding section 200.340 from the incorporation. Pl. Mot. 17-18; *see* Pl. Ex. 11 at 2. But, as noted above, the NOFOs also include language that incorporates the Uniform Guidance without this limitation. Pl. Ex. 8 at 32 (noting that recipients are responsible for "ensuring overall compliance with the terms and conditions of the award or subaward, as applicable, including the terms of 2 C.F.R. Part 200."). Plaintiffs seem to understand the "as applicable" language in the NOFOs as modifying the phrase "the terms of 2 C.F.R. Part 200." Pl. Mot. 17 & n.6; Pl. Ex. 8 at 32. Given its placement after "award or subaward," a better reading is that "as applicable" is modifying "award or subaward": that is, any given agreement is either an award or a subaward, and the language is referencing whichever term is applicable. If the intent was to modify "the terms of 2 C.F.R. Part 200," then the "as applicable" phrase would more reasonably be placed between "including" and "the terms." *See* Pl. Ex. 8 at 32. And plaintiffs do not provide any limiting principle on their focus on the "applicable" language, which seems to allow plaintiffs to decide after the fact that particular disfavored provisions of the

12

Uniform Guidance are inapplicable. In fact, the termination provision at issue here makes plaintiffs' right to perform subject to DHS's right to terminate performance. *See* 2 C.F.R. § 200.340(a). Plaintiffs thus provide no reason that a termination provision would fall into the category of provisions that are not applicable to them.

Plaintiffs also call attention to the NOFOs' statement that "pass-through entities should refer to 2 C.F.R. § 200.340 for additional information on termination regarding subawards." Pl. Mot. 17 n.7; *see* Pl. Ex. 8 at 33. But this language undermines rather than supports plaintiffs' argument, in that it reflects an assumption that the termination provisions of section 200.340 were incorporated into the grant agreements. *See id.* We are aware of no reason that the provisions of 2 C.F.R. § 200.340 would apply to pass-through entities, but not to states like plaintiffs.

Because section 200.340 was incorporated into the grant agreements, DHS was permitted to terminate the agreement based upon a determination that the grant agreements no longer effectuated agency priorities.[4]

---

[4] In the context of a different grant agreement, the Southern District of New York concluded that section 200.340 did not authorize a particular grant termination. *Metro. Transp. Auth. v. Duffy*, 25-cv-1413, 2026 WL 588117, at *8 (S.D.N.Y. Mar. 3, 2026); *see also id.*, 784 F.Supp.3d 624, 669 (S.D.N.Y. 2025). The Secretary is appealing the order entered in *Duffy*. *See id.*, *appeal docketed*, No. 26-1213 (2d. Cir. May 4, 2026). In any event, *Duffy* considered the version of section 200.340 that was in effect between 2024 and the present day, not the version that was enacted in 2020. *See* 2 C.F.R. § 200.340(a)(2) (2024) (authorizing termination "[b]y the Federal agency or pass-through entity pursuant to the terms and conditions of the Federal award, including, to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities.").

2.      Alternatively, Section 200.340's Termination Provisions Are Incorporated As A Matter of Law Via The *Christian* Doctrine

Even if the Court concludes that the references in the grant agreements are insufficient to incorporate by reference the termination provisions at section 200.340, the termination provisions in section 200.340 are incorporated as a matter of law through the *Christian* doctrine.

Under the *Christian* doctrine, "a mandatory contract clause that expresses a significant or deeply ingrained strand of procurement policy is considered to be included in the contract by operation of law." *Tolliver Grp. v. United States*, 140 Fed. Cl. 520, 529 (2018) (quoting *S.J. Amoroso Constr. Co. v. United States*, 12 F.3d 1072, 1075 (Fed. Cir. 1993)). "The doctrine turns on whether the contract omits a mandatory clause, not on whether the omission was intentional or inadvertent." *Id.* As we explain below, although *Christian* arose in the procurement contract context, the same principles that undergird the holding in *Christian* apply here and the Court should accordingly follow its reasoning in this case.

