**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

STATE OF COLORADO; STATE OF
MARYLAND; STATE OF MINNESOTA;
STATE OF HAWAI‘I; STATE OF
MICHIGAN; and STATE OF RHODE
ISLAND,

         *Plaintiffs*,

   v.

UNITED STATES, *acting through its
executive agency*, the Department of
Homeland Security, *and its subagency*, the
Federal Emergency Management Agency,

         *Defendant.*

No. 26-315
(Judge Somers)

**<ins>PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF
MOTION FOR PARTIAL SUMMARY JUDGMENT
AND OPPOSITION TO DEFENDANT'S CROSS-MOTION
FOR SUMMARY JUDGMENT</ins>**

## TABLE OF CONTENTS

TABLE OF CONTENTS..............................................................................................................i

TABLE OF AUTHORITIES ......................................................................................................ii

INTRODUCTION ...................................................................................................................... 1

STANDARD OF REVIEW ........................................................................................................ 2

ARGUMENT.............................................................................................................................. 3

    I.     The United States breached the grant agreements because the agreements do not authorize termination for "agency priorities."......................................................................... 3

        A.     The plain text of the agreements contradicts the reasons claimed in the termination notices.................................................................................................................................... 3

        B.     The agreements do not incorporate the Uniform Guidance........................................ 5

        C.     The *Christian* doctrine has no application here. ......................................................... 10

        D.     Even if the Uniform Guidance had been incorporated, the grants could only be terminated on clear and unambiguous grounds. .................................................................. 16

    II.     Plaintiffs are entitled to expectation damages for the breach, including the remaining balance of the grants.................................................................................................................. 17

        A.     Plaintiffs lay out the correct calculation of their expectation damages. ................... 17

        B.     The government's argument fights the law at every turn. ......................................... 19

        C.     The government's argument would carry jurisdictional implications that contradict its arguments in other courts............................................................................................... 24

        D.     Plaintiffs' expectation damages are not speculative. ................................................ 25

        E.     The government misapplies the duty to mitigate....................................................... 26

        F.     The government is incorrect that consequential or incidental damages are unavailable................................................................................................................................. 29

        G.     Plaintiffs have done enough to withstand the government's motion for summary judgment. .............................................................................................................................. 30

CONCLUSION.......................................................................................................................... 30

APPENDIX...............................................................................................................................1a

## TABLE OF AUTHORITIES

**Cases**

*AmBase Corp. v. United States*,
142 Fed. Cl. 105 (2011).................................................................................................. 26

*Arizona v. EPA*,
No. 2:25-cv-02015 (W.D. Wash. Mar. 17, 2026) ..................................................... 24

*Astoria Fed. Sav. & Loan Ass'n v. United States*,
72 Fed. Cl. 712 (2006)................................................................................................... 17

*Bluebonnet Sav. Bank, F.S.B. v. United States*,
266 F.3d 1348 (Fed. Cir. 2001)................................................................................... 25

*Boaz Housing Authority v. United States*,
994 F.3d 1359 (2021) .............................................................................. 20, 21, 27, 28

*Cmty. Health Choice, Inc. v. United States*,
970 F.3d 1364 (Fed. Cir. 2020)................................................................................... 26

*Cosmo Const. Co. v. United States*,
196 Ct. Cl. 463 (1971)................................................................................................... 30

*Earman v. United States*,
114 Fed. Cl. 81 (2013)................................................................................................... 10

*G.L. Christian & Assocs. v. United States*,
312 F.2d 418 (Ct. Cl. 1963)................................................................... 10, 12, 14, 15

*Hoskins v. State ex rel. Div. of Admin., Off. of Cmty. Dev.*,
273 So. 3d 323 (La. Ct. App. 2019) ............................................................................ 20

*Hymas v. United States*,
810 F.3d 1312 (Fed. Cir. 2016).................................................................................... 10

*Illinois v. Vought*,
No. 1:26-cv-01566 (N.D. Ill. Feb. 23, 2026)............................................................. 24

*K-Con, Inc. v. Sec'y of the Army*,
908 F.3d 719 (Fed. Cir. 2018)...................................................................................... 10

*Marquette Univ. v. Kuali, Inc.*,
584 F. Supp. 3d 720 (E.D. Wis. 2022) ....................................................................... 20

*Mata v. United States*,
107 Fed. Cl. 618 (2012)................................................................................................. 25

ii

*MTA v. Duffy,*
   No. 25-cv-1413, 2026 WL 588117 (S.D.N.Y. Mar. 3, 2026) ........................................ 9, 13, 14

*MTA v. Duffy,* 784 F. Supp. 3d 624 (S.D.N.Y. 2025).................................................... 9, 10, 13, 14

*Nat'l Ctr. for Mfg. Scis. v. United States,*
   114 F.3d 196 (Fed. Cir. 1997) ................................................................................................. 25

*New Jersey v. OMB,*
   No. 1:25-cv-11816-IT, 2026 WL 2069832 (D. Mass. July 17, 2026)........................... 2, 14, 15

*Northrop Grumman Info. Tech., Inc. v. United States,*
   535 F.3d 1339 (Fed. Cir. 2008) ..................................................................................... 6, 7, 8, 9

*Pennhurst State Sch. & Hosp. v. Halderman,*
   451 U.S. 1 (1981) ..................................................................................................................... 15, 16

*Precision Pine & Timber, Inc. v. United States,*
   596 F.3d 817 (Fed. Cir. 2010) ................................................................................................... 7

Pub. Hous. Auth. Dirs. Ass'n v. United States,
   130 Fed. Cl. 522 (2017)............................................................................................................. 7

*San Antonio Hous. Auth. v. United States,*
   143 Fed. Cl. 425 (2019)............................................................................................................. 20

*San Juan City Coll. v. United States,*
   391 F.3d 1357 (Fed. Cir. 2004) ................................................................................................. 20

*Sanders v. United States,*
   252 F.3d 1329 (Fed. Cir. 2001) ................................................................................................. 17

*Smithson v. United States,*
   847 F.2d 791 (Fed. Cir. 1988)................................................................................................... 7

*Stone Forest Indus., Inc. v. United States,*
   973 F.2d 1548 (Fed. Cir. 1992) ................................................................................................. 27

*United States v. Winstar Corp.,*
   518 U.S. 839 (1996) ................................................................................................................... 17

*Washington v. U.S. Dep't of Homeland Sec.,*
   No. 2:25-CV-1401-BJR, 2026 WL 1469538 (W.D. Wash. May 26, 2026)............................. 15

*Wells Fargo Bank N.A. v. United States,*
   88 F.3d 1012 (Fed. Cir. 1996)................................................................................................... 29

**Statutes**

31 U.S.C. § 6303.................................................................................................................... 11, 21

31 U.S.C. § 6304.............................................................................................................. 11, 19, 21

41 U.S.C. § 1303......................................................................................................................... 11

**Other Authorities**

Executive Order 14332, § 6(b)...................................................................................................... 14

Grover C. Grismore, Principles of the Law of Contracts § 105 (1947)) ........................................ 4

Restatement (Second) of Contracts § 237 (1981) ......................................................................... 27

Restatement (Second) of Contracts § 240 (1981) ......................................................................... 27

Restatement (Second) of Contracts § 344 (1981) .................................................................... 17, 18

Restatement (Second) of Contracts § 347 (1981) ......................................................................... 29

Restatement (Second) of Contracts § 350 (1981) ......................................................................... 28

Solomon, Matthew H., Court of Federal Claims:
    Jurisdiction, Practice, and Procedure (2016)............................................................................ 1

Williston on Contracts § 64:1 (4th ed.)......................................................................................... 17

**Rules**

RCFC 56(e)............................................................................................................................. 3, 26

**Regulations**

2 C.F.R. § 1.200 (2024) .............................................................................................................. 12

2 C.F.R. § 200.102 (2024) ........................................................................................................... 12

2 C.F.R. § 200.211 (2020) ............................................................................................................. 7

2 C.F.R. § 200.340 (2020) ................................................................................................... passim

2 C.F.R. § 200.343 (2024) ........................................................................................................... 29

2 C.F.R. § 200.472 (2024) ........................................................................................................... 29

48 C.F.R. § 2.101 (2025) ............................................................................................................. 11

48 C.F.R. § 49.503 (2022) ........................................................................................................... 12

48 C.F.R. § 52.249 (2022) ...................................................................................................... 12

Guidance for Grants & Agreements, 85 Fed. Reg. 49,506 (Aug. 13, 2020) .......................... 13, 14

**INTRODUCTION**

Plaintiff States brought this case to recover damages they suffered as a consequence of promises broken by the federal government. Plaintiffs filed an early motion for partial summary judgment (Dkt. 21) to resolve two simple legal questions that lie at the core of this dispute: *First*, can the federal government rewrite its agreements *ex post facto* when its original bargains no longer suit it? And *second*, is there any value to an agreement entered into with the federal government, such that monetary damages should issue in the event of a breach? These questions have been asked and answered by the Court of Federal Claims many times over. Indeed, these issues are as old as the Court itself and are reflected in its rich judicial heritage. *See* Solomon, Matthew H., Court of Federal Claims: Jurisdiction, Practice, and Procedure, Chpt. 1 (2016).