Both *Christian* criteria are satisfied here. First, it is mandatory that grants contain the termination provisions set forth in section 200.340. Under 2 C.F.R. § 200.211(c), "[f]ederal agencies *must incorporate* the following general terms and conditions either in the Federal award or by reference, as applicable: . . . (v) ***Termination provisions.*** Federal awarding agencies must make recipients aware, in a clear and unambiguous manner, of the termination provisions in § 200.340, including the applicable termination provisions in the Federal awarding agency's regulations or in each Federal award." 2 C.F.R. § 200.211 (2020); *see also* 2 C.F.R. § 200.211 (2024) (containing similar language). DHS expressly adopted these regulations. *See* 2 C.F.R. § 3002.10. This provision, as adopted by DHS in its regulations, uses the word "must" twice, and "as a rule courts treat the word 'must' as mandatory." *Bridges v. United States*, 156 Fed. Cl. 129, 133 n.3 (2021) (collecting cases). Moreover, the provision specifically identifies the

14

"termination provisions in § 200.340" as subject to this mandatory rule of inclusion.  2 C.F.R. § 200.211(c).  Thus, by regulation, grant agreements must incorporate the termination provisions in section 200.340.

Second, this provision "expresses a significant or deeply ingrained strand" of policy that has long guided the Government's contracting authority.  In particular, it expresses the view that the Government should have flexibility in ending contracts that no longer serve the Government's policy interests.  Indeed, this is the same strand of policy that originally led the Court of Claims to recognize the *Christian* doctrine.  *See G. L. Christian and Assocs. v. United States*, 312 F.2d 418, 426 (Ct. Cl. 1963) (recognizing "deeply ingrained strand of public procurement policy" that allows Government "to provide for the cancellation of defense contracts when they are no longer needed" and that prevents the "recovery of anticipated but unearned profits").  To be clear, we are not arguing that the states' grant agreements were constructively terminated for convenience.  Termination for convenience is a doctrine that was created to address for-profit contracts, not cost-reimbursement grants like this one.  We are arguing only that the same "deeply ingrained" policy interest that underlines terminations for convenience also underlies the permissible bases for termination set out in section 200.340.

We note that another judge on this Court has concluded that the *Christian* doctrine is not applicable to financial assistance agreements, as they are not procurement contracts.  *Earman v. United States,* 114 Fed. Cl. 81, 112 (2013), *aff'd*, 589 Fed. App'x 991; *see also Metro. Transp. Auth. v. Duffy*, 784 F.Supp.3d 624, 672 (S.D.N.Y. 2025) (citing *Earman* in arriving at same conclusion).  *Earman* relied solely on the fact that *Christian* referred only to "procurement policy" in explaining its rationale.  *Id.* (quoting *Gen. Eng'g & Mach. Works v. O'Keefe,* 991 F.2d 775, 779 (Fed. Cir. 1993)). We respectfully disagree with this aspect of *Earman*'s reasoning,

15

which is not binding on this Court.  It is true that, subsequent to *Christian*, "Congress passed the

[Federal Grant and Cooperative Agreement Act (FGCAA] in light of its findings that there was

'a need to distinguish [f]ederal assistance relationships from [f]ederal procurement

relationships,' as well as 'uncertainty as to the meaning of . . . "cooperative agreement.'" *Hymas*

*v. United States*, 810 F.3d 1312, 1325 (Fed. Cir. 2016) (quoting FGCAA, 92 Stat. at 3).  But it

does not follow that the Court of Claims had those technical distinctions in mind in 1961 when it

decided *Christian* (and, indeed, as *Hymas* points out, the FCGAA was necessary in part because

Congress perceived a need to distinguish between these different arrangements).  *Christian* is

better read as articulating a rule that applies generally to exercises of the Government's

contracting authority, rather than being limited to procurements as defined under the FCGAA,

given that policy rationales that support the rule in *Christian* apply to financial assistance

agreements as well.  *See Nat'l Pork Producers Council v. Ross*, 143 S.Ct. 1142, 1144 (2023)

("the language of an opinion is not always to be parsed as though we were dealing with language

of a statute." (cleaned up)).

Because section 200.340 was incorporated in the grant agreements, DHS did not breach

the agreements by terminating the agreements.

### B.      Plaintiffs' Arguments To The Contrary Are Unavailing

Plaintiffs' argument on liability is largely predicated upon their view that section 200.340

was not incorporated into their grant agreements.  As we explained above, they are incorrect.

Moreover, their remaining arguments are unavailing.