The fact that this case arises in the context of grant agreements does not change the fundamentals of this Court's job. The government cannot simply rewrite its contracts after the fact just because the legal instrument is a grant agreement. Likewise, the government is liable for its breaches in the same manner as it would be if it breached any other type of contract.

In response, the government levies arguments that would render grant agreements illusory, effectively promises that carry no intrinsic value whatsoever, gifts that can be taken back at the government's caprice. Its positions are in direct conflict with black letter contract law and a vast tide of precedent, and they go against the congressional definition of grants and the fundamental purpose of this Court, which is to enforce the government's contractual bargains. What is disguised in the government's brief is its true ask: for a radical upending across federal grants, a segment of the economy worth billions of dollars and that touches upon nearly every public policy imaginable.

Plaintiffs are entitled to rulings on summary judgment in their favor on both liability and damages. When DHS/FEMA terminated Plaintiffs' grants on a basis not provided for in the agreements, the agency breached. The government is liable for that breach as it would be in any

1

other context. Plaintiffs are entitled to damages amounting to the remaining value of their grants, which the undisputed facts show they would have received but for the government's breach.

## STANDARD OF REVIEW

Before turning to the substance, the standard of review and the record before the Court must be addressed, as this backdrop sets the board for much of the analysis that follows. Each party has filed a cross-motion for summary judgment. Plaintiffs request no more than two rulings on narrow issues of law, because their early disposition would enable the efficient resolution of this litigation. In support of its motion, Plaintiffs submitted the grant documents, as well as sworn declarations by representatives of the injured grantees, which attest, among other things, that the grantees would have continued to perform on their agreements in full, but for the government's breach; that they valued the grants based on the total amount originally awarded; and that they each expected to fully draw down their awards. *See* Dkt. 21, Exs. 22–27.

The government, by contrast, asks for much more but provides much less. It contends that its arguments justify full dismissal of the case. That request for relief fails at its first step because, as Plaintiffs noticed at the first possible opportunity, *see* Dkt. 17, the cross-motions do not and cannot cover all of the claims asserted in the Complaint. For example, regardless of whether the grant agreements contained an "agency priorities" termination clause, the parties also dispute whether the terminations breached that clause. Dkt. 1 ¶¶ 91–92; *see also New Jersey v. OMB*, No. 1:25-cv-11816-IT, 2026 WL 2069832, at *17 (D. Mass. July 17, 2026) (declaring that the "agency priorities" termination provision "do[es] not allow terminations of awards based on new program goals or agency priorities that an agency identifies after granting the award"). As the Complaint also alleges, the agency targeted Plaintiffs for reasons unrelated to the grant programs, which would violate the "agency priorities" clause, even if it had been part of the agreements. *See* Dkt. 1

2

at ¶¶ 11, 27, 41–43, 68–69, 72 (describing Plaintiffs' appropriate uses of their grants as opposed to agency's pretextual reason for terminating). Neither party has addressed those issues yet.

Moreover, Plaintiffs allege a violation of the duty of good faith and fair dealing in Count Two. But because that Count unavoidably depends on facts that would require development in discovery, the parties have not put that claim in front of the Court at this time.

Likewise, neither party briefed nor presented evidence on facts related to damages that would be necessary for this Court to issue a judgment for any sum certain. Those issues likewise are properly the subject of further discovery and subsequent proceedings.

Not only does the government ask for too much, but at the same time it adds no admissible evidence to the record. As a consequence, the Court must rely on the undisputed record submitted by Plaintiffs, consisting of the grant documents and the unrebutted testimony of Plaintiffs' declarants. Any contentions by the government that conflict with that record are the product of unsupported speculation and inference, and they must be set aside. RCFC 56(e). The government's call for full dismissal of the case is inappropriate and unjustifiable at this stage.

## ARGUMENT

**I.    The United States breached the grant agreements because the agreements do not authorize termination for "agency priorities."**

### A.    The plain text of the agreements contradicts the reasons claimed in the termination notices.

DHS/FEMA ("the agency") purported to terminate Plaintiffs' TVTP grants "pursuant to the terms and conditions of the grant award," claiming those terms allowed termination where a grant no longer effectuates "agency priorities." Exs. 15–21 at 1. But the plain text of the grant agreements makes clear that this was not a permissible ground for termination.

The grant documents expressly set forth a limited list of three grounds—and only three grounds—on which an award may be terminated: "a. Noncompliance"; "b. With the Consent of

the Recipient"; or "c. on Notification by the Recipient." Ex. 8 (FY 2022 NOFO, Article H.1); Ex. 9 (FY 2023 NOFO, Article H.1); Ex. 10 (FY 2024 NOFO, Article H.1). As Plaintiffs explained previously, the familiar canon of *expression unius est exclusio alterius* applies. Dkt. 21 at 13–14 (citing Grover C. Grismore, Principles of the Law of Contracts § 105, at 164 (1947)). Where, as here, certain things have been specified in detail, other things of the same general character are excluded. *Id*. Tellingly, the government does not even attempt to address this familiar canon or to justify the termination of Plaintiffs' grants on any of the three appropriate bases.

That FEMA limited termination to these three grounds was no accident. FEMA chose to make these three grounds the exclusive bases for termination for all Preparedness Grants, including the TVTP grant program.[1] FEMA created a Preparedness Grants Manual for each year to provide detailed "guidance on policies and procedures for managing preparedness grants." Ex. 28 (FY 2022 Preparedness Grants Manual at 9); Ex. 29 (FY 2023 Preparedness Grants Manual at 8); Ex. 30 (FY2024 Preparedness Grants Manual at Section 1.2) (similar). The Manual confirms Plaintiffs' plain reading and cites the same three reasons as the exclusive grounds for termination. *See* Appendix 1. As if the plain text of the agreements were not obvious enough, the Manual confirms it. A grant manager reviewing this list would have no cause to believe that the agency could terminate a grant based on agency priorities.

Lacking any textual basis for its arguments, the government illogically seizes on the word "may," rather than "shall," in the termination provisions to claim that they are "best read as calling attention to specific examples of possible bases for termination without restricting the rights of DHS" to terminate on other grounds. *See* Dkt. 22 at 17. This argument makes no sense as a matter

---

[1]   The grant documents identify the TVTP grants as Preparedness Grants. Ex. 8 (FY 2022 NOFO, Article A.9); Ex. 9 (FY 2023 NOFO, Article A.9); Ex. 10 (FY 2024 NOFO, Article A.9).

4

of construction. The word "may" in the phrase "FEMA may terminate a federal award" indicates only that the agency is allowed, but is not required, to terminate an award for one of the enumerated bases. In other words, it leaves open the possibility that FEMA may choose another course of action, for example, first giving a non-compliant grantee the opportunity to cure. It would make no sense to use the word "shall" in this context. And the word "may" gives no indication that these are just sample grounds for termination.

The government identifies no other pertinent provisions that call for consideration, apart from those already identified by the States' briefing. As a result, it has conceded the plain text, as it must. The Court can draw two conclusions at this stage of the proceedings by extension: *First*, the plain language of the TVTP grant agreements did not authorize termination for "agency priorities." And *second*, DHS/FEMA wrongly claimed in the notices that the terminations were being made "pursuant to the terms and conditions of the grant award."

### B.    The agreements do not incorporate the Uniform Guidance.

Confronted with plain legal error on the agency's part, the government resorts to a theory of incorporation by reference. Plaintiffs anticipated this argument and briefed it at length. See Dkt. 21 at 14–19. Nothing in the government's response changes the legal analysis or the correct conclusion as a matter of law: The TVTP grants did not incorporate the Uniform Guidance.

Plaintiffs' opening brief identifies and construes the two most robust references to the Uniform Guidance that can be found in the TVTP grant documents. See Dkt. 21 at 17. The first reference, found in the GANs, says only that "recipients are required to follow the applicable provisions of the [Uniform Guidance]." *Id.* (citing Ex. 1 (FY 2022 GAN, Article IX); Exs. 2, 3, 4 (FY 2023 GANs, Article II); Exs. 5, 6, 7 (FY 2024 GANs, Article 2)). The second reference, in the NOFOs, says, that "FEMA may place specific terms and conditions on individual awards in

5

accordance with 2 C.F.R. Part 200." *Id.* (citing Ex. 8 (FY 2022 NOFO, Article F.2); Ex. 9 (FY 2023 NOFO, Article F.2); Ex. 10 (FY 2024 NOFO, Article F.2)).