Plaintiffs argue that the three bases for termination identified in the NOFOs reflect the

exclusive bases allowed for termination.  Pl. Mot. 13-14.  But the regulation relied upon by DHS

in terminating plaintiffs' grants expressly recognized (a) a determination that an award "no

16

longer effectuates the program goals or agency priorities" and (b) a termination "pursuant to termination provisions included in the Federal award" as two separate bases for termination. *Compare* 2 C.F.R. § 200.340(a)(2) *with id.* § 200.340(a)(5). Section 200.340(a)(5) is only one of five permissible bases for termination recognized in the regulation, which supports the view that the termination provisions expressly identified in the NOFOs are not necessarily exclusive.

Plaintiffs' argument also runs headlong into the language of the NOFOs themselves, which provide that "FEMA *may* terminate a federal award in whole or in part for one of the following reasons." Pl. Ex. 8 at 33 (emphasis added). "'May' is a permissive word, not a command." *Champagne v. McDonough*, 122 F.4th 1325, 1330 (Fed. Cir. 2024). A contractual provision that uses the word "may" is most reasonably read as authorizing particular courses of action, not requiring them. *See A.A.B. Joint Venture v. United States*, Nos. 04–1719 C, 05–114 C, 05–1172 C, 06–49 C, 2008 WL 4415054, at *7 (2008) (relying on Court of Claims cases to explain that "courts should generally presume clauses in government contracts containing the word 'may' to be permissive only, unless the contract contains additional, specific language that establishes a warranty."). Moreover, the termination provision in the text of the NOFOs do not contain any restrictive language, such as "only," or any indication that they supersede broader language located elsewhere in the agreement. The NOFO's termination provisions are thus best read as calling attention to specific examples of possible bases for termination without restricting the rights of DHS to the extent that some other source of law (such as section 200.340, as incorporated into the contract) authorizes separate bases for termination.

Alternatively, and at best for plaintiffs, they have identified a patent ambiguity in the award documents. Under this reading, the grant agreements "contain[] facially inconsistent provisions" regarding when grantees can be terminated: the NOFO lists three possible

17

termination grounds, while the Uniform Guidance lists five.  *See Blue Tech Inc. v. United States*, 155 Fed. Cl. 229, 238 (2021) ("[a] patent ambiguity is present when the contract contains facially inconsistent provisions . . . .") (quoting *K-Con, Inc. v. Sec'y of Army*, 908 F.3d 719, 722 (Fed. Cir. 2018)).  And "[i]f a patent ambiguity is found in a contract, the contractor has a duty to inquire of the contracting officer the true meaning of the contract before submitting a bid." *Newsom v. United States*, 676 F.2d 647, 649 (Ct. Cl. 1982).  Plaintiffs have not alleged that they have made any such pre-award inquiries here of DHS with respect to the termination provisions. Plaintiffs' focus on the *contra preferentem* doctrine, which applies only to latent ambiguities, is thus misplaced.  *See* Pl. Mot. 21-22.  To the extent that there is any ambiguity in the grant agreements, the ambiguity was obvious on the face of the documents by comparing the provision in the NOFO with section 200.340.  *Blue Tech*, 155 Fed. Cl. at 238.  Thus, any ambiguity was patent and was required to be raised pre-award.  *See id.*

Plaintiffs also suggest that DHS failed to comply with the requirement to make grantees aware of potential bases for termination.  Pl. Mot. 20.  As we explained above, the NOFOs and DHS's Standard Terms and Conditions in fact both explicitly incorporated the Uniform Guidance, which permitted DHS to terminate grants based upon a determination that the grant "no longer effectuates program goals or agency priorities."  *See* Pl. Ex. 11 at 2, Pl. Ex. 8 at 32; 2 C.F.R. § 200.340(a)(2).  Plaintiffs fail to explain why the NOFOs and the DHS Standard Terms and Conditions were required to restate the entire Uniform Guidance, especially where 2 C.F.R. § 200.211(c)(1) expressly authorizes incorporation by reference.  Even setting that aside and accepting plaintiffs' premise that the grant agreements did not comply with the Uniform Guidance, the regulations plaintiffs identify do not impose any contractual duties on the Government.  The Uniform Guidance was incorporated only against recipients of awards, not

against the Government.  *See* Pl. Ex. 11 at 2; *accord* Pl. Mot. 18 ("The reference only to recipients must be read plainly as a decision to bind only one side of the grant agreement (the grantee) to the Uniform Guidance, while not imposing the same duty on DHS/FEMA."). Accordingly, the cited regulations are irrelevant to plaintiffs' claim for a breach of contract.