In its briefing, the government identifies an additional, third location in support of its incorporation argument. *See* Dkt. 22 at 12 (citing Ex. 8 (FY 2022 NOFO, Article F.5)). That reference, which is located in the "Monitoring and Oversight" section says: "In terms of overall award management, recipient and subrecipient responsibilities include, but are not limited to: . . . ensuring overall compliance with the terms and conditions of the award or subaward, as applicable, including the terms of 2 C.F.R. Part 200." *See id*. [2] But this reference does nothing more than echo the first reference in the GAN requiring that recipients follow applicable provisions of the Uniform Guidance. It imposes a one-sided obligation on recipients to ensure overall compliance with the portions of the Uniform Guidance that impose obligations on grantees. It does not, however, fully incorporate the Uniform Guidance, let alone override the express Termination Provisions.

To determine whether these references justify incorporation, the parties agree that the legal standard is set forth in *Northrop Grumman Information Technology, Inc. v. United States*. See Dkt. 21 at 16 & Dkt. 22 at 11 (each citing 535 F.3d 1339, 1344 (Fed. Cir. 2008)). In order to incorporate extrinsic material into a contract, the contract must do two things: (1) it must explicitly and precisely identify the written material being incorporated, and (2) it must clearly communicate that the purpose of the reference is to incorporate. *Id.* at 1345. The government's arguments fail because it misapplies the law at the first step, and it ignores the second step entirely.

---

[2]    The location and context of this reference must be scrutinized. This provision falls within paragraph F, "Federal Award Administration Information," in subparagraph 4: "Monitoring and Oversight." Thus, this reference is all about recipient's monitoring and oversight obligations. Given that there is an express Termination Provisions (paragraph H.1) located elsewhere, this "Monitoring and Guidance" reference cannot override the more specific section. Dkt. 22 at 12.

Taking *Northrop Grumman*'s elements in turn, given that neither Section 200.340(a)(2) nor Section 200.211 are cited in the grant documents, the government faces an uphill battle from the start. The government argues that the agency did enough by referencing the Uniform Guidance by its common name and by citation to its overall title. That argument is wrong, as the cases cited in Plaintiffs' opening brief show. *See, e.g.*, Dkt. 21 at 15–17. For example, *Smithson v. United States*, explicitly advises against cavalierly incorporating regulations wholesale, because doing so risks improperly imposing a host of new contractual obligations on the other party without requisite notice. 847 F.2d 791, 794 (Fed. Cir. 1988); *see also Precision Pine & Timber, Inc. v. United States*, 596 F.3d 817, 826 (Fed. Cir. 2010) (same).

Similarly, the government utterly fails to engage with *Public Housing Authorities Directors Ass'n v. United States*, a case that points out that, where an agency has otherwise incorporated extrinsic materials properly, its failure to do so elsewhere is a factor that must be read against incorporation. 130 Fed. Cl. 522, 535 (2017). Here, for example, the grant agreements use standard and familiar language to properly incorporate the NOFOs. Dkt. 21 at 18–19. Comparing that language against the passing and vague references to the Uniform Guidance, however, shows that the two pieces of extrinsic material were treated very differently. As in *Public Housing*, the distinction actually reads against incorporation of the Uniform Guidance. Dkt. 21 at 19.

Next, as to *Northrop Grumman*'s second prong—purpose—the government offers even less. It does not attempt to identify any text, or to otherwise present any evidence, showing that the agency evinced the requisite purpose to incorporate. Indeed, as to this issue, the government's brief devotes only a single sentence. Dkt. 22 at 11–12 ("Nor is there any reasonable doubt that the intent is to incorporate these regulations *as against the grantees*." (emphasis added)). This argument misses the mark, because that point is not and has never been in dispute. Plaintiffs have

7

consistently agreed that, across the various references, there is a plain intent to bind *grantees* to *applicable* provisions of the Uniform Guidance. *See supra*.

In any event, an intent to bind Plaintiffs is not dispositive or even relevant to what the Court now has before it. Rather, *Northrop Grumman* requires the government to show that the agency intended to incorporate Section 200.340(a)(2) into the grant documents and that it intended to bind *itself* to those terms. The government sidesteps the issue entirely, cites no intrinsic or extrinsic evidence to demonstrate such an intent, and in doing so fails to make out its burden.

The government's remaining arguments lack merit. For example, the government argues that Plaintiffs are unduly focused on the limiting language constraining the Uniform Guidance to its "applicable" provisions. *See* Dkt. 22 at 12. But the agreements clearly state "recipients are required to follow the *applicable* provisions of the [Uniform Guidance]." Dkt. 21 at 17 (citing Ex. 1 (FY 2022 GAN, Article IX); Exs. 2, 3, 4 (FY 2023 GANs, Article II); Exs. 5, 6, 7 (FY 2024 GANs, Article 2) (emphasis added). Plaintiffs have never claimed that a grantee should or would be able "to decide after the fact that particular disfavored provisions of the Uniform Guidance are inapplicable." Dkt. 22 at 12–13. Plaintiffs' argument is that none of these brief references, all of which impose one-sided obligations on recipients to comply only with applicable provisions of the Uniform Guidance, can be understood to override the express Termination Provisions.[3]

Similarly, the government latches onto another fragment of a statement in the NOFOs that talks about pass-through entities and 2 C.F.R. § 200.340. *See* Dkt. 22 at 13. But that provision merely instructs pass-through entities to "*refer to* 2 C.F.R. § 200.340 *for additional information*

---

3       On a summary judgment posture, the government cannot rely solely on the argument of counsel to create a disputed issue of fact as to the agency's intent. Especially where, as here, the plain language of the documents is otherwise clear, it would be especially inappropriate to take the government counsel's speculations about the agency's intent as sufficient to create a factual dispute, let alone to make out the government's burden of proof on its cross-motion.

on termination regarding subawards." Dkt. 21, Ex. 8 (FY 2022 NOFO, Article H.1) (emphasis added). Nothing in this provision suggests that pass-through entities were *required* to impose the termination grounds in 2 C.F.R. § 200.340(a) to subgrants, as the government suggests. Rather, it merely instructs pass-through entities to review that section of the Uniform Guidance for additional information as to what termination provisions they can (but are not required) to impose, instructs them that they must "clearly and unambiguously specify all termination provisions in the terms and conditions" of a subgrant, and provides additional information regarding the implications of a termination. Importantly, nothing overrides the three express termination grounds that follow.

The Court should follow *MTA v. Duffy*, where the court correctly rejected similar incorporation arguments. 784 F. Supp. 3d 624 (S.D.N.Y. 2025) (preliminary injunction); 2026 WL 588117 (S.D.N.Y. Mar. 3, 2026) (summary judgment). The court held that the government could not make out *Northrop Grumman*'s incorporation test through passing references, made only to the Guidance as a whole, that were scattered across a series of documents. This was deemed "an attenuated chain of reasoning" insufficient to justify incorporation. 2026 WL 588117, at *47–48. Indeed, this case is even stronger than *Duffy*, because here (unlike *Duffy*) there are express Termination Provisions with an enumerated list of permissible grounds for termination. Defendant's burden is therefore even higher to show the intent was to incorporate and override that express provision. The agency clearly considered the Uniform Guidance and applied its provisions in some respects. But as to termination, the agency used its own judgment to select a more narrowed set of termination grounds. To hold otherwise would introduce an intra-contractual conflict that otherwise would not exist. In sum, the TVTP grant agreements did not incorporate the Uniform Guidance, let alone in a manner that overrode the express Termination Provisions.

9

### C.      The *Christian* doctrine has no application here.

The government alternatively asks this Court to read Section 200.340(a)(2)'s termination clause into the grant agreements by virtue of the *Christian* doctrine. Dkt. 22 at 14–16 (citing *G.L. Christian & Assocs. v. United States*, 312 F.2d 418, 427 (Ct. Cl. 1963)). The Court should decline this unprecedented argument, as other courts have before it.

### 1.      The *Christian* doctrine does not apply to grants.

The *Christian* doctrine allows a clause that does not appear in the plain text of a federal procurement contract to be read in when the clause otherwise (a) is mandatory; and (b) expresses a significant or deeply ingrained strand of public procurement policy. *K-Con, Inc. v. Sec'y of the Army*, 908 F.3d 719, 724 (Fed. Cir. 2018). The government mischaracterizes the *Christian* doctrine as one that "arose" in the context of federal procurement contracts (Dkt. 22 at 14), rather than acknowledging it for what it really is—a legal peculiarity unique to that specific realm. Indeed, Plaintiffs are unaware of any authority applying the doctrine to grants, and certainly the government cites to no examples. In fact, the two courts that have had the opportunity to extend the doctrine beyond federal procurements have expressly declined to do so. *See Earman v. United States*, 114 Fed. Cl. 81, 112 (2013) (holding that the doctrine is "not applicable" outside of procurement contracts); *Duffy*, 784 F. Supp. 3d at 672 (same). The government's attempts to undermine those cases are unavailing.