To the extent that plaintiffs are contending that DHS's alleged failure to comply with the Uniform Guidance in and of itself gives rise to a claim based upon a violation of a regulation, there are at least three problems with such an argument.  First, plaintiffs have not suggested (and would not be able to establish) that the Uniform Guidance is a money-mandating source of law in the context of alleged failures to clearly identify applicable termination provisions.  *See Fisher v. United States*, 402 F.3d 1167, 1173 (Fed. Cir. 2005) (*en banc*).  Second, even if it were money mandating, plaintiffs cannot identify any private right of action that allows them to sue to enforce the requirements set out in the Uniform Guidance.  *INSLAW, Inc. v. United States*, 39 Fed. Cl. 307, 360 (1997) (rejecting plaintiff's argument that host of regulations created a private right of action allowing plaintiff to sue in this Court).  And third, even if plaintiffs had standing to enforce these regulations, they were on notice of this alleged deficiency before they agreed to the award.  They were free to raise the alleged failure to comply with the Uniform Guidance prior to seeking the grant.  Having failed to do so, they have waived any such challenge.  *Cf. Blue & Gold Fleet v. United States*, 492 F.3d 1308, 1314 (Fed. Cir. 2007) (applying patent ambiguity doctrine to procurement solicitation).

Thus, the "agency priorities" language in the Uniform Guidance was incorporated into the grant agreements.  None of plaintiffs' arguments show otherwise.  As such, DHS did not breach the grant agreements by terminating them on account of a change in agency priorities.

19

**III.    The United States Is Entitled To Summary Judgment With Respect To Plaintiffs' Alleged Damages**

Even if the Court does not grant summary judgment to the United States regarding liability, it should grant summary judgment as to plaintiffs' claimed damages.

Plaintiffs seek the full value of the grants as expectations damages.  Their claimed damages fall into two categories.  Certain plaintiffs are seeking to recover costs that they admit that they admittedly did not incur.  *See* Pl. Mot. 25 ("For other Plaintiff States, they were not able to come up with alternative state funding and had to abandon their TVTP-funded projects, leaving them unable to accomplish the public purposes of the grants on behalf of their citizens."). Other plaintiffs are seeking to recover costs they incurred after the termination notice that they paid for using alternative sources of funding.  Pl. Mot. 24.

As we explain below, neither category of damages is recoverable.  The grant agreements promised only to reimburse plaintiffs' costs to the extent that (among other requirements) they were actually incurred.  Moreover, to the extent that plaintiffs seek to recover costs incurred after they received a termination notice, they are failing to contend with the principle of loss avoidability and their duty to mitigate that arose once DHS sent plaintiffs a termination notice.

We are thus asking this Court to rule that plaintiffs' damages must satisfy four prerequisites: they must (a) be incurred costs (b) for which plaintiffs sought reimbursement through the closeout process, (c) that are recoverable under the cost principles identified in the Uniform Guidance, and (d) exclude avoidable costs that plaintiffs incurred after receipt of the termination notice.  Absent these limitations, plaintiffs' damages theory would run afoul of fundamental principles of damages.  In particular, they would be put in a better position than they would have been had the contract been performed; they would be relieved of their duty to mitigate; and they would be allowed to recover speculative damages that they cannot establish

20

with reasonable certainty.  The Court should grant summary judgment by ruling in favor of the United States' theory of damages and rejecting plaintiffs' theory of damages.

### A.    Plaintiffs' View Of Their Expectation Interests Is Based Upon A Misunderstanding Of The Grant Agreements

To begin, plaintiffs' brief is predicated upon a misunderstanding of the expectation interests arising out of the grant agreements.  Their damages theory is thus fatally flawed.