### 2.      Procurement contracts and grants are different.

*First*, the government fails to recognize that federal procurement contracts and grant agreements are distinct legal instruments. The Federal Grant and Cooperative Agreement Act of 1977 ("FGCAA") expressly defines "procurement contracts," "grant agreements," and "cooperative agreements" differently. *See Hymas v. United States*, 810 F.3d 1312, 1325 (Fed. Cir. 2016) (detailing FGCAA background and Congressional findings that led to distinguishing these

10

instruments). Procurement contracts are used when "the principal purpose . . . is to acquire . . . property or services for the direct benefit or use of the [U.S.] Government." 31 U.S.C. § 6303(1). By contrast, grant agreements are used when "the principal purpose . . . is to transfer a thing of value to the State or local government or other recipient to carry out a public purpose of support or stimulation authorized by a law of the [U.S.]." *Id.* § 6304(1).

These definitional distinctions are expressly recognized and given further effect in the Federal Acquisition Regulation ("FAR"), which purposefully does not apply to grant agreements. *See* 48 C.F.R. § 2.101 (excluding grants and cooperative agreements from definition of "contracts"). Thus, while the FAR mandates many of the terms of procurement contracts, including a termination for convenience clause, no such provision has ever been applied to confine grants.

*Second*, the nature of an agency's authority to enter into these distinct forms of agreements is also different. In the case of the former, procurement contracts are generally part of an agency's enabling statutes as well as its ongoing appropriation funding. Grants, by contrast, are generally the product of a specific appropriation. These appropriations can only be issued by Congress, they often are set for a limited period, and they describe the specific public policy goal Congress seeks to serve with the funding. Such was the case, for example, with the TVTP grant program, which is not funded out of DHS or FEMA's general funds, but rather is the product of a specific appropriation first made in 2020 and extended several times thereafter. *See* Dkt. 1 at ¶¶ 23–27 (detailing history of the TVTP program and its associated enabling and appropriations legislation).

Taking the definitions and the sources of authority together, it becomes evident that agencies have long- and free-standing authority to enter into contracts. Congress considered that long-standing authority one that merited further standardization, and thus, by virtue of the Office of Federal Procurement Policy Act Amendments of 1979 (the "OFPPA"), 41 U.S.C. § 1303, it

11

created a statutory framework to support the promulgation of the FAR. Because the FAR originates with a Congressional directive, it can be applied as a mandatory requirement across all contracts, including its express provision that permits the government to terminate any procurement contract for convenience. 48 C.F.R. §§ 49.503, 52.249–6(a)(1).

Compare that to the Uniform Guidance where OMB lacks equivalent authority. Instead, OMB's authorizing legislation allows it only to provide "overall direction and leadership," including the issuance of guidance, in service of grant management. 31 U.S.C. § 503(a). OMB's guidance is just that, guidance, 2 C.F.R. § 1.200, and ultimately it remains up to each executive agency to adopt or to disregard OMB's advice, which can change on a program-by-program and even on a grant-by-grant basis, at the agency's discretion. *See, e.g.*, 2 C.F.R. § 200.102(c). So, too, is OMB's authority more attenuated in the grant context, because the awarding agencies have no inherent authority to issue the grants. Instead, the funding for grant awards, as well as the delegation of authority to issue the awards, must be traced back to a Congressional appropriation. Both OMB and the awarding agency, therefore, are acting with more constrained powers in the grant context than exists in the procurement contract arena.

These distinctions carry weighty implications that cannot be ignored in the face of the government's call to extend the *Christian* doctrine beyond the procurement context.

### 3.  These distinctions impact the *Christian* analysis.

The government argues that the Uniform Guidance, and Section 200.340 in particular, is mandatory and must be incorporated into every federal grant. *See* Dkt. 22 at 20. Not so. As explained above, OMB's authority—which is cabined to that delegated to it by Congress—only permits OMB to issue non-binding guidance. *See supra*. That the Uniform Guidance deploys at points seemingly mandatory language, like "shall" or "must," does not change that simple fact. To imply otherwise would allow OMB to claim for itself more authority than Congress gave it.

12

Instead, that OMB can only issue guidance means that each federal agency may, but is not required, to adopt or to set aside the Uniform Guidance, including OMB's guidance as to appropriate grounds for termination. The government seems to suggest that 2 C.F.R. Part 3002 (which adopts the Uniform Guidance for DHS), combined with DHS's Standard Terms and Conditions, plus the grant documents, means that OMB's guidance was mandatory for the TVTP grants. But this torturous path of references is precisely the argument that was thoughtfully considered and rejected in *Duffy*. *See* 784 F. Supp. at 672–74; 2026 WL 588117, at *54–55. As that court rightfully found, the text, structure, history, and purpose of OMB's regulatory scheme, as a whole, suggest that the Uniform Guidance is permissive, not mandatory. *Id*. And that is especially so for the Uniform Guidance's termination provision, which is no way requires agencies to include "agency priorities" as a ground for termination in every grant agreement.

Next, the Uniform Guidance—and its termination provision more specifically—does not express a deeply ingrained strand of policy. In fact, the very idea of terminating a grant because it "no longer effectuates the program goals or agency priorities" is a recent development, with no historic roots. OMB first inserted the "agency priorities" termination provision into the Uniform Guidance in 2020 and explained how to construe it. *See* Guidance for Grants & Agreements, 85 Fed. Reg. 49,506–07 (Aug. 13, 2020). Responding to concerns "that the proposed language [could] provide Federal agencies too much leverage to arbitrarily terminate awards without sufficient cause," OMB emphasized that the agency priorities provision did not change the fundamental precept that agencies cannot terminate grants arbitrarily. 85 Fed. Reg. 49,509. According to OMB, the provision would authorize termination only in limited circumstances—where, for example, "additional evidence reveals that a specific award objective is ineffective at achieving program goals" or "cause[s] the Federal awarding agency to significantly question the feasibility of the

13

intended objective of the award." *Id.* at 49,507–08. In other words, in 2020, OMB expressly disclaimed the authority that the government now claims here is "deeply ingrained." *See also New Jersey*, 2026 WL 2069832, at *13 (holding OMB's "broader regulatory scheme" dictates agencies "may not terminate grants pursuant to the Termination Clause solely because [an awarding] agency's priorities have changed"); *see also Duffy*, 784 F. Supp. 3d 624, 672–74; 2026 WL 588117, at *54–55 (finding Uniform Guidance does not satisfy *Christian*'s second prong).

Further, when adopting this provision, OMB never suggested that agencies were *required* to include agency priorities termination in every grant agreement. Instead, this was an *option* that agencies could add as a ground for termination if agencies deemed it appropriate. The entire premise of the *Christian* doctrine is that termination for convenience is both mandatory and deeply ingrained in procurement contracts. The "agency priorities" provision satisfies neither.

Notably, for the first time in August 2025, the President mandated via Executive Order that executive agencies include "agency priorities" termination provisions in future "discretionary grant" awards (not all grant awards). Executive Order 14332, § 6(b). As a result, DHS recently revised its Standard Terms and Conditions. *See* Dkt. 21, Ex. 14. But the government is not arguing (nor could it) that any of these recent developments apply retroactively. And such a change would not be necessary in the first place if the Uniform Guidance already mandated that "agency priorities" be a termination provision in each and every federal grant.

### 4. Constitutional and Public Policy Implications.

Accepting the government's arguments, on the other hand, would carry profound policy implications, including those of constitutional weight and dimension. A holding that the Uniform Guidance is "mandatory" would go beyond the authority Congress gave when it authorized the creation of OMB. It also would centralize power within the OMB and take away discretion from agencies, who are the entities ultimately charged to give effect to Congress's appropriations. This

14

risks usurping Congress's power of the purse, given that OMB is a separate entity entirely. *See, e.g.*, *Washington v. U.S. Dep't of Homeland Sec.*, No. 2:25-CV-1401-BJR, 2026 WL 1469538, at *9 (W.D. Wash. May 26, 2026) (rejecting federal defendants' argument that 2 C.F.R. § 200.340 gives authority to "substitute their policy preference for Congress's funding judgment").

Moreover, as pointed out in their opening brief, the plaintiffs here are States, themselves sovereigns, who retain powers by virtue of federalism and the Tenth Amendment. When it comes to the Spending Clause, in particular, the Supreme Court has long recognized that States are entitled to unique protections when accepting federal money through grant programs. *See Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). The federal government cannot impose funding conditions on States retroactively, and if Congress imposes funding conditions, it must do so upfront, "clearly" and "unambiguously." *Id.* That protection ensures that States are not saddled with retroactive or ambiguous conditions and that they are empowered to knowingly exercise their sovereign authority in choosing whether to participate in a funding opportunity. Applying the *Christian* doctrine as the government wants, however, would run afoul of those constitutional protections. As a practical matter, it would allow an agency to read in terms *ex post facto* that explicitly were not a part of the original grant, in violation of the Spending Clause. *See New Jersey*, 2026 WL 2069832, at *16 (holding that interpreting Uniform Guidance as government suggests would run counter to *Pennhurst*'s protections).