The only monetary promise in the grant agreements is to reimburse costs incurred by the grantees to the extent that they are allowable, reasonable, and allocable under the Uniform Guidance.  The grant agreements provide that "[a]ll costs charged to awards covered by this NOFO must comply with the Uniform Administrative Requirements, Cost Principles, And Audit Requirements at 2 C.F.R. Part 200, unless otherwise indicated in the NOFO, or the terms and conditions of the award."  *E.g.*, Pl. Ex. 8, at 17.  "This includes, among other requirements, that costs *must be incurred*, and products and services must be delivered, within the period of performance of the award."  *Id.* (citing 2 C.F.R. § 200.403(h)) (emphasis added).  The cost regulations incorporated into the grant agreements extensively cover "allowable" costs, "reasonable" costs, and "allocable" costs.  *E.g.*, 2 C.F.R. §§ 200.403, 200.404, 200.405.  To the extent DHS determines (such as through an audit, *Id.* §§ 200.504, 200.516, 200.521) that grantees have obtained funding in excess of their costs, those funds can be recovered by DHS and, if not recovered, constitute a debt to the Federal Government.  *Id.* §§ 200.410, 200.346.  In other words, plaintiffs had no reasonable expectation that they would receive the full value of their grants irrespective of what work they performed; rather, their expectation interests could result at most only in expectation of reimbursement of reasonable, allowable, and allocable costs that were incurred.

21

Thus, the grant agreements reflect a limited promise to reimburse certain categories of costs, up to the budgeted total amount set forth in the grant agreement, rather than a promise to compensate a contractor for its output.  Although this Court's review of grants or grant-type instruments as contracts may be of recent origin, *see Boaz Housing Authority v. United States*, 994 F.3d 1359, 1368 (Fed. Cir. 2021),[5] *Columbus Regional Hospital v. United States*, 990 F.3d 1330 (Fed. Cir. 2021), this approach to contracting is not anomalous.  The FAR recognizes cost-reimbursement contracts.  *See* FAR 16.301-1 ("Cost-reimbursement types of contracts provide for payment of allowable incurred costs, to the extent prescribed in the contract."); FAR 31.103(b)(1) ("[T]he contracting officer shall incorporate the cost principles and procedures [of subpart 31.2] in contracts with commercial organizations as the basis for [d]etermining reimbursable costs under (I) cost-reimbursement contracts ... and (ii) the cost-reimbursement portion of time-and-materials contracts ....").  "In a cost-reimbursement contract, the Government agrees to pay the contractor for all allocable and allowable costs incurred under the contract."  *See McDonnell Douglas Corp. v. United States*, 37 Fed. Cl. 295, 299 (1997), *modified by* 39 Fed. Cl. 665, 665 (1997).  "[T]he focus of a cost-reimbursement contract is contractor input, not output."  *Id.*  "Cost principles are a necessary predicate to a cost-reimbursement contract because it is imperative for both parties to establish the scope of the undertaking's

---

    [5]  Plaintiffs' reliance upon *Boaz* in support of their damages argument, Pl. Mot. 27, is misplaced.  *Boaz* addressed Tucker Act jurisdiction over grant agreements.  *Boaz* did not address any of our arguments for why plaintiffs are not entitled to the damages they seek here: it neither considered whether a Federal grantee's damages are limited by the standards set forth in the Uniform Guidance, nor the extent to which a grantee is required to mitigate its damages, nor the extent to which a grantee must prove its damages with reasonable certainty.  Indeed, *Boaz* expressly disclaimed addressing those types of arguments.  *See* 994 F.3d at 1370 n.7 (citing *White v. Delta Constr. Int'l Inc.*, 285 F.3d 1040, 1043 (Fed. Cir. 2002) to emphasize that the decision did not displace established damages principles).  Rather, *Boaz* rejected the Government's contention that the governing agreement did not contemplate money damages—an argument we are not making here.  994 F.3d at 1366-70.

allowable, allocable costs (*i.e.,* the 'reimbursable' costs)." *Information Systems & Networks Corp. v. United States*, 64 Fed. Cl. 599, 606–07 (2005).

In effect, grant agreements can be viewed as a type of cost reimbursement contract (albeit one that does not fall under the FAR). Accordingly, it is "[m]ere speculation" for plaintiffs to assume that they would have received the full value of their grants irrespective of what costs they incurred. *Willems Indus. v. United States*, 295 F.2d 822, 831 (Ct. Cl. 1961). Indeed, any such assumption would impermissibly place plaintiffs "in a better position" than if the grant agreements had not been terminated. *Bluebonnet Sav. Bank, F.S.B. v. United States*, 339 F.3d 1341, 1345 (Fed. Cir. 2003); *see also White v. Delta Constr. Int'l v. United States*, 285 F.3d 1040, 1043 (Fed. Cir. 2002) (holding that, where United States had breached obligation to provide plaintiff with guaranteed minimum amount of work, plaintiff was not entitled to recover full amount of minimum guarantee irrespective of costs it had incurred). Plaintiffs' damages theory would allow them to recover for work they did not perform and costs they did not incur, which under no circumstance would be allowed under the governing grant agreements. *White*, 285 F.3d at 1043 (the non-breaching party "should on no account get more than would have accrued if the contract had been performed." (quoting *DPJ Co. v. FDIC,* 30 F.3d 247, 250 (1st Cir. 1994)); *Boaz*, 994 F.3d at 1370, n.7 (recognizing *White*'s holding limiting the amount of recoverable damages). Indeed, were the plaintiffs to obtain the damages they seek under the grant agreements, they would be in the position of owing a debt to the Government on account of compensation for un-incurred costs. *See* 2 C.F.R. § 200.346.