The Court should hold, consistent with prior court rulings, that the *Christian* doctrine applies only to procurement contracts, not to grants; where the doctrine applies, it only extends to mandatory clauses, not non-binding guidance; and even then, the doctrine is limited to mandatory clauses that express a significant or deeply ingrained strand of public procurement policy, which the Uniform Guidance's termination provisions are not.

15

**D.     Even if the Uniform Guidance had been incorporated, the grants could only be terminated on clear and unambiguous grounds.**

Even if the Uniform Guidance has been incorporated in full, that still would not alter the outcome. Nothing in Section 200.340 *requires* that every agency must include all of the grounds identified in Section 200.340(a) as bases for termination in every grant. To the contrary, Section 200.340(b) requires that the agency "clearly and unambiguously specify all termination provisions in the terms and conditions" of the award. *Id.* As noted above, that is consistent with constitutional requirements of the Spending Clause, which likewise requires that any grant conditions must be noticed clearly and unambiguously. *Pennhurst*, 451 U.S. at 17. If Section 200.340 is fully incorporated, it equally applies to the government's obligations. Here, Defendants met that obligation through the inclusion of an express Termination Provisions clause, which clearly and unambiguously specified the three permissible grounds for termination. But that did not include "agency priorities" as an allowable basis. And FEMA confirmed through the Preparedness Grant Manuals that same understanding of the three permissible grounds for termination. *See supra*. The government cannot point to any location that clearly and unambiguously stated that the grant agreements could be terminated based on "agency priorities."

Lastly, the Court should reject the government's suggestion that the responsibility lay with Plaintiffs clarify this issue with the agency before entering into their agreements. *See* Dkt. 22 at 17–18. The undisputed evidence is that each Plaintiff understood, based on the plain text of the agreements, that the three listed grounds were the exclusive grounds for termination. *See* Ex. 22 ¶ 15–16; Ex. 23 ¶ 13–14; Ex. 24 ¶ 10–11; Ex. 25 ¶ 17–18; Ex. 26 ¶ 11–12; Ex. 27 ¶ 12–13. Plaintiffs were under no obligation to clarify a term that they thought was clear. The agency laid out the bases for termination—a term that always is up to the agency as the drafting party to set— and the Plaintiffs reasonably relied on the term FEMA drafted. Dkt. 21at 21 (collecting cases that

16

in such circumstances, any ambiguity must be construed against the drafter).

* * *

In sum, the plain text of the TVTP grant agreements contained a specific termination provision that identified the only three permissible grounds for termination. Those grounds do not allow termination based on "agency priorities." None of the brief references to the Uniform Guidance served to override these grounds, let alone clearly and unambiguously. And even if the Uniform Guidance had been fully incorporated, which it was not, that would still require that each ground for termination be clearly and unambiguously specified in the terms and conditions of the award. The TVTP grant agreements *did* clearly and unambiguously specify the grounds for termination, but those grounds did not include "agency priorities." Because Defendant terminated the TVTP agreements based on grounds not permitted by the terms of the agreements, Plaintiffs are entitled to summary judgment that DHS/FEMA breached the agreements.

## II. Plaintiffs are entitled to expectation damages for the breach, including the remaining balance of the grants.

### A. Plaintiffs lay out the correct calculation of their expectation damages.

Turning to the question of damages, it bears repeating a few black letter principles of contract law at the outset: (1) Monetary damages are the presumptive and default remedy for a breach of contract. *United States v. Winstar Corp.*, 518 U.S. 839, 885 (1996) (recognizing damages as default remedy); *see also Sanders v. United States*, 252 F.3d 1329, 1334 (Fed. Cir. 2001) (acknowledging damages as presumptive following breach). (2) Plaintiffs are entitled "to recover the highest amount [they] can prove under any measure of damages." *Astoria Fed. Sav. & Loan Ass'n v. United States*, 72 Fed. Cl. 712, 718 (2006). And (3) the valuation of those damages is assessed from the perspective of the injured party. *See* Dkt. 21 at 22 (citing Restatement (Second) of Contracts § 344, cmt b. (1981) and Williston on Contracts § 64:1 (4th ed. 2025)).

17

Plaintiffs are entitled to expectation damages, which requires placing them "in as good of a position as [they] would have been in had the contract been performed." Dkt. 21 at 22 (citing Restatement (Second) of Contracts § 344). Applying expectation damage's three step-process, the value of the grants is the total amount originally offered and accepted, less any payments made prior to termination, plus consequential and incidental damages. Plaintiffs are entitled to at least the remaining balance of the grant awards, which is the amount they would have received but for Defendant's breach, and which is the only measure that places them in as good of a position as they would have been in had the contract been performed in full.

*First*, assessing the value as Plaintiffs propose gives effect to a fundamental precept of contract law: The value of a broken contract is assessed *by its value to the injured party*. *See* Dkt. 21 at 22–23 (citing cases and treatises). Here, the value to the States lay in the grants' public safety objectives. Translating that value to a monetary figure, the most reasonable measure is the total amount of the grant award. That figure is the most concrete place to start, given that it represents a meeting of the minds about how much funding to spend in service of each program's objectives. Accordingly, that is the starting point from which all other calculations should flow.

*Second*, Plaintiffs have submitted admissible evidence, in the form of sworn testimony, averring that each grantee was planning to spend down and was capable of spending down its total grant award. Dkt. 21, Exs. 22-27. That evidence, which is unrebutted, is enough for this Court to make a finding of fact that Plaintiffs reasonably expected to receive their full grants.[4]

---

4    Contrary to the government's arguments, *see* Dkt. 22 at 28, that conclusion would rest on the undisputed record before this Court, not on speculation. Indeed, to the extent that the government suggests Plaintiffs *may not* have continued to perform or *may not* have used up their full awards, it is that speculative suggestion that finds no basis in the admissible evidence.

*Third*, Plaintiffs' measure comports with the Congressional definition of a grant. As mentioned previously, grants are defined in relation to "their principal purpose" which "is to *transfer a thing of value* to the State or local government or other recipient" so as "*to carry out a public purpose of support or stimulation* authorized by a law of the [U.S.]." 31 U.S.C § 6304(1) (emphasis added). The thing of value transferred is the total amount of the award. The purpose justifying that transfer is the TVTP program's public objectives. The elements of the statutory definition of a grant, both the monetary and the non-monetary, are given full effect.

### B.    The government's argument fights the law at every turn.

By contrast, the government's theory actively fights the congressional definition of a grant, and it contradicts the caselaw and black-letter contract principles at every turn. According to the government, the only "thing of value" awarded to a grantee is a right to request reimbursement. That right is further circumscribed, because it is entirely contingent on the grantee first performing, incurring costs, seeking reimbursement. Then, if applicable, that value is still even further reduced by any avoidable costs. *See* Dkt. 22 at 20 (proposing four "prerequisites" to recovery).

This theory is wrong, because it conflates the reimbursement method of payment with the value of the contract itself. In doing so, the government seeks to remove the central promise of the grant—the "thing of value" being transferred—and the agreed upon grounds for termination, both of which were core to the Plaintiffs' expectations. The government's argument is also extreme. Put into practice, it would result in two inescapable outcomes. For one, it would render the contracts illusory, because tying the government's promise to reimbursement would mean the award itself has no intrinsic or enforceable value. For another, it would grant the government the right to terminate every grant for its convenience, *sub silentio* and without consequence, notwithstanding express termination provisions to the contrary. And the government does not even attempt to address how its proposed damages calculation would "plac[e] the wronged party in as

good a position as it would have been had the breaching party fully performed," *Boaz Housing Authority v. United States*, 994 F.3d 1359, 1369 (2021), because it plainly would not.

### 1.    The government's argument is contrary to case law.

*First*, and notably, the government cites no case law to support its narrow interpretation on recovery or the "prerequisites" it would have this Court apply. In fact, the few cases that have considered the laws on recovery for unlawful grant terminations only suggest that injured grantees are entitled to the same traditional contractual remedies as any other claimant who appears before this Court. *San Juan City Coll. v. United States*, 391 F.3d 1357, 1360–61 (Fed. Cir. 2004) ("The fact that this contract covers government financial grants does not warrant a different standard. If the government has breached the Agreement, the [plaintiff] is entitled to seek whatever damages it is entitled to receive."); *see also San Antonio Hous. Auth. v. United States*, 143 Fed. Cl. 425, 440 (2019) (upholding jurisdiction over claim for wrongly diminished subsidy where plaintiff sought to recover the difference between "the amount of the Section 9 operating subsidy plaintiff alleges it should have received in 2012, and . . . the amount of the Section 9 operating subsidy plaintiff received in 2012"); *Hoskins v. State ex rel. Div. of Admin., Off. of Cmty. Dev.*, 273 So. 3d 323, 328, 331 (La. Ct. App. 2019) (affirming damages award to plaintiff for breach of contract in the full amount of a grant from FEMA under a cost reimbursement program); *Marquette Univ. v. Kuali, Inc.*, 584 F. Supp. 3d 720, 723 (E.D. Wis. 2022) (finding evidence of "some damages" for cost-reimbursement grant even though plaintiff had yet to "incur the costs of the program").