In light of the nature of this contract, plaintiffs could reasonably expect that any incurred costs that were recoverable under the Uniform Guidance's cost principles would be reimbursed.

23

But they could not reasonably expect to recover more than their incurred, recoverable costs.  The Court should thus reject plaintiffs' damages theory.

**B.      Plaintiffs Fail To Account For Their Duty To Mitigate And Fail To Identify Damages That Can Be Proven With Reasonable Certainty**

In addition to mischaracterizing their expectation interests, plaintiffs also fail to contend with two fundamental principles of damages.

First, they do not contend with the principle of loss avoidance.  "[A] party cannot recover damages for loss that he could have avoided by *reasonable efforts.*"  *Robinson v. United States,* 305 F.3d 1330, 1333 (Fed. Cir. 2002) (quoting Restatement (Second) Contracts § 350 cmt. b (1981)).  One consequence of this principle is that "[m]itigation is appropriate where a reasonable person, in light of the known facts and circumstances, would have taken steps to avoid damage."  *Ind. Mich. Power Co. v. United States*, 422 F.3d 1369, 1375 (Fed. Cir. 2005).

Plaintiffs here received termination notices that instructed them to immediately cease work under the grants.  Pl. Ex. 15-21.  Once they received these notices, plaintiffs were obligated to mitigate their damages—a point they do not contest.  *See Ind. Mich. Power Co.*, 422 F.3d at 1375.  Plaintiffs nevertheless seek compensation for costs incurred after the termination notice was issued: for instance, by asserting that the termination caused them to redirect funding from other priorities, *see, e.g.,* Pl. Ex. 25, ¶ 24.  But, after the termination notice informed plaintiffs that the grant agreements had been terminated and they must stop incurring costs under the agreements, they had a duty to mitigate and avoid damages for losses that were avoidable.  To be sure, plaintiffs were free to make a voluntary decision in their sovereign capacity to continue funding the work that had previously been funded under the grant agreements using other sources of funding.  But the costs of doing so are not chargeable to the United States, which made clear through the termination notices that the grant agreements were no longer in existence.

*See* Pl. Ex. 15-21; 3 E. Allan Farnsworth and Zachary Wolfe, *Farnsworth on Contracts* § 12.08, at 12-67 (4th ed. 2019) ("To take an obvious case, the builder who stubbornly continues work after the owner has repudiated the contract cannot recover for expenditures in doing work after the repudiation."). Plaintiffs thus cannot recover for costs that were incurred after they received the termination notice.

Second, plaintiffs cannot establish with reasonable certainty the value of certain losses they claim. As part of their summary judgment submission, plaintiffs aver that, but for the termination, they would have hired for other positions, *see* Pl. Mot. 25; held additional conferences, *see* Pl. Ex. 26, ¶ 18; and been able to "accomplish the public purpose of the grants[,]" *see* Pl. Mot. 25, by making their state safer, Pl. Ex. 22, ¶ 25. As we explained above, this mischaracterizes what can be reasonably expected under the grant agreements, which gave rise only to an expectation that recoverable costs would be reimbursed.