Along the same lines, the government unsuccessfully attempts to distinguish *Boaz* and tries to say that its reasoning does not apply here. *See* Dkt. 22 at 22 n.5. According to the government, *Boaz* only stands for a rejection of a proposition that a particular governing agreement "did not contemplate money damages." *Id*. But *Boaz* also addressed *how* to calculate damages, by "plac[ing] the wronged party in as good a position as it would have been had the breaching party

20

fully performed its obligation." 994 F.3d at 1369. There, HUD breached its agreement to provide housing subsidy grants. Had HUD fully performed, the plaintiffs would have received the full value of the housing subsidy grant. Because HUD breached, the court reasoned plaintiffs were entitled to "compensatory damages of the difference" between the full value and the amount they received, which "places them in as good a position as they would have been had HUD fully performed its obligation." *Id.* at 1370. So, too, here. The undisputed evidence is that Plaintiffs would have received the full value of grants but for Defendants' breach. Like the *Boaz* plaintiffs, Plaintiffs are entitled to the remaining value of their grants, because only that calculation would place them in as good a position had the grant been fully performed.

### 2. The government's argument conflicts with the statutory definition of a grant.

*Second*, compare the statutory definition of a grant against the four "prerequisites" the government would have this Court apply. Once again, grants are statutorily defined as the "*transfer a thing of value . . . to carry out a public purpose of support or stimulation*." 31 U.S.C. § 6304(1) (emphasis added). The government says the only "thing of value" is the ability to seek reimbursement of costs from the government, one which is entirely contingent on the grantee's first performance. But the statutory definition plainly does not circumscribe the value of a grant in such a way. And given that federal grants are routinely structured on a reimbursement payment method, the exclusion of such obvious caveats from the definitional plain text would be absurd.

Next, contrast the statutory definition of a grant against that of a procurement contract, the analogy that the government would have this Court draw. *See* Dkt. 22 at 22. The "principal purpose" of a procurement contract is the "acqui[sition]" of property or services "for the direct benefit or use of the United States government." 31 U.S.C. § 6303(1). Once again, reimbursement (or any other payment method) is not a definitional component. The government's attempt to inject

21

a contractual term about repayment—which is just that, a term—into the intrinsic value of these agreements is definitionally wrong-headed.

### 3. The government's theory ignores that it is the Plaintiffs' valuation of the grant that matters.

*Third*, the government's theory ignores the value of the grants to Plaintiff. Valuing damages must be done from the injured parties' perspective. *See supra*. The entire reason that grantees go through the burdensome task of applying for grants is to obtain the "thing of value" that is the grant's purpose. Thus, for example, to a grantee who obtains a grant to build a new library, the value of the grant is the new library. If the government breaches by terminating the agreement, and the grantee is left without a library, it is absurd to suggest this grantee has no damages, even if the agreement provided for a reimbursement method of payment. The value to the Plaintiffs is to achieve the public purposes of the grant, i.e., here to achieve the public safety purposes and goals of the grants. The government's theory fails to account for that value.

### 4. The government wrongly conflates contractual provisions with the value of the grants themselves.

Ultimately, the government's extraordinarily narrow theory of recovery conflates *contractual provisions*—such as those regarding the payment mechanism, agency oversight, and auditing rights—with *the value of the grant itself*.

To be sure, those contractual terms are ones that could come into play when calculating damages in different hypotheticals. For example, the government might be right to point to the reimbursement provision if a grantee was claiming entitlement to time-value losses associated with not receiving its funding up front. Such an expectation would be unreasonable under a reimbursement grant. So, too, would the hypothetical grantee be unreasonable in asking the court to award damages for unallowable costs, costs incurred outside of the period of performance, or costs incurred complying with the government's reasonable exercise of its oversight and auditing

22

rights. But none of those scenarios are before this Court. Instead, the sole focus here is how to value the Plaintiffs' reasonable expectations when they did nothing wrong. None of the contract provisions, including the reimbursement repayment mechanism, say anything about that scenario.

To illustrate further the practical problem of a *per se* bar to recovery beyond reimbursement, consider how the government's position would play out in the event of a grant that was terminated *justifiably*. Under the government's theory, the grantee who is injured by a wrongful termination would be entitled *to the exact same losses* as the one whose grant was justifiably terminated. In effect, the termination clause would have no meaning, and a breach of that term would be unenforceable, because recovery would be the same under either scenario.

The TVTP grant agreements provide a clear example of the distinction between each side's valuation theories. Here, several of the injured grantees had pending reimbursement requests at the time of termination for money spent under the award agreement prior to the termination. Similarly, they incurred valid and allowable costs during the close-out process. *See* Dkt. 1 at ¶ 76. Those costs remain unpaid, despite efforts to seek their reimbursement. The government's utter silence—in other words, its refusal to pay those costs—constitutes one breach, because the grants entitle recipients reimbursement for allowable pretermination and close-out costs. *See* Ex. 8 (FY 2022 NOFO, Article H.1); Ex. 9 (FY 2023 NOFO, Article H.1); Ex. 10 (FY 2024 NOFO, Article H.1).

The government's abrupt mid-grant terminations, by comparison, cut off Plaintiffs from seeking any reimbursements going forward. That action is *an entirely different*, *second* breach. That second breach caused damages that are separate and distinct from the unreimbursed, already spent costs, and Plaintiffs are entitled to compensation for those damages, too. Only Plaintiffs' methodology recognizes each breach as its own problem, gives effect to all the terms of the agreement, and offers recovery for both of the government's wrongful actions.

Were the government's theory accepted, it would turn all contracts that utilize a reimbursement method of payment into a *de facto* right to terminate for convenience. For example, if Bob contracts for Joe to provide 100 hours of services and then breaches by unlawfully terminating the contract after only 10 hours, Joe can seek damages for the remaining 90 hours for which Bob contracted. It does not matter if the contract provided that Joe would be paid by reimbursement method after submitting invoices or whether Joe's rights were subject to auditing or other reimbursement principles. The government's theory mistakes payment and oversight mechanisms for the fundamental promises of the agreements.

### C.    The government's argument would carry jurisdictional implications that contradict its arguments in other courts.

Defendant also neglects to mention that, in numerous lawsuits over the past year, it has taken a different position. In federal district courts, the government has fought to transfer disputes over grant terminations to the Court of Federal Claims, even when aggrieved grantees' theories assert claims under the Administrative Procedure Act ("APA"). For example, in one federal district court, the government said that court lacked jurisdiction under the APA because "[*t*]*he loss of grant funding is monetary injury*" and that injury is "capable of being remedied by a damages award in the Court of Federal Claims." Defs.' Cross-Mot. for Summ. J. at 34, *Arizona v. EPA*, No. 2:25-cv-02015 (W.D. Wash. Mar. 17, 2026), Dkt. No. 137 (emphasis added); Defs. Mem. in Support of Motion to Transfer or Dismiss at 16, *Illinois v. Vought*, No. 1:26-cv-01566 (N.D. Ill. Feb. 23, 2026), Dkt. No. 43-1 ("If the COFC ultimately finds that the Government wrongfully terminated the contract, Plaintiffs will be entitled to money damages for the alleged breach.").

The Government cannot urge district courts to dismiss plaintiffs' claims on the theory that this Court can award damages for the termination of grant agreements, then turn around and tell this Court that there are no damages for wrongful terminations. Such evolving views of the Tucker

24

Act present the sort of "whipsaw litigation strategy" that is "'unfair to the plaintiff,'" *Mata v. United States*, 107 Fed. Cl. 618, 624 (2012) (citation omitted), and "threatens to turn this case into a jurisprudential Flying Dutchman, casting about in search of a court that can reach the merits," *Nat'l Ctr. for Mfg. Scis. v. United States*, 114 F.3d 196, 199 (Fed. Cir. 1997).

This Court can take the government's conflicting positions in other forums as an additional reason to reject the arguments it presents here, because the government's theories here, if adopted, would only lead to absurd consequences.

### D. Plaintiffs' expectation damages are not speculative.

The government also claims that it is entitled to summary judgment because Plaintiffs have not proven, to a reasonable degree of certainty, the harm suffered. Not so. "The ascertainment of damages is not an exact science, and where responsibility for damage is clear, it is not essential that the amount thereof be ascertainable with absolute exactness or mathematical precision: It is enough if the evidence adduced is sufficient to enable a court or jury to make a fair and reasonable approximation." *Bluebonnet Sav. Bank, F.S.B. v. United States*, 266 F.3d 1348, 1355 (Fed. Cir. 2001) (citation modified). Here, Plaintiffs have met that burden by submitting uncontested, admissible evidence—the grant agreements—which provide the sum certain amount awarded to each grantee, and undisputed declarations, which establish that each grantee would have received these full amounts had Defendants not breached the agreements. *See* Ex. 22 ¶ 17; Ex. 23 ¶ 15; Ex. 24 ¶ 12; Ex. 25 ¶19; Ex. 26 ¶13; Ex. 27 ¶ 14. "One way the law makes the non-breaching party whole is to give him the benefits he expected to receive had the breach not occurred." *Bluebonnet Sav. Bank*, 266 F.3d at 1355 (citation omitted). Here, the undisputed, proffered evidence more than established a fair and reasonable approximate of Plaintiffs' reasonable expectations and damages.