Even setting that aside, these interests do not give rise to a cognizable damages claim. At best, plaintiffs' assertions about their alleged inability to achieve the public purpose of the grants through a state-wide diminution in safety resulting from the termination of these grants are speculative. *San Carlos Irr. and Drainage Dist. v. United States*, 111 F.3d 1557, 1563 (Fed. Cir. 1997) (explaining "that contract law precludes recovery for speculative damages."). This is especially so given that, as plaintiffs acknowledge, acts and threats of terrorism occurred in their states prior to the issuance of the grants, *e.g.*, Pl. Ex. 23, ¶ 7, and plaintiffs do not attempt to explain how they can quantify the alleged difference in state-wide safety pre-termination and post-termination. Much less do plaintiffs connect the foregone work (such as a cancelled conference, Pl. Ex. 26, ¶ 18, an abandoned plan of "standing up an Advisory Group," Pl. Ex. 27, ¶ 21, and cancelled training programs, Pl. Ex. 24, ¶ 17) to an alleged diminution in safety that

25

can be quantified with reasonable certainty.  If anything, plaintiffs' theory resembles a claim for lost business opportunities of the sort that courts have routinely rejected.  *See Lucas v. United States*, 25 Cl. Ct. 298, 311 (1992) ("Damages for lost business opportunities are not recoverable."); *Fields v. United States*, 147 Fed. Cl. 352, 357 (2020) ("The Court's award of any amount of damages based on Plaintiff's lost opportunity theory is speculative and would place Plaintiff in a position superior to the one it would reasonably have occupied had the breach not occurred.").  In addition, plaintiffs have not established that a reduction in safety would be the type of injury that is compensable at common law.  By analogy, it is generally accepted that emotional disturbance cannot give rise to contract damages except in special circumstances.  Restatement (Second) of Contracts § 353 (1981).  In sum, because plaintiffs' averments run contrary to the law governing damages, they are insufficient to avoid summary judgment being entered against them.  *See Willem*, 295 F.2d at 831 ("The claimant bears the burden of proving the fact of loss with certainty, as well as the burden of proving the amount of loss with sufficient certainty so that the determination of the amount of damages will be more than mere speculation.")

Comparing plaintiffs' damages theory to typical breach cases makes clear the anomalous nature of the remedy sought by plaintiffs here.  Non-breaching parties will often seek to recover anticipatory profits as expectancy damages.  In such cases, "it must be 'definitely established' that without the government's breach there would have been a profit."  *Rumsfeld v. Applied Companies, Inc.*, 325 F.3d 1328, 1340 (Fed. Cir. 2003) (quoting *Cal. Fed. Bank v. United States*, 245 F.3d 1342, 1349 (Fed. Cir. 2001)).  As *Rumsfeld* demonstrates, plaintiffs generally have a tall task in demonstrating that they in fact would have obtained profits had the Government not breached.  *See id.*

26

Plaintiffs here seek to sidestep these barriers by contending that expectancy damages are not limited to lost profits. Pl. Mot. 26. But the fact that they are not seeking lost profits does not allow them to bypass the usual hurdles of damages recovery. Rather, it puts the burden on them to identify some other source of law that authorizes their claimed damages. Tellingly, although plaintiffs cite section 347 of Restatement (Second) of Contracts for the proposition that lost profits are not equivalent to expectation damages, Pl. Mot. 26, they fail to acknowledge section 347's instruction that, when identifying lost profits "is not possible . . . compensation for lost value may be precluded by the limitation of certainty." Restatement (Second) of Contracts § 347 cmt. b (1981) (citing § 352). Nor do they anchor their claim for damages in any other theory, apart from lost profits, that allows them to recover damages equivalent to the face value of the grants.

Instead, plaintiffs seek as damages the amount they would have paid employees, and would have expended on costs such as organizing conferences, if the grants had not been terminated. Pl. Mot. 24-25. But seeking avoided costs as damages gets the analysis backwards. An assertion that plaintiffs would have paid employees and expended funds on organizing conferences, but instead forwent those costs as a result of the grant terminations, would typically be a basis for *reducing* their recovery, not establishing it. *See White*, 285 F.3d at 1043; Restatement (Second) of Contracts § 347 cmt. d (1981). Plaintiffs drive their theory further into unchartered territory when they contend that, unlike every other claimant, they do not need to offset their damages claim by costs avoided, because they "would have been entitled to full reimbursement of costs under the agreements." Pl. Mot. 26; *but see White*, 285 F.3d at 1043 (holding that plaintiff's avoided costs could not be disregarded when calculating damages). This

27

assertion only emphasizes the unsoundness of a methodology that relies upon costs avoided as a basis for quantifying an affirmative damages claim.