The government weakly protests that this method could impermissibly allow an injured grantee to recover speculative damages. *See* Dkt. 22 at 25. However, that argument cannot stand

on a summary judgment posture where, as here, there is no genuine factual dispute about whether Plaintiffs would have continued to perform and draw down the full value of their grants. Plaintiffs have submitted admissible evidence testifying that they would have done so. The government, by contrast, presents nothing to contradict that testimony or to undermine it. Any suggestion by the government to the contrary is actually what constitutes unsupported speculation, and this Court must disregard such speculation on summary judgment. RCFC 56(e).

### E. The government misapplies the duty to mitigate.

Under Defendants' mitigation theory, Plaintiffs' damages must be reduced by costs Plaintiffs incurred after they received the termination notice, because at that point Plaintiffs were under an obligation to mitigate damages. Here, too, Defendants misapply black-letter law.

The purpose of mitigation is to prevent an injured party from being placed *in a better position* than if no breach had occurred. S*ee Cmty. Health Choice, Inc. v. United States*, 970 F.3d 1364, 1375 (Fed. Cir. 2020). But Plaintiffs are not seeking to be placed in any better position. Ultimately, the grants represented a unique source of funding for which they had no viable replacement, at least not any option that did not involve the redirection of funding that would have been used elsewhere. *Cf. AmBase Corp. v. United States*, 142 Fed. Cl. 105, 130 (2011) ("The Government's argument is like that of a bad driver who destroys your car and then says because you have replaced it with your own money you have no damages."). There was nothing more Plaintiffs could have done to mitigate this harm. What is more, because Plaintiffs intend to use any damages award either to replace lost funding, or to replenish redirected funding, there is no monetary windfall; any monetary award would be purely compensatory; and the award would serve the grants' original public safety objectives.

In various places, the government seems to suggest, but does not say outright, that Plaintiffs would be placed in a better position, because a damages award would not subject Plaintiffs to the

26

same strings they would have been accountable to if the agreements were never terminated, such as provisions like those regarding allowable costs and auditing. *See* Dkt. 22 at 20, 23. Indeed, in one place, the government suggests that, even if damages are awarded by this Court, those damages still would be subject to auditing by the agency and recoverable if used differently from the original intent of the grants as a debt to the federal government. *See* Dkt. 22 at 21, 23. The government is wrong. The agency's breach carries consequences. One of those is that Plaintiffs have been relieved of their obligation to comply with the grant agreements' original terms. *See, e.g.*, *Stone Forest Indus., Inc. v. United States*, 973 F.2d 1548, 1552–53 (Fed. Cir. 1992) (citing Restatement (Second) of Contracts §§ 237 & 240 and noting, for nondivisible contracts, breaching party cannot require nonbreaching party's continued performance of what is left on contract). Ultimately, even if Plaintiffs still use the monetary damages to fulfill the grants' original intended public safety purposes, the grant agreements no longer exist, and the award of monetary damages by this Court is only compensation substituting for the loss caused by the government's breach.

*Boaz* is instructive here: in *Boaz*, state and local public housing authorities sued because the United States failed to provide the full amount of housing subsidies that the state and local governments were supposed to receive. The Federal Circuit recognized that these governmental entities were entitled to compensatory damages in the difference between what should have been paid had the contract been fully performed and what was actually paid because "the difference places them in as good a position as they would have been had HUD fully performed its obligation." 994 F.3d at 1369–70.

The Federal Circuit also rejected the government's argument that a lack of strings on the monetary award mattered. *Id*. ("That [Plaintiffs] would have been contractually bound to use their prorated operating subsidy in accordance with all applicable statutes and HUD regulations had

27

HUD not breached is irrelevant to whether their money damages award compensates them for HUD's breach."). Instead, the *Boaz* plaintiffs were entitled to an "unrestricted money judgment," because of the difference between monetary damages as compared to an equitable form of relief like specific performance. *See Boaz*, 994 F.3d at 1367, 1363. As the Federal Circuit explained, an award of monetary damages (which is equivalent to a *substitute* for losses) is not the same thing as specific remedies (which would give the injured party *the thing to which it was originally entitled*). *Id*. at 1367–68 (citing *Bowen v. Massachusetts*, 487 U.S. 879 (1988)). That the monetary sum awarded might approach the amount originally promised does not change the compensatory nature of the damages.[5] Imposing the strings of the original agreement to that award, by contrast, would be to impose conditions of an agreement that no longer existed, and it would be more akin to specific performance, an equitable form of relief that the Claims Court cannot order. *Id*.

As for any avoidable losses, there are none. Ultimately, there were no steps Plaintiffs could have taken that would have entirely avoided the harm of losing the grant awards. Plaintiffs have not sought additional amounts for any steps they took to blunt the damage. Plaintiffs acted reasonably post-termination by complying with closeout procedures and only submitting claims for allowable costs incurred prior to closeout or during the closeout process.[6] Plaintiffs, despite having done nothing wrong to begin with, have done all that was required of them. Restatement (Second) of Contracts §§ 347, 350; *see also Cmty. Health Choice, Inc.*, 970 F.3d at 1375–76

---

5    Plaintiffs agree that this Court is not empowered to order specific performance, *see* Dkt. 22 at 28 (citing cases). But that limitation does not constrain the government's options as a litigant. The agency could now—as it could have at any point before—offer to resolve this case by reinstating the grants and agreeing to perform on its original obligations. If the government chose to take such action, Plaintiffs' damages would be reduced accordingly.

6    The government is incorrect that Plaintiffs are "seek[ing] compensation for costs incurred after the termination notice was issued: for instance, by asserting that the termination caused them to redirect funding from other priorities." Dkt. 22 at 24 (citing Ex. 25 ¶ 24). Plaintiffs included evidence of post-termination harm to show the steps taken in reaction to the terminations.

(noting that although injured party may not recover damages for losses that could have been avoided without undue risk, burden, or humiliation, injured party may still recover where it has made reasonable, but unsuccessful, efforts to prevent avoidable loss).

Ultimately, it was up to each Plaintiff State to decide how to handle the government's wrongful cancellation of the TVTP grants. For certain states, they decided their programs were so important as to justify redirecting funding from other sources to keep their efforts going. For other states, they could not make that happen, and they were forced to abandon their efforts entirely. *See* Dkt. 21 at 10. Under either scenario, the duty to mitigate does not require a particular course of action, nor does it impact the damages suffered.

**F.      The government is incorrect that consequential or incidental damages are unavailable.**

Plaintiff States have not yet moved for or otherwise sought consequential or incidental damages stemming from the agency's breach. Despite that, Defendant seeks summary judgment for both categories of damages. But black-letter law provides that an injured party may recover "incidental or consequential loss, caused by the breach." Restatement (Second) of Contracts § 347. Contrary to the government's argument, *Wells Fargo Bank N.A. v. United States* did not hold that consequential damages are *never* recoverable against the government. Instead, the case says that, in order to recover such damages, they must be "caused directly by the breach and . . . proven with certainty." 88 F.3d 1012, 1023 (Fed. Cir. 1996). Defendant also asserts that the grant agreements prohibit such damages, but it cites provisions governing remedies and allowable costs in the event of noncompliance *by the grant recipient*, not by the government. Likewise, the Uniform Guidance says nothing about damages caused *by the government*. 2 C.F.R. §§ 200.343, 200.472.

Ultimately, this Court has no need or occasion to decide now whether Plaintiffs may recover consequential or incidental damages. The Court should deny the government's motion and only consider the issue *if* Plaintiffs seek to recover these damages at a later date.

### G.    Plaintiffs have done enough to withstand the government's motion for summary judgment.

The Court should grant partial summary judgment in favor of Plaintiffs. But at a minimum, the Court should not award summary judgment to Defendant. After all, Plaintiffs need not prove "the quantity, quality, or precision necessary to support a judgment in a precise sum" to survive summary judgment. *Cosmo Const. Co. v. United States*, 196 Ct. Cl. 463, 469–70 (1971). Rather, all that is required of Plaintiffs is "*some* evidence of damage . . . to demonstrate that the issue of liability is not purely academic." *Id.* Plaintiffs easily clear that bar here, where they claim not only the unpaid grant funds, but also allowable costs incurred prior to termination and valid close out costs, neither of which have been paid. Indeed, the government concedes as much when it disclaims any position that the TVTP grant agreements did not contemplate money damages. *See* Dkt. 22 at 22. That concession renders fatal the government's request for summary judgment on damages, because it acknowledges that there can be *some* damages associated with the breach.