Finally, we note that plaintiffs do not explicitly ground their damages theory in a request for specific performance. We thus do not understand plaintiffs to be seeking this equitable remedy here. That said, their request for the full potential value of the grants irrespective of incurred costs does bear some resemblance to a request that the Court order specific performance. A grant of specific performance would constitute an award of equitable relief that is outside of the scope of the Court's subject-matter jurisdiction. *See Gates v. United States*, 33 Fed. Cl. 9, 12 (1995) ("Claims for specific performance are not generally within the Court of Federal Claims' subject-matter jurisdiction.") (citing *Coggeshall Dev. Corp. v. United States,* 23 Cl. Ct. 739, 744 n. 7 (1991), *appeal dismissed,* 33 F.3d 64). Were plaintiffs to request specific performance, the Court would not possess subject-matter jurisdiction to award it.

Ultimately, plaintiffs fail to identify any authority that allows them to (a) recover the purely speculative purported benefits in state-wide well-being that would have come from continuing to perform the awards, or (b) use their avoided costs as a proxy for the value they would have obtained from the contract being performed. By seeking the full value of their grants as expectation damages, plaintiffs effectively assume that the benefit to them is equivalent to the cost they would have incurred had the contract not been terminated. But this is not a viable basis for a damages theory. The Court should reject it.

### C.   Plaintiffs Cannot Recover Any Consequential Damages Or Incidental Damages Apart From Those That Are Compensable Under The Uniform Guidance's Cost Principles

Plaintiffs' briefing suggests that they may seek consequential damages and/or incidental damages, although their motion for summary judgment does not ask the Court to rule on their

28

entitlement to such damages now.  Pl. Mot. 23 n.10.  We are entitled to summary judgment on both categories of damages.

First, a claim for consequential damages is a nonstarter.  It is settled that "remote and consequential damages are not recoverable in a common-law suit for breach of contract, especially in suits against the United States for the recovery of common-law damages, such as the instant case."  *Wells Fargo Bank N.A. v. United States*, 88 F.3d 1012, 1021 (Fed. Cir. 1996) (cleaned up).  We are therefore entitled to summary judgment on any claim for consequential damages.

Second, with respect to incidental damages, the amount of such damages is limited by the parties' agreement as to the costs plaintiffs would be allowed in the event of termination.

Generally, "[i]ncidental losses include costs incurred in a reasonable effort, whether successful or not, to avoid loss, as where a party pays brokerage fees in arranging or attempting to arrange a substitute transaction."  *Globe Savings Bank, F.S.B. v. United States*, 65 Fed. Cl. 330, 346 (2005) (citing *Restatement (Second) Contracts* § 347 cmt. C).  But the grant agreements themselves specified what recovery grantees would receive in the event of a termination.  The cost regulations contained in the Uniform Guidance, which were incorporated in the grant agreements, govern the recoverability of "termination costs" that "would not have arisen had the Federal award not been terminated."  2 C.F.R. § 200.472(a); *see also id.* § 200.343.  The regulations also provide for "closeout costs."  *Id.* § 200.472(b).  Grantees "may charge the Federal award during the closeout for the necessary administrative costs of that Federal award," such as "salaries of personnel preparing final reports" and "publication and printing costs."  *Id.*  The recovery of incidental damages is thus controlled by the terms of the governing agreement.

29

Plaintiffs thus appear to be seeking a category of damages that are redundant of a category of costs to which the Uniform Guidance (as incorporated in the contract) already entitles them.  This would be an impermissible double recovery.  *See Tex. Advanced Optoelectronic Solutions  v. Renesas Elec. Am.*, 895 F.3d 1304, 1328 (Fed. Cir. 2018).  The Court should thus reject this theory and grant summary judgment to us on the issue of whether plaintiffs are entitled to incidental damages beyond those that are compensable under the Uniform Guidance.

## CONCLUSION

For these reasons, we respectfully request that the Court grant summary judgment in favor of the United States and deny plaintiffs' motion for summary judgment.

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

PATRICIA M. McCARTHY
Director

MARTIN F. HOCKEY, JR.
Deputy Director

s/ Matthew J. Carhart
MATTHEW J. CARHART
Senior Trial Counsel
Commercial Litigation Branch, Civil Division
U.S. Department of Justice
P.O. Box 480, Ben Franklin Station
Washington, DC 20044
Telephone: (202) 307-0313
Email: Matthew.Carhart@usdoj.gov

June 29, 2026                    Attorneys for Defendant

30