**CONCLUSION**

The Court should grant Plaintiffs' motion and order (a) Defendant is liable for breach of contract by terminating the grant agreements, and (b) Plaintiffs are entitled to their expectation damages, including the remaining award balances. Defendant's cross-motion should be denied.

30

Dated: July 24, 2026.                                    Respectfully Submitted,


**PHILIP J. WEISER**                           **ANTHONY G. BROWN**
ATTORNEY GENERAL OF COLORADO          ATTORNEY GENERAL OF MARYLAND


By: */s/ Sarah H. Weiss*                        By: */s/ Robert Brewer*
David Moskowitz                                Robert Brewer
    *Deputy Solicitor General*                      *Assistant Attorney General*
Sarah H. Weiss                                 Office of the Attorney General
    *Senior Assistant Attorney General*         200 Saint Paul Place
1300 Broadway, 10th Floor                      Baltimore, Maryland 21202
Denver, CO 80203                               (410) 576-7057
(720) 508-6000                                 rbrewer@oag.maryland.gov
david.moskowitz@coag.gov
sarah.weiss@coag.gov


*Counsel for the State of Colorado*            *Counsel for the State of Maryland*


**KEITH ELLISON**                              **ANNE E. LOPEZ**
ATTORNEY GENERAL OF MINNESOTA         ATTORNEY GENERAL OF HAWAIʻI


By: */s/ Katherine Bies*                        By: */s/ Kalikoʻonālani D. Fernandes*
Katherine Bies                                 Kalikoʻonālani D. Fernandes
Brian S. Carter                                    *Solicitor General*
    *Special Counsel*                           Hawaiʻi Department of the Attorney General
445 Minnesota Street, Suite 1400               425 Queen Street
St. Paul, Minnesota 55101                      Honolulu, HI 96813
(651) 300-0917                                 (808) 586-1360
katherine.bies@ag.state.mn.us                  kaliko.d.fernandes@hawaii.gov
brian.carter@ag.state.mn.us

                                               *Counsel for the State of Hawaiʻi*
*Counsel for the State of Minnesota*

31

**DANA NESSEL**
ATTORNEY GENERAL OF MICHIGAN

By: */s/ Neil Giovanatti*
Neil Giovanatti
    *Assistant Attorney General*
Michigan Department of Attorney General
525 W. Ottawa
Lansing, MI 48909
(517) 335-7603
giovanattin@michigan.gov

*Counsel for the State of Michigan*

**PETER F. NERONHA**
ATTORNEY GENERAL OF RHODE ISLAND

By: */s/ Chelsea Baittinger*
Chelsea Baittinger
    *Special Assistant Attorney General*
150 South Main Street
Providence, RI 02903
(401) 274-4400
cbaittinger@riag.ri.gov

*Counsel for the State of Rhode Island*

# APPENDIX

## APPENDIX INDEX

Termination Provisions from FY 2022 Preparedness Grants Manual .......................................... 1a

Termination Provisions from FY 2023 Preparedness Grants Manual .......................................... 2a

Termination Provisions from FY 2024 Preparedness Grants Manual .......................................... 3a

**Excerpt of Ex. 28 (FY 2022 Preparedness Grants Manual), pg. 36**

# Termination Provisions

FEMA may terminate a federal award in whole or in part for one of the following reasons. FEMA and the recipient must still comply with closeout requirements at 2 C.F.R. §§ 200.344-200.345 even if an award is terminated in whole or in part. To the extent that subawards are permitted under the respective program's NOFO, pass-through entities should refer to 2 C.F.R. § 200.340 for additional information on termination regarding subawards.

1. *Noncompliance.* If an applicant fails to comply with the terms and conditions of a federal award, FEMA may terminate the award in whole or in part. If the noncompliance can be corrected, FEMA may first attempt to direct the recipient to correct the noncompliance. This may take the form of a Compliance Notification. If the noncompliance cannot be corrected or the recipient is non-responsive, FEMA may proceed with a Remedy Notification, which could impose a remedy for noncompliance per 2 C.F.R. § 200.339, including termination. Any action to terminate based on noncompliance will follow the requirements of 2 C.F.R. §§ 200.341-200.342 as well as the requirement of 2 C.F.R. § 200.340(c) to report in FAPIIS the recipient's material failure to comply with the award terms and conditions. See also the section on Actions to Address Noncompliance.

2. *With the Consent of the Recipient.* FEMA may also terminate an award in whole or in part with the consent of the recipient, in which case the parties must agree upon the termination conditions, including the effective date, and in the case of partial termination, the portion to be terminated.

3. *Notification by the Recipient.* The recipient may terminate the award, in whole or in part, by sending written notification to FEMA setting forth the reasons for such termination, the effective date, and in the case of partial termination, the portion to be terminated. In the case of partial termination, FEMA may determine that a partially terminated award will not accomplish the purpose of the federal award, so FEMA may terminate the award in its entirety. If that occurs, FEMA will follow the requirements of 2 C.F.R. §§ 200.341-200.342 in deciding to fully terminate the award.

**Excerpt of Ex. 29 (FY 2023 Preparedness Grants Manual), pg. 35**

# Termination Provisions

FEMA may terminate a federal award in whole or in part for one of the following reasons. FEMA and the recipient must still comply with closeout requirements at 2 C.F.R. §§ 200.344-200.345 even if an award is terminated in whole or in part. To the extent that subawards are permitted under the respective program's NOFO, pass-through entities should refer to 2 C.F.R. § 200.340 for additional information on termination regarding subawards.

1. *Noncompliance.* If an applicant fails to comply with the terms and conditions of a federal award, FEMA may terminate the award in whole or in part. If the noncompliance can be corrected, FEMA may first attempt to direct the recipient to correct the noncompliance. This may take the form of a Compliance Notification. If the noncompliance cannot be corrected or the recipient is non-responsive, FEMA may proceed with a Remedy Notification, which could impose a remedy for noncompliance per 2 C.F.R. § 200.339, including termination. Any action to terminate based on noncompliance will follow the requirements of 2 C.F.R. §§ 200.341-200.342 as well as the requirement of 2 C.F.R. § 200.340(c) to report in FAPIIS the recipient's material failure to comply with the award terms and conditions. See also the section on Actions to Address Noncompliance.
2. *With the Consent of the Recipient.*  FEMA may also terminate an award in whole or in part with the consent of the recipient, in which case the parties must agree upon the termination conditions, including the effective date, and in the case of partial termination, the portion to be terminated.
3. *Notification by the Recipient.* The recipient may terminate the award, in whole or in part, by sending written notification to FEMA setting forth the reasons for such termination, the effective date, and in the case of partial termination, the portion to be terminated. In the case of partial termination, FEMA may determine that a partially terminated award will not accomplish the purpose of the federal award, so FEMA may terminate the award in its entirety. If that occurs, FEMA will follow the requirements of 2 C.F.R. §§ 200.341-200.342 in deciding to fully terminate the award.

**Excerpt of Ex. 30 (FY 2024 Preparedness Grants Manual), pg. 40**

## 6.3.    Termination Provisions

FEMA may terminate a federal award in whole or in part for one of the following reasons. FEMA and the recipient must still comply with closeout requirements at 2 C.F.R. §§ 200.344-200.345 even if an award is terminated in whole or in part. To the extent that subawards are permitted under the respective program's NOFO, pass-through entities should refer to 2 C.F.R. § 200.340 for additional information on termination regarding subawards.

1.  *Noncompliance.* If a recipient fails to comply with the terms and conditions of a federal award, FEMA may terminate the award in whole or in part. If the noncompliance can be corrected, FEMA may first attempt to direct the recipient to correct the noncompliance. This may take the form of a Compliance Notification. If the noncompliance cannot be corrected or the recipient is non-responsive, FEMA may proceed with a Remedy Notification, which could impose a remedy for noncompliance per 2 C.F.R. § 200.339, including termination. Any action to terminate based on noncompliance will follow the requirements of 2 C.F.R. §§ 200.341-200.342 as well as the requirement of 2 C.F.R. § 200.340(c) to report in SAM.gov R/Q the recipient's material failure to comply with the award terms and conditions. See also the section on Actions to Address Noncompliance.
2.  *With the Consent of the Recipient.*  FEMA may also terminate an award in whole or in part with the consent of the recipient, in which case the parties must agree upon the termination conditions, including the effective date, and in the case of partial termination, the portion to be terminated.
3.  *Notification by the Recipient.* The recipient may terminate the award, in whole or in part, by sending written notification to FEMA setting forth the reasons for such termination, the effective date, and in the case of partial termination, the portion to be terminated. In the case of partial termination, FEMA may determine that a partially terminated award will not accomplish the purpose of the federal award, so FEMA may terminate the award in its entirety. If that occurs, FEMA will follow the requirements of 2 C.F.R. §§ 200.341-200.342 in deciding to fully terminate the award